UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
RICHARD FIGUEROA

                                     DEFENDANT'S STATEMENT OF
                                     UNDISPUTED MATERIAL FACTS
           Plaintiff,               PURSUANT TO LOCAL CIVIL R. 56.1
                                     Civil Action No.
               -against-            CV-11-2087

JEH JOHNSON, SECRETARY,            (Kuntz, J.)
U.S. DEPARTMENT OF HOMELAND      (Levy, M.J.)
SECURITY,

           Defendant,
-------------------------------------------------X

        Defendant Jeh Johnson, Secretary of the United States Department of Homeland

Security,[1] by its attorney, Loretta E. Lynch, United States Attorney for the Eastern District of

New York, Seth D. Eichenholtz, Assistant United States Attorney, of counsel, submits the

following statement of undisputed material facts as to which Defendant contends there exists no

genuine issue to be tried.

## A.     BACKGROUND AND PLAINTIFF'S EMPLOYMENT AT CBP

1. Plaintiff is an officer with the U.S. Customs and Border Protection (CBP), an agency of

   the U.S. Department of Homeland Security. Exhibit A to the September 22, 2014

   Declaration of Seth D. Eichenholtz (Eichenholtz Decl.), Plaintiff's Amended Complaint

   (Ex. A)

2. Plaintiff identifies himself as Hispanic, and has stated that he is of Puerto Rican descent.

   Exhibit B to the Eichenholtz Decl., Plaintiff's Deposition Testimony (Ex. B), at p. 10-11.

3. On July 9, 2001, Plaintiff began work for the U.S. Customs Service (Customs), CBP's

---

[1] The Honorable Jeh Johnson is the current Secretary of Homeland Security, having taken office on December 16, 2013.  Accordingly, he should be automatically substituted for Janet Napolitano as the named official defendant. See Fed. R. Civ. P. 25(d)(1).

predecessor, as an inspector. Ex B at p. 14.

4. In August 2002, after training in Atlanta, Georgia, Plaintiff was assigned to work in the passenger processing department of the John F. Kennedy International Airport (JFK) in Queens, New York. Ex. B at p. 16-17, 23.

5. Since 2002, Plaintiff has been assigned to continuously work at JFK. Ex B at pp. 16-17.

6. In 2003, Customs was reorganized into the CBP, and Plaintiff's position as an "inspector" transformed to a position as a "Customs and Border Protection Officer" (CBPO or Officer) within the newly reorganized agency. Ex. B at p. 19.

7. As a CBPO, Plaintiff is responsible to help ensure that unlawful merchandise does not enter the country, and also inspect travelers entering the country.  Ex. B at p. 19.

8. From 2003 to 2006, Plaintiff remained assigned to passenger processing department as a CBPO. Ex. B at 23.

9. Between 2006 and 2008, Plaintiff was assigned as a CBPO to the Mail Branch at JFK. Ex. B at 31-32.

10. CBPOs working in the Mail Branch at JFK were responsible for inspecting international mail for illegal merchandise and goods with suspected connections to terrorism. Ex. B at 31-32.

11. Between April 2008 and February 2009, Plaintiff was assigned as a CBPO to the JFK cargo facility, where he was responsible for examining internationally arrived cargo for illegal merchandise and goods with suspected connections to terrorism. Ex. B at 35-38.

12. CBPOs in the cargo facility are responsible for reviewing paperwork for irregularities, and conducting physical inspections of cargo shipments. Ex. B at 35-38.

13. In October 2009, after short periods of being assigned to JFK passenger processing

(February through April 2009) and JFK Advanced Passenger Information Systems (APIS) (April through October 2009), Plaintiff was reassigned back to cargo facility in October 2009. Ex. B at 44.

14. In October 2011, plaintiff was reassigned to the JFK Firearms Unit, where he currently works and is responsible for overseeing the progress and training of those officers who carry weapons at JFK. Ex. B at 47-48.

**B.      PLAINTIFF'S FAILURE TO WORK ASSIGNED HOLIDAYS IN LATE 2007**

15. In 2006 and 2007, during plaintiff's assignment to the Mail Branch, Senior Customs and Border Protection Officer (SCBPO or Supervisor) Kompel Sachdeva[2] was one of Plaintiff's supervisors. Ex. B at 32, 53.

16. Prior to becoming a supervisor, Supervisor Sachdeva was Plaintiff's coworker. Ex B at 57.

17. Plaintiff and Supervisor Sachdeva originally met sometime in 2002, when Plaintiff first was assigned to JFK. Ex. B at 57.

18. In 2007, after Supervisor Sachdeva became Plaintiff's supervisor, Chief Laura Rios tasked Supervisor Sachdeva with assigning officers in the Mail Branch to work holiday assignments.  Exhibit C to the Eichenholtz Decl., Deposition Testimony of Kompel Verdi (Ex. C) at 34.

19. In 2007, the federal holidays during this time period were Thanksgiving (November 22), Christmas Eve (December 24), Christmas (December 25), and New Year's Day (January 1, 2008).  September 19, 2014 Declaration of Andrew Reena (Reena Decl.), ¶ 3; Ex. B at

---

[2] Supervisor Sachdeva's married name is Kompel Verdi, which she has used since her marriage in 2011. Sachdeva is her maiden name, which she used between the end of her first marriage through 2011.Ex. C, at 4-5.  Because she was using her maiden name throughout the relevant period for the purposes of this lawsuit, Sachdeva will be used throughout.

69, Ex. C at 36.

20. Supervisor Sachdeva assigned CBPOs to holiday shifts based on several factors, including seniority, officer safety, and the needs of the CBP in general. Ex. B at 65, 73; Ex. C at 35-37.

21. Before the 2007 holiday assignments were finalized, Supervisor Sachdeva discussed them with Chief Rios and two other supervisors (Ben Sciacca and Charlie Mattina), who approved them. Ex. C at 47-48.

22. In 2007, Plaintiff was assigned to work Thanksgiving and New Year's Day.  Ex. C at 39.

23. Supervisor Sachdeva based her decision to assign Plaintiff to work on these holidays on the same factors she used to make all of her holiday determinations: how many officers were needed, officer safety and seniority. Ex. C at 39-41.

24. Sometime during November 2007, Supervisor Sachdeva told Plaintiff that he had been assigned to work on Thanksgiving. Ex. B at 68.

25. At least one officer junior to Plaintiff (Officer F)[3] was not required to work on Thanksgiving Day 2007. Ex. B at 76-77.

26. However, Officer F was scheduled for, and worked on, Christmas Eve and New Year's Day.  Reena Decl., ¶ 6.

27. Plaintiff alleged that another office with less seniority to him, Officer V, was not required to work on holidays.  Ex. A.

28. However, Officer V was scheduled for, and worked on Thanksgiving, Christmas Eve, Christmas, and New Year's Day.  Reena Decl., ¶ 4.

29. Plaintiff contested his holiday assignment to Supervisor Sachdeva, his union representative

---

[3] For privacy purposes, Officer F and V are identified by their initial only.

John Will, and several other CBP supervisors. Ex. B at 71-88.

30. Plaintiff was unsuccessful in his attempt to contest his Thanksgiving Day work assignment. Ex. B at 71-88.

31. Despite the fact that this assignment on Thanksgiving Day was not changed, Plaintiff did not show up for his Thanksgiving Day work assignment. Ex. B at 93.

32. Instead, Plaintiff called in sick that day. Exhibit D to the Eichenholtz Decl., Plaintiff's EEO Testimony (Ex. D), at 63.

33. Plaintiff never submitted any documentation supporting his illness. Ex. HH to the Eichenholtz Decl., Memo from Tim Jernigan regarding Plaintiff's Thanksgiving Day work assignment (Ex. E).

34. It is standard CBP policy to assign officers to work on the next holiday if they did not work on the holiday that they originally were assigned. Ex. D at 63-64; Exhibit F to Eichenholtz Decl., Kampel Sachdeva Affidavit, attached to 2009 Administrative Inquiry Report (Ex. F).

35. As a result of Plaintiff's absence from work on Thanksgiving Day 2007, he was assigned to work on Christmas Day 2007.  Ex. A; Ex. D at 63-64; Ex. F.

36. Despite this, Plaintiff did not report to work on Christmas Day either. Ex. A; Ex. D at 63-64; Ex. F.

37. Plaintiff claims he was unable to report to work because he was stuck in upstate New York and could not get his car started.  Ex. D at 64-65.

**C.  PLAINTIFF'S DECEMBER 29, 2007 ARGUMENT WITH SCPBO SACHDEVA REGARDING THE HOLIDAY SCHEDULE**

38. On December 29, 2007, Plaintiff was assigned to work in the mail branch from 4:00pm to

12:00 midnight. Ex. B at 58.

39. During Plaintiff's shift on December 29, 2007, he personally spoke with Supervisor

Sachdevah in the Detention Room at Mail Branch about his being upset about his holiday

assignments. Ex. D at 57; Exhibit G to the Eichenholtz Declaration, March 17, 2008

Suspension Proposal Letter (Ex.G).

40. During the conversation in the Detention Room, Supervisor Sachdeva and Plaintiff

discussed his displeasure with the Thanksgiving holiday assignment. Ex. B at 106-107.

41. Plaintiff describes the conversation as "heated" and noted that he and Supervisor Sachdeva

raised their voices to each other. Ex. B at 116-18.

42. Supervisor Sachdeva contends that she never raised her voice during the altercation. Ex. C

at 73.

43. According to Supervisor Sachdeva, Plaintiff raised his voice at her, started screaming,

cursing, and pointing his finger at her, told her that she had "fucked him" by assigning him

to work on Thanksgiving Day, and accused her of protecting other CBPOs who were

junior to him. Ex. C at 62-65; Exhibit H to the Eichenholtz Decl., December 31, 2007

Memorandum from Kompel Sachdeva Regarding the December 29 Incident (Ex. H).

44. Supervisor Sachdeva felt threatened during the conversation, and felt as if Plaintiff was

going to hit her.  Ex. C at 60; Ex. F.

45. Plaintiff later admitted that he "felt terrible" about the conversation with Supervisor

Sachdeva. Exhibit I to the Eichenholtz Decl., September 8, 2008 Memorandum from

Plaintiff Regarding the December 29 Incident, at ¶ 13.

46. After the discussion in the Detention Room, Plaintiff said that he felt ill, and that he left

work prior to the end of his shift. Ex. B at 122; Ex. H; Exhibit J to the Eichenholtz Decl.,

January 3, 2008 Memorandum from Plaintiff Regarding the December 29 Incident.

47. Plaintiff walked out without waiting for a supervisor to give approval or permission for him to do so. Ex. C at 83.

48. Plaintiff was charged two hours of sick leave for leaving work early on December 29, 2007. Ex H.

49. After the argument on December 29, Supervisor Sachdeva sent an e-mail to her supervisor, Chief Rios, to document the incident because she felt that Plaintiff's conduct physically threatened her. Ex. C at 60; Exhibit K to the Eichenholtz Decl., Deposition Testimony of Chief Laura Rios (Ex. K), at 29.

50. At Chief Rios's request, SCBPO Sachdeva also submitted a formal statement about the incident. Ex. H; Ex. K at 30.

51. Ms. Rios identifies herself as Hispanic. Ex. K at 11.

52. After receiving Supervisor Sachdeva's report, Chief Rios requested that Plaintiff provide a statement as well, and on January 8, 2008, Plaintiff wrote a written report regarding the December 29 incident. Ex. J; Ex. K at 31, 34-35.

   **D. CBP'S DISCIPLINE FOR PLAINTIFF'S UNPROFESSIONAL AND DISRUPTIVE BEHAVIOR**

53. Chief Rios reviewed both Supervisor Sachdeva's and Plaintiff's written reports regarding the December 29, 2007 incident, and based on the matter contained therein, Chief Rios recommended disciplinary action against Plaintiff for his unprofessional and disruptive behavior. Exhibit L to the Eichenholtz Decl., Memorandum from Chief Laura Rios re: December 29, 2007 Incident (Ex. L); Ex. K at 36.

54. After reviewing the underlying incident, Assistant Area Director (AAD) Robert Meekins

concluded that Plaintiff acted inappropriately toward Supervisor Sachdeva during the

December 29, 2007 encounter by cursing, screaming and pointing his finger in her face.

Ex. G.

55. On March 17, 2008, AAD Meekings proposed a 2-day suspension. Ex. G.

56. By letter dated March 17, 2008, Plaintiff was advised of the proposed suspension. Ex. G.

57. Plaintiff was provided with the opportunity to reply to the suspension proposal, either

orally or in writing. Ex. G.

**E.   AFTER THE PROPOSED SUSPENSION, PLAINTIFF BEGAN ALLEGING THAT SUPERVISOR SACHDEVA AND OTHER CBP EMPLOYEES HAD ACTED IMPROPERLY TOWARD HIM IN 2006**

58. By letter dated April 18, 2008 -- after receiving notice of the insubordination charges and

pending suspension on March 18, 2008 – Plaintiff contested the charges against him, and

accused Supervisor Sachdeva of creating a hostile work environment for him and initiating

a negative campaign of retaliation. Ex. B at 160-162, 196, 246; Exhibit M to Eichenholtz

Decl., April 18, 2008 Allegation Letter from Plaintiff (Ex. M).

59. Plaintiff also implicated other CBP employees for their involvement in the "negative

campaign." Ex. M.

60. Before April 18, 2008, Plaintiff had never mentioned any of these allegations to anyone.

Ex. B at 258-261; Ex. K at 54.

61. After the proposed suspension Plaintiff alleged that, in and around September 2006, there

were two occasions in which, during lunch, Supervisor Sachdeva looked at him

"seductively," "batting her eyes." Ex. B at 209-212.

62. According to Plaintiff, Supervisor Sachdeva's alleged inappropriate behavior consisted of

her sitting down very close to him while he was eating lunch and asking him "what are

you having for lunch?" Ex. B at 223-230.

63. Plaintiff testified that each of the first two instances of alleged unwanted overtures lasted between two and three seconds. Ex. B at 209-212.

64. There were no witnesses to the first two instances of alleged inappropriate overtures from Supervisor Sachdeva. Ex. B at 213.

65. Plaintiff never spoke to Supervisor Sachdeva about these alleged inappropriate overtures in the lunchroom. Ex B at 231, 243.

66. On a third occasion in fall of 2006, which occurred within a short period of time after the first two incidents, Plaintiff alleged that Supervisor Sachdeva briefly put her hand on his thigh.  Ex. D at 16-17.

67. According to Plaintiff, there were two individuals present when Supervisor Sachdeva allegedly put her hand on Plaintiff's thigh: Marguerite Caropolo and Helon Ashton. Ex. B at 235.

68. Other than Plaintiff, no one, neither Margarite Caropolo nor Helen Ashton, nor Supervisor Sachdeva, corroborates Plaintiff's allegations of inappropriate behavior. Ex. C at 97-101; Ex. F; Exhibit N to the Eichenholtz Decl., Administrative Inquiry Report (Ex. N);  Exhibit O to the Eichenholtz Decl., Affidavit of Helen Ashton (Ex. O).

69. Specifically, Supervisor Sachdeva denied ever giving unusual attention to Plaintiff, batting her eyes at him, touching his thigh, or making unwanted overtures toward Plaintiff. Ex. C at 97-101.

70. Instead, Supervisor Sachdeva stated that she treated Plaintiff the same way she treated other officers. Ex. F.

71. No other CBPO has ever complained about Supervisor Sachdeva. Exhibit P to Eichenholtz

Decl., Sept. 11, 2008 Laura Rios Affiidavit (Ex. P).

72. Also after learning of his suspension, Plaintiff alleges that Chief Rios briefly snarled at Plaintiff, muttered under her breath at him and stared at him in the aftermath of the December 29, 2007 incident.  Ex. B, at 510-511.

73. Chief Rios denies ever doing any of these actions. Ex. K at 41-42.

74. Plaintiff has no evidence that SCBPO Sachdeva retaliated against him, but assumes she did so because she had allegedly made an unwanted advance toward him.  However, Plaintiff admits that there was "nothing else negative" between Plaintiff and CBPO Sachdeva for over a year between these alleged inappropriate contacts, and the holiday scheduling incident.  Ex. B at 252; Ex. D at 33-34.

75. Per CBP protocol, Plaintiff was reassigned to cargo operations pending the investigation into his allegations. Ex. K at 49-51.

76. Additionally, Plaintiff's suspension was held in abeyance pending the results of the investigation into his counter allegations.  Ex. B at 304-306; Exhibit Q to the Eichenholtz Decl., May 21, 2009 Letter from Area Director Camille Polimeni Affirming Plaintiff's Suspension (Ex. Q).

**F.    PLAINTIFF'S ALLEGATIONS ARE INVESTIGATED AND FOUND TO BE UNSUBSTANTIATED**

77. In around August 2008, CBP conducted an administrative investigation into Plaintiff's allegations against Supervisor Sachdeva. Ex. N.

78. Program Analyst and trained Fact Finder Peter Parisi conducted the administrative investigation. Exhibit R to Eichenholtz Decl., August 8, 2008 Email from Peter Parisi to Plaintiff (Ex.R).

79. Mr. Parisi interviewed several CBP officers, none of whom corroborated Plaintiff's claims about a hostile work environment, racial comments by CBP employees, or a campaign of retaliation against Plaintiff. Ex. N.

80. As part of the investigation, Plaintiff submitted to Mr. Parisi a written statement, dated September 8, 2008, providing details of his allegations. Ex. I.

81. Based on the information that Plaintiff provided to him, Mr. Parisi interviewed and collected affidavits from Plaintiff, Supervisor Sachdeva, and several other CBP employees: Chief Laura Rios, CBPO Barbara Sohl, CBPO James Sweeney, CBPO Joseph Laviano, CBPO Helen Ashton, CBPO Marguerite Caropolo, SCBPO Charles Mattina, and CBPO Charles Grote. Ex. N.

82. None of the witnesses corroborated any of Plaintiff's allegations. Ex. N.

83. Supervisor Sachdeva told Mr. Parisi that she never made improper overtures towards Plaintiff. Ex. N.

84. CBP also investigated an earlier allegation that Plaintiff made in January 2008 that CBP employees created a hostile work environment by having made statements about Puerto Rico and people of Puerto Rican decent.  Ex. N.

85. CBPO Sweeney, CBPO Ashton, and CBPO Grote all told Mr. Parisi that they do not recall discussing Puerto Rico or people of Puerto Rican descent. Ex. N.

86. SCBPO Mattina told Mr. Parisi that while he recalled talking about a restaurant article in general, he did not remember making disparaging comments, as alleged by Plaintiff. Ex. N.

87. Ultimately, the investigator determined there was no evidence corroborating any of Plaintiff's allegations against Supervisor Sachdeva, or any of Plaintiff's other allegations.

Ex. N.

88. On or around February 3, 2009, based on the lack of corroborating evidence, CBP

management concluded that all of Plaintiff's allegations were unsubstantiated.  Ex. N.

89. After the determination that Plaintiff's allegations were unsubstantiated, CBP moved

forward with its previous decision to suspended Plaintiff.  Ex. Q.

90. Plaintiff's suspension was reduced from two days to one day, without pay. He was notified

of this suspension on May 21, 2009. Ex. Q.

91. On June 16, 2009, Plaintiff served the one-day suspension. Ex. B at 310.

**G.     IN JANUARY 2009, PLAINTIFF PARTICIPATED IN THE 2009 BID,
         ROTATION, AND PLACEMENT PROCEDURE AND EXPRESSED HIS
         PREFERENCE FOR WORKING AT JFK**

92. In or around 2008, CBP used a Bid, Rotation, and Placement (BRP) procedure through

which CBP officers would submit assignment preferences and get placed according to

those preferences and officer seniority. Ex. B at 463-64.

93. The BRP was created through an agreement between CBP and the National Treasurer and

Employees Union (NTEU) to give CBPOs the opportunity to express their preferences,

and the system based on seniority. Ex. B at 463-64; Exhibit S to the Eichenholtz Decl.,

Memorandum of Understanding (MOU) Between CBP and NTEU (Ex. S).

94. The MOU notes that officers with pending disciplinary investigations are not eligible to

bid as part of the BRP. Ex. S.

95. In or around January 2009, Plaintiff was asked by CBP management to submit a bid sheet

as part of the BRP process. Ex. B at 465-66.

96. CBP Officers are encouraged, but not required to submit bid request forms. Exhibit T to

the Eichenholtz Decl., Guidance on BRP (Ex. T).

97. Plaintiff submitted a bid sheet on January 2, 2009. Ex. B at 466-67; Exhibit U to
    Eichenholtz Decl., Plaintiff's Bid Sheet, January 2009 (Ex. U).

98. At the time of his January 2009 bid, Plaintiff was assigned to JFK Cargo Operations, and
    in his bid, expressed a preference to staying in that placement. Ex. U.

99. Plaintiff was allowed to bid because the proposed suspension against him (for his
    altercation with Supervisor Sachdeva) had been put in abeyance until his allegations
    against Supervisor Sachdeva were fully investigated.   Exhibit S to the Eichenholtz Decl.,
    May 12, 2009 E-mail Statement from Camille Polimeni (Ex. V).

100. Therefore, at the time of the bid process, Plaintiff was not considered to have a pending
     disciplinary action.  Ex.V.

101. Plaintiff contends that a Caucasian CBPO was not permitted to participate in the bidding
     process due to his facing disciplinary matters. As a result, the Caucasian CBPO did not
     leave his position in Cargo Operations. Ex. A at ¶ ¶ 80-83; Ex. B at 483-485.

102. At the time of the bidding process, unlike Plaintiff, that Caucasian CBPO was not
     permitted to perform the full duties of a CBP officer, was not covered by the BRP process,
     and was not allowed to bid. Ex. V.

103. Because Plaintiff's proposed suspension was itself put in abeyance, he was not on any
     kind of limited duty as a result of his disciplinary action and was not exempted from the
     BRP process.  Ex. V.

104. Plaintiff's "seniority date" was July 9, 2001, which gave him 7 years, 5 months, and 24
     days of service at CBP. Ex. U.

105. After submitting his January 2, 2009 bid, Plaintiff did not receive any of the six bids he
     had requested.  Instead, in February 2009, he was assigned to passenger processing. Ex. A

at ¶ 86; Ex. B at 473.

106. The reason Plaintiff did not receive his preferred assignment in Cargo Operations was because he had less seniority than any of the 16 officers placed in Cargo Operations as a result of the 2009 BRP process, with the next least senior officer having a seniority date of April 13, 1997 (which was four years senior to Plaintiff). Exhibit W to Eichenholtz Decl., May 18, 2009 Declaration of Assistant Area Director John Mirandona (Ex. W); Exhibit X to the Eichenholtz Decl., Declaration of Clifford Harris (Ex. X).

107. In assigning Plaintiff to passenger processing, CBP management followed BRP procedures and guidance.  Ex. W; Ex. X.

108. In addition to Plaintiff, fifty other CBPOs were placed in passenger processing who were previously assigned to other units. Ex. X.

109. There is no evidence to support that Plaintiff was denied his bids because he was Hispanic. Ex. B at 485-87; Ex. W; Ex. X.

110. Supervisor Sachdeva in fact had nothing to do with the BRP process in 2009 for Plaintiff or anyone else. Ex. B at 480-83, 488-89, 491; Ex X.

111.  APIS was one of Plaintiff's preferred assignments.  Ex. U.

112.  In accordance with the union agreement and BRP procedures, Plaintiff was reassigned to APIS in April 2009, two months after the bid placements were originally released. Ex. S; Exhibit Y to Eichenholtz Decl., April 10, 2009 email from Clifford Harris (Ex. Y).

113.  Plaintiff was reassigned to APIS because he was the most senior officer on the standby list, as instructed by the union agreement. Ex. S; Ex. Y.

114. Cargo Operations was Plaintiff's first choice assignment.  Ex. U.

115. In October 2009, as soon as a position became available at Cargo Operations, Plaintiff

15

was transferred back to Cargo Operations, which was his first choice assignment. Ex. B at
44.

**H.    THE JULY 25, 2011 INCIDENT AND SUBSEQUENT SUSPENSION**

116. On July 25, 2011, Plaintiff was assigned to work from 4:00 p.m. to 12:00 a.m. in the
passenger processing area at JFK. Ex. B at 312.

117. Prior to July 25, 2011, CBP management put into place a system of assigning CBPOs to
work at specific immigration booths in the passenger processing area. Exhibit Z to
Eichenholtz Decl., December 2010 email by Greg Eddy (Ex. Z).

118. On July 25, 2011, Plaintiff's supervisor was Supervisor Pedro Cano, who is Hispanic.
Exhibit AA to the Eichenholtz Decl., Deposition Testimony of Pedro Cano (Ex. AA) at 14.

119. On July 25, 2011, Plaintiff had been assigned to booth #32 by Supervisor Cano. Ex. B at
356; Exhibit BB to the Eichenholtz Decl., July 27, 2011 email from Plaintiff to DCBPO
Youngs (Ex. BB); Exhibit CC to Eichenholtz Decl., July 25, 2011 email from Pedro Cano
(Ex. CC).

120. On July 25, 2011, Supervisor Cano indicated Plaintiff's assignment by noting the
assigned booth number next to Plaintiff's name on the JFK Terminal 4 sign-in sheet. Ex.
AA at 24-25; Exhibit DD to Eichenholtz Decl., July 25 Terminal 4 sign-in sheet (Ex. DD).

121. On July 25, 2011, when Plaintiff signed in, he noticed the booth assignment number next
to his name, and knew he was assigned to booth #32. Ex. B at 356-57; Ex. BB.

122. After signing in on July 25, Plaintiff reported to booth #42, rather than booth #32. Ex. B
at 354-55.

123. Just after 4:00 p.m., CBPO Francisco Santos, who had been assigned to Booth #42,
reported to Supervisor Cano that Plaintiff was occupying his booth. Exhibit AA, at 32-33.

124. Supervisor Cano told CBPO Santos to tell Plaintiff to leave booth #42 and to report to his assigned booth. Ex. AA, at 32-33.

125. CBPO Santos did so, and soon returned to Supervisor Cano to report that Plaintiff had refused to leave booth #42. Ex AA, at 32-33.

126. Supervisor Cano then went to booth #42 and instructed Plaintiff to move to booth #32, where he had been assigned. Ex. AA at 33-34; Ex. CC.

127. Plaintiff told Supervisor Cano that he could not move because another officer's belongings were in booth #32. Ex. B at 331; Ex. AA at 33-34; Ex. CC.

128. The bags in booth #32 belonged to Officer Alan Harris, whom CBPO Cano had initially assigned to booth #32 but had been subsequently reassigned to work at the Remote Control Center. Ex. AA 39-42; Ex. CC.

129. Supervisor Cano told Plaintiff that he would have Office Harris remove his bags, and instructed Plaintiff to move to booth #32. Ex. CC.

130. Plaintiff refused to go into booth #32 while CBPO Harris's bags were inside of it, and Plaintiff refused to remove the bags himself because he was "not a janitor." Ex. B at 405.

131. Plaintiff did not relocate to booth #32 as instructed; instead, Plaintiff left booth #42, and informed Mr. Cano that he would be going home sick. Ex. B at 377; Ex. BB; Ex. CC.

132. Plaintiff admits that up until the point he said he was leaving, he was not sick. Ex. B at 351.

133. Plaintiff had not been given permission to leave work that day. Ex. AA at 52; Ex. CC.

134. Supervisor Cano also had ordered Plaintiff was also ordered to fill out an OPM Form 71 prior to taking sick leave that afternoon.  Ex. AA at 52; Ex. CC.

135. Plaintiff refused to fill out the form as instructed by Supervisor Cano. Ex. B at 377, 400,

411-412.; Ex. AA at 51.

136. The CBP procedure requires that a CBPO who wants to take sick leave first submit an
OPM Form 71. Exhibit EE to the Eichenholtz Decl., CBP Leave Handbook (Ex. EE).

137. When sick leave is not scheduled in advance, the standard practice was for a Form 71 to
be submitted on the same day that the unscheduled leave is taken. Ex. AA at 56.

138. On July 25, 2011, at around 4:30 PM, Plaintiff left JFK Airport without scheduled leave,
without submitting an OPM Form 71 and without being sick earlier in the day. Ex. B at
388, 411-412; Ex. AA at 51, 56; Ex. CC.

139. Supervisor Cano reported the incident, including Plaintiff's failure to report to his
assigned booth and his unauthorized early departure from work, to CBP Watch
Commander Chance Youngs. Ex. CC; Exhibit EE to the Eichenholtz Decl., Deposition of
Chance Youngs (Ex. EE) at 17.

140. As a result, Commander Youngs instructed Plaintiff to provide written explanation as to
why he refused to report to booth #32, why he refused to fill out a leave slip for his
requested sick leave, and why he left his assignment without supervisory approval. Ex. B
at 380-83; Exhibit GG to the Eichenholtz Decl., Email exchange between Commander
Youngs and Plaintiff (Ex. GG).

141. Plaintiff responded to Commander Youngs that he did not refuse to report to booth #32,
and that he departed work early to seek medical attention due to his feeling ill.  Plaintiff's
response did not address the issue of his refusal to complete the leave slip. Ex. GG.

142. As a result of Plaintiff's failure to follow the instructions of Supervisor Cano on July 25,
2011, and his subsequent decision to leave his post early without filling out the proper
documentation, CBP proposed to suspend plaintiff for two days without pay on November

29, 2011. Exhibit HH to the Eichenholtz Decl., November 29, 2011 Proposed Suspension

Letter (Ex. HH).

143. On November 29, 2011, Plaintiff received a letter from CBP management, notifying him

of the two-day proposed suspension. Ex. B at 311; Ex. HH.

144.  CBP charged Plaintiff with the following violations: Failure to follow supervisory

instructions; Absence without leave; Unprofessional conduct. Ex. B at 312; Ex HH.

145. On May 9, 2012, Plaintiff was given an opportunity to present an oral reply in his

defense, at which he was represented by a union representative, Daniel Barra. Exhibit II to

the Eichenholtz Decl., May 23, 2012 Suspension Notification (Ex. II).

146. After reviewing the evidence, including Plaintiff's responses and statements in his

defense, Acting Port Director Wayne R. Biondi sustained all three charges against Plaintiff

and suspended him for two days . Ex. II.

147. Plaintiff served the two-day suspension starting on June 27, 2012. He returned to work on

June 29, 2012. Ex. B at 419.

148. Supervisor Cano had never spoken with Supervisor. Sachdeva about the Plaintiff, nor did

Supervisor Cano know about Plaintiff's complaint against her. Ex. C at 105; Ex. AA at 19.

149. Supervisor Cano had never spoken with Chief Rios about the Plaintiff, nor did he know

about Plaintiff's prior dealings with Chief Rios. Ex. K at 64; Ex. AA at 19.

150. Supervisor Cano did not know about Plaintiff's prior complaints or EEO activity. Ex. AA

at 22.

I.       THE NOVEMBER 25, 2011 INCIDENT AND SUBSEQUENT SUSPENSION

151. On November 25, 2011, Plaintiff was assigned to the firearms division, and was

scheduled to work a shift from 12:00 p.m. to 8:00 p.m. Ex. B at 421-22, 427.

152. When Plaintiff arrived to work at 12:00 on November 25, 2011, he noted on the sign-in sheet that he was volunteering for overtime after his shift. Ex. B at 427.

153. Plaintiff was told to report Commander Youngs at the international arrivals terminal at 7:00 p.m., and that from there he will report to the medical facility in a different section of JFK Airport. Ex. B at 430.

154. At 7:00 p.m., Plaintiff reported to the office of Commander Youngs at 7 p.m. on November 25. Ex. B at 433-34.

155. Commander Youngs told Plaintiff to drive a car on the tarmac to the medical van to watch prisoners. Ex. B at 433-34.

156. According to Commander Youngs, Plaintiff refused to drive on the airport tarmac because he did not know how to drive on the tarmac at night. Ex. FF at 41-43; Exhibit JJ to Eichenholtz Decl., November 25, 2011 email from Chance Youngs (Ex. JJ).

157. Based on this statement from Plaintiff, Commander Youngs instead instructed Plaintiff to report to immigration to process passports. Ex. FF at 45-46; Ex. JJ.

158. Plaintiff was unprepared to process passports because he did not have his immigration admission stamp with him. Ex. B at 434-35; Ex. FF at 45-46; Ex. JJ.

159. CBP Officers are expected to have their equipment available when reporting to overtime assignments. Ex. FF at 46-47.

160. Commander Youngs cancelled Plaintiff's overtime assignment. Ex. B at 444-45; Ex. FF at 52; Ex. JJ.

161. There were no other overtime assignments that Commander Youngs could have given to Plaintiff on November 25, 2011. Ex. FF at 63.

162. After reviewing both Plaintiff's and Commander Youngs's accounts of the November 25,

2011 incident, Assistant Port Director (APD) John Mirandona proposed to suspend

Plaintiff for 14 days on February 22, 2012. Exhibit KK to the Eichenholtz Decl., February

22, 2012 Suspension Proposal Notification (Ex. KK).

163. Plaintiffs' prior suspensions and disciplinary infractions were considered in the

evaluating the length of the suspension term. Ex. B at 420; Ex. KK.

164. Plaintiff was suspended because APD Mirandona concluded that Plaintiff refused to

report to Passport Control his overtime assignment, despite an instruction to do so from

Commander Youngs, and because Plaintiff either refused to retrieve his admission stamp,

despite a direct order to do so from Commander Youngs. Ex. KK.

165. On March 2, 2012, Plaintiff submitted a written reply through his attorney. Exhibit LL to

the Eichenholtz Decl., March 26, 2012 Suspension Notification Letter (Ex. LL).

166. On March 26, 2012, after reviewing the relevant evidence, including Plaintiff's reply,

Port Director Brian Humphrey upheld the charges against Plaintiff, but mitigated the

proposed suspension from fourteen to ten days. Ex. B at 462; Ex. LL.

167. On or about May 14, 2012, Plaintiff started serving this ten-day suspension. Ex. B at 462.

168. Commander Youngs had never spoken with Supervisor Sachdeva about the Plaintiff, nor

did Supervisor Cano know about Plaintiff's complaint against her. Ex. C at 105.

169. Commander Youngs had never spoken with Chief Rios about the Plaintiff, nor did he

know about Plaintiff's prior dealings with Chief Rios. Ex. K at 65-66.

170. Commander Youngs did not know about Plaintiff's prior complaints or EEO activity. Ex.

FF at 21.

**J.      PLAINTIFF'S RELEVANT EEO CLAIMS**

171. On or about March 17, 2009, Plaintiff filed a formal written complaint claiming that he

had been discriminated against on the basis of national origin (Hispanic) and gender (Male), and in reprisal for his prior protected activities. This complaint was made with respect to the bid issue, when Plaintiff did not receive his preferred work assignment of Cargo Operations and instead was assigned Passenger Operations in February 2009. Ex. A at ¶ 5.

172. On or about July 30, 2009, Plaintiff filed a second complaint, making similar discrimination and retaliation claims. This complaint was made in connection with his one-day suspension on June 16, 2009, which related to the incident involving Supervisor Sachdeva. Ex. A at ¶ 6.

173. After a full investigation, an Equal Employment Opportunity Commission Judge, Monique J. Roberts, ruled that there was no evidence of discrimination in either of Plaintiff's two complaints. Ex. A at ¶ 9.

174. On September 3, 2010, CBP adopted Judge Roberts's decision in a Final Agency Decision (FAD). Ex. A at ¶ 10.

175. On January 31, 2011, the EEOC Office of Federal Operations affirmed the FAD in response to an appeal made by Plaintiff. Ex. A at ¶ 12.

## K.  PLAINTIFF FILES THE INSTANT ACTION

176. Plaintiff filed his initial complaint in this action on April 29, 2011. Ex. A at ¶ 14.

177. Plaintiff brings this lawsuit alleging that employees of CBP the discriminated against him on the basis of his national origin (Hispanic) and his gender (Male). Ex. A, ¶ 1.

178. In 2011, Plaintiff made two additional formal complaints to the Agency, alleging new allegations of discrimination, retaliation and the creation of a hostile work environment. Ex. A at ¶ 15.

179. On October 16, 2012 Plaintiff amended his civil complaint in this action to include the

new allegations of discrimination, retaliation, and the creation of a hostile work

environment relating to the November 2011 incident. Ex. A.

Dated:  Brooklyn, New York
        September 22, 2014

LORETTA E. LYNCH
United States Attorney
Attorney for Defendant United States
271 Cadman Plaza East, 7th Fl.
Brooklyn, New York 11201

By:     _____/s/_____
        Seth D. Eichenholtz
        Assistant United States Attorney
        (718) 254-7036
        seth.eichenholtz@usdoj.gov

To:     Alan E. Wolin, Esq.
        Attorney for Plaintiff
        Wolin & Wolin, Esqs
        420 Jericho Turnpike, Suite 215
        Jericho, NY 11753