UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RICHARD FIGUEROA,

                              Plaintiff,

            v.

JEH JOHNSON, Secretary,
U.S. Department of Homeland Security,

                              Defendant.

**DECLARATION OF AUSA
SETH D. EICHENHOLTZ**

Civil Action No. CV-11-2087
(Kuntz, J.)
(Levy, M.J.)

        **SETH D. EICHENHOLTZ**, declares pursuant to 28 U.S.C. § 1746, under penalty

of perjury, that the following is true and correct:

        1.        I am an Assistant United States Attorney, of counsel to Loretta E. Lynch, United

States Attorney, Eastern District of New York, attorney for Defendant Johnson. [1]   I have

responsibility for the defense of this action.   I submit this declaration in support of Defendant's

Motion for Summary Judgment, and to place before the Court true and correct copies of various

documents that support Defendant's motion.

        2.        Attached as Exhibit A is a true and correct copy of Plaintiff's Amended Complaint.

        3.        Attached as Exhibit B is a true and correct copy of relevant portions of Plaintiff's

deposition testimony.

        4.        Attached as Exhibit C is a true and correct copy of relevant portions of Kampel

Sachdeva (Verdi)'s deposition testimony.

---

        [1] The Honorable Jeh Johnson is the current Secretary of Homeland Security, having taken office on
December 23, 2013.   He is automatically substituted for Janet Napolitano as the named official defendant.   See Fed.
R. Civ. P. 25(d)(1).

5.      Attached as Exhibit D is a true and correct copy of relevant portions Plaintiff's testimony from administrative EEO proceedings.

6.      Attached as Exhibit E is a true and correct copy of a memorandum from Tim Jernigan regarding Plaintiff's Thanksgiving Day work assignment.

7.      Attached as Exhibit F is a true and correct copy of an affidavit by Kampel Sachdeva.

8.      Attached as Exhibit G is a true and correct copy of a March 17, 2008 Suspension Proposal Letter regarding Plaintiff.

9.      Attached as Exhibit H is a true and correct copy of a December 31, 2007 memorandum from Kampel Sachdeva regarding the December 29, 2007 incident with Plaintiff.

10.     Attached as Exhibit I is a true and correct copy of a September 8, 2008 memorandum from Plaintiff.

11.     Attached as Exhibit J is a true and correct copy of a January 3, 2008 memorandum from Plaintiff.

12.     Attached as Exhibit K is a true and correct copy of relevant portions Chief Laura Rios's deposition testimony.

13.     Attached as Exhibit L is a true and correct copy of a memorandum from Chief Rios regarding the December 29, 2007 incident involving Plaintiff.

14.     Attached as Exhibit M is a true and correct copy of an April 18, 2008 letter from Plaintiff responding to charges against him and raising allegations against his supervisor.

15.     Attached as Exhibit N is a true and correct copy of the Administrative Inquiry Report regarding CBP's investigation into Plaintiff's April 18, 2008 allegations.

16.     Attached as Exhibit O is a true and correct copy of an affidavit from Helen Ashton.

17.     Attached as Exhibit P is a true and correct copy of a September 11, 2008 affidavit from Chief Rios.

18.     Attached as Exhibit Q is a true and correct copy of a May 21, 2009 letter from Area Director Camille Polimeni affirming Plaintiff's suspension.

19.     Attached as Exhibit R is a true and correct copy of an August 8, 2008 E-mail from Peter Parisi.

20.     Attached as Exhibit S is a true and correct copy of a Memorandum of Understanding (MOU) Between CBP and National Treasurer and Employees Union (NTEU).

21.     Attached as Exhibit T is a true and correct copy of a Memorandum of Guidance Regarding CBP's Bid and Rotation Process.

22.     Attached as Exhibit U is a true and correct copy of Plaintiff's January 2009 bid sheet.

23.     Attached as Exhibit V is a true and correct copy of a May 12, 2009 E-mail Statement from Camille Polimeni.

24.     Attached as Exhibit W is a true and correct copy of a May 18, 2009 Declaration from Assistant Area Director John Mirandona.

25.     Attached as Exhibit X is a true and correct copy of a declaration from Clifford Harris.

26.     Attached as Exhibit Y is a true and correct copy of an April 10, 2009 E-mail from Clifford Harris.

27.     Attached as Exhibit Z is a true and correct copy of a December 2010 E-mail from Greg Eddy.

28.     Attached as Exhibit AA is a true and correct copy of relevant portions Supervisor Pedro Cano's deposition testimony.

29.     Attached as Exhibit BB is a true and correct copy of a July 27, 2011 E-mail from Plaintiff to Commander Youngs.

30.     Attached as Exhibit CC is a true and correct copy of a July 25, 2011 E-mail from Supervisor Cano.

31.     Attached as Exhibit DD is a true and correct copy of relevant portions of the July 25, 2011 sign-in sheet for JFK Terminal 4.

32.     Attached as Exhibit EE is a true and correct copy of relevant portions of the CBP Leave Handbook.

33.     Attached as Exhibit FF is a true and correct copy of relevant portions of the Deposition of Commander Chance Youngs.

34.     Attached as Exhibit GG is a true and correct copy of an E-mail exchange between Plaintiff and Commander Youngs.

35.     Attached as Exhibit HH is a true and correct copy of a November 29, 2011 Proposed Suspension Letter.

36.     Attached as Exhibit II is a true and correct copy of Plaintiff's May 23, 2012 Suspension Notification.

37.     Attached as Exhibit JJ is a true and correct copy of a November 25, 2011 E-mail from Commander Youngs.

38.     Attached as Exhibit KK is a true and correct copy of Plaintiff's February 22, 2012

Suspension Proposal Notification.

39.     Attached as Exhibit LL is a true and correct copy of Plaintiff's March 26, 2012

Suspension Notification Letter.

Dated:        Brooklyn, New York
              September 22, 2014

                                LORETTA E. LYNCH
                                United States Attorney
                                Eastern District of New York
                                *Attorney for Defendant Johnson*
                                271 Cadman Plaza East, 7th Floor
                                Brooklyn, New York   11201

                      By:     _____/s/_____
                                Seth D. Eichenholtz
                                Assistant United States Attorney
                                (718) 254-7036
                                Seth.Eichenholtz@usdoj.gov

cc:     Alan E. Wolin, Esq.
        *Attorney for Plaintiff*
        Wolin & Wolin, Esqs
        420 Jericho Turnpike, Suite 215
        Jericho, NY 11753

5

Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| RICHARD FIGUEROA, | : | Civil Action No. 11-2087 cv |
|  | : | (Kuntz, J.) (Levy, MJ) |
| Plaintiff, | : |  |
|  | : |  |
| - against - | : |  |
|  | : | **AMENDED  VERIFIED COMPLAINT** |
| JANET NAPOLITANO, Secretary, | : |  |
| U.S. Department of Homeland Security, | : |  |
|  | : |  |
| Defendant. | : | Trial by Jury |
|  | : |  |

---

Plaintiff, Richard Figueroa, by and through his attorneys, Wolin & Wolin,

complaining of the defendant, Janet Napolitano, Secretary, U.S. Department of Homeland

Security, alleges as follows:

### Introduction

1.      This is an action brought pursuant to Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, et seq., as amended, more specifically 42 U.S.C. § 2000e-5 and

42 U.S.C. § 2000e-16 in which plaintiff alleges employment discrimination based upon his

national origin (Hispanic), sex/gender (Male), and retaliation based upon his prior

protected activities.  Plaintiff seeks appropriate monetary, equitable and other relief to

redress the wrongdoing complained of herein.

### Statement Pursuant to Local Rule 9

2.      For purposes of complying with Local Rule 9, plaintiff states that he has no

-1-

corporate parent, subsidiary or affiliate and that there are no other interested parties.

## Jurisdiction and Venue

3.      Jurisdiction of the Court over this controversy is based upon 42 U.S.C. § 2000e-5(f) and 42 U.S.C. § 2000e-16.

4.      Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3).

## Exhaustion of Administrative Remedies

5.      On or about March 17, 2009, plaintiff, an employee of the U.S. Department of Homeland Security, U.S. Customs and Border Protection ("Agency") at the John F. Kennedy (JFK) International Airport filed a formal written complaint of discrimination in which he claimed that the Agency had discriminated against him on the basis of national origin (Hispanic), sex/gender (Male), and in reprisal for his prior protected activities, when, on February 2, 2009, his work assignment preference request for Cargo Operations was not approved and he was assigned to Passenger Operations (Primary Inspections). This complaint bore Agency No. HS-CBP-003831-040112.

6.      On or about July 30, 2009, plaintiff filed a second formal written complaint of discrimination in which he claimed that the Agency had discriminated against him on the basis of national origin (Hispanic), sex/gender (Male) and in reprisal for his prior protected activities, when he was suspended from duty and pay for one day, effective June 16, 2009. This complaint bore Agency No. HS-09-CBP-007263-040126.

7.      The Agency accepted plaintiff's formal written complaints and

-2-

consolidated them for investigation.

8.　After the completion of the investigation, plaintiff requested a hearing before an EEOC Administrative Judge.　The matter was then referred to Monique J. Roberts, Administrative Judge, Equal Employment Opportunity Commission.

9.　In a Decision Without a Hearing dated August 4, 2010, Administrative Judge Roberts held that "I find, after a review of the entire record, that there is no discrimination in this complaint."　Accordingly, Administrative Judge Roberts entered judgment in favor of the Agency.

10.　Thereupon, on September 3, 2010, the Agency issued a Final Agency Decision (FAD) adopting the Administrative Judge's decision.

11.　Plaintiff then duly appealed the FAD to the EEOC, Office of Federal Operations.

12.　In a decision dated January 31, 2011, the EEOC Office of Federal Operations affirmed the FAD.

13.　The decision further informed plaintiff of his right to file a civil action in an appropriate U.S. District Court within ninety (90) days from the date that he received the decision.

14.　Plaintiff filed this action on April 29, 2011, within the time prescribed by statute.

15.　Subsequent to the commencement of the action, plaintiff filed two (2)

additional formal complaints (HS-CBP-01818-2011 filed September 28, 2011 and HS-CBP-21381-2012 filed December 23, 2011) with the Agency, within which he alleged new allegations of discrimination, retaliation and the creation of a hostile work environment.

16. On January 6, 2012, the Agency consolidated the complaints for investigation.

17. On July 2, 2012, plaintiff requested a FAD.

18. On September 28, 2012, the Agency issued a FAD concluding that plaintiff had failed to prove that the agency discriminated and/or retaliated against him and did not create a hostile work environment.

19. The decision further informed plaintiff of his right to file a civil action in an appropriate U.S. District Court within ninety (90) days from the date that he received the decision.

20. Plaintiff, with the consent of defendants' counsel, is amending his complaint to add the additional acts of discrimination, retaliation and the creation of a hostile work environment.

**Parties**

21. Plaintiff, Richard Figueroa, was and still is a citizen of the United States of America and, at all relevant times, was and still is a resident of the State of New York, County of Bronx.

22. Defendant, Janet Napolitano, is the duly appointed and sworn Secretary

-4-

of the U.S. Department of Homeland Security and is that agency head, under 42 U.S.C. § 2000e-16 and other applicable statute, who is the appropriate defendant herein.

## Facts

23.     Plaintiff is currently employed as a Customs and Border Protection Officer (CBPO) at the JFK International Airport in Jamaica, New York. He is a legacy Customs Inspector, having first started with the Agency on July 9, 2001.

24.     Plaintiff is a Hispanic male.

25.     Plaintiff has worked different branches of the agency. He worked in Passenger Processing (Baggage) until approximately 2006.

26.     Plaintiff was then assigned to the Mail Branch, on March 20, 2006, for approximately two years.

27.     After the Mail Branch, Plaintiff was assigned to work in the Cargo Facility in or about April, 2008. He remained in the Cargo Facility for approximately ten months.

28.     Plaintiff then was reassigned to Passenger Processing in or about February, 2009.

29.     In October, 2009, Plaintiff was reassigned back to the Cargo Facility.

30.     In or about 2006, while Plaintiff was assigned to the Mail Branch, one Kompel Sachdeva, a Supervisory Customs and Border Protection Officer (SCBPO), became Plaintiff's supervisor.

31.     On and after September 16, 2006, SCBPO Sachdeva started to smile at

-5-

Plaintiff and give him unusual attention.

32.     SCBPO Sachdeva also began sitting close to Plaintiff during lunch breaks.

33.     Plaintiff received said unusual attention from SCBPO Sachdeva on several occasions.

34.     On one occasion, SCBPO Sachdeva placed her hand on Plaintiff's thigh.

35.     Plaintiff believes that, on these occasions, SCBPO Sachdeva sat uncomfortably close to him and invaded his personal space.    Plaintiff felt extremely uncomfortable by her actions.

36.     Plaintiff was shocked when SCBPO Sachdeva placed her hand on his thigh.

37.     Other officers were present when SCBPO Sachdeva engaged in this conduct.

38.     Plaintiff believed that SCBPO Sachdeva's conduct was unwelcome and inappropriate. He was horrified by it.

39.     SCBPO Sachdeva's unusual attention toward Plaintiff only stopped when SCBPO Sachdeva began a relationship with Steve Guzman, a contracted Security Guard for the U.S. Postal Service.

40.     After Plaintiff rejected SCBPO Sachdeva's advances, SCBPO Sachdeva began retaliating against him.

41.     SCBPO Sachdeva had Plaintiff working holiday assignments that he should have been exempt from.

42.     SCBPO Sachdeva assigned Plaintiff to work Thanksgiving, Christmas and New Year's Day, all holidays that he should not have been assigned to work based upon his seniority.

43.     At the relevant time, in 2006-2007, holidays were supposed to be assigned according to seniority.

44.     SCBPO Sachdeva assigned Plaintiff to work on Thanksgiving and Christmas in 2007. Based upon his seniority, Plaintiff should not have been assigned to work these holidays.

45.     Plaintiff spoke to Supervisors Sciacca and Mitnick, both of whom advised him that they would not have done the holiday scheduling in the same manner that it was done.

46.     Officer Fischetti, a junior officer, was not assigned to work on Christmas in 2007. Plaintiff believes that Officer Fischetti, as a junior officer, should have been assigned to work Christmas, 2007.

47.     By Thanksgiving 2007, there were five officers who were beneath Plaintiff in terms of seniority. These officers should have been assigned to work the holiday before Plaintiff. They include Officers Fischetti and Vinokur.

48.     Plaintiff discussed the deviation of the holiday scheduling policy with management.

49.     When Plaintiff was the junior officer, in the previous year, he did work

Thanksgiving and Christmas.

50.     Because of personal circumstances beyond his control, Plaintiff did not actually work on Thanksgiving and Christmas in 2007.

51.     However, he was then required to work on New Year's Day because did not work on Christmas.

52.     Other employees in the Mail Branch, who unavoidably cannot work an assigned holiday, are not required to work the very next holiday, as Plaintiff was.

### The Suspension

53.     Plaintiff had a discussion about the holiday schedule with SCBPO Sachdeva on December 29, 2007.

54.     At the time, SCBPO Sachdeva approached Plaintiff and stated she wanted to have a personal conversation "between you and me" no one's business.  Plaintiff protested and SCBPO Sachdeva kept insisting.

55.     During the conversation, Plaintiff did not tell SCBPO Sachdeva that "she f**ked [him] with regard to holiday scheduling."  In fact, he never used the work "f**k" during the conversation with SCBPO Sachdeva.

56.     Plaintiff never used any profanity in his conversation with SCBPO Sachdeva.

57.     SCBPO Sachdeva did use profanity during the conversation with Plaintiff.

58.     During the conversation, both SCBPO Sachdeva and Plaintiff raised their voices as to why the holiday pattern was not being followed.

-8-

59.     Plaintiff believed that SCBPO Sachdeva's explanations were ludicrous, ridiculous and not possible.

60.     Plaintiff stated that he had previous experience assigning people and did not understand the problem. SCBPO Sachdeva responded that "Well maybe you should have made the assignments if it is that easy."

61.     Plaintiff felt terrible about the "heated private conversation" and told SCBPO Sachdeva they should drop the issue. SCBPO Sachdeva agreed and apologized. However a few days later, management ordered Plaintiff to write a memorandum about the discussion with SCBPO Sachdeva.

62.     On or about January 15, 2008, the Agency decided to draft a letter proposing a 2-day suspension of Plaintiff based on SCBPO Sachdeva's statement of what occurred between she and Plaintiff during the December 29, 2007 conversation.

63.     On March 18, 2008, the Agency issued a letter to Plaintiff advising him of a proposed 2-day suspension.

64.     Plaintiff responded to the proposed suspension by writing an e-mail to upper management claiming that he was being discriminated and retaliated against and was the victim of a hostile work environment. This communication constituted protected activity which plaintiff believed he could engage in without fear of reprisal.

65.     The e-mail, addressed to Susan T. Mitchell, DFO New York; Camille Polimeni, Area Director, JFK Airport; Rosemary Oliveri, L&R Specialist NY; and the local

-9-

EEO Manager, stated that the proposed suspension was in response to the fact that he rebuffed SCBPO Sachdeva's unwelcome and improper overtures.

66.    Plaintiff was forcibly transferred to Cargo on April 21, 2008, days after he sent the e-mail complaining of a hostile work environment on April 14, 2008.

67.    Plaintiff believed that this action was discriminatory and retaliatory. At the time, SCBPO Jernigan mocked him and discussed the complaint in public and mentioned that Plaintiff might now refer to him in a complaint.

68.    At this time, Plaintiff sought EEO counseling. Plaintiff, in that EEO complaint, identified the following issues: (1) he was assigned to work Thanksgiving Day in 2007 and Martin Luther King Day in January, 2008; (2) on March 18, 2008 he received a letter proposed a 2-day suspension; and (3) on April 21, 2008 he was reassigned to Cargo. After counseling was completed, Plaintiff did not initiate a formal complaint at that time. The seeking of EEO counseling also constituted protected activity which plaintiff believed he could engage in without fear of reprisal.

69.    In an initial interview on May 1, 2008, Plaintiff indicated that he had been subject to a hostile work environment by SCBPO Sachdeva, who was acting inappropriately towards him. Plaintiff specifically mentioned that SCBPO Sachdeva batted her eyes at him while in the break room; would sit close to him; touched his leg; and, on several occasions, attempted to initiate conversations that were not work related.

70.     The Agency claims that it held Plaintiff's suspension in abeyance until an investigation into his allegations of a hostile work environment could be conducted.

71.     Thereupon, after the Agency claimed it completed its investigation, it issued a second letter proposing a 2-day suspension with regard to Plaintiff's meeting with SCBPO Sachdeva.

72.     On or about June 18, 2009, JFK Airport Area Director, Camille Polimeni, issued a 1-day suspension to Plaintiff. Plaintiff believed that any suspension was baseless.

### The Bid Issue

73.     There is a bid rotation placement process (BRP). Pursuant to this process, officers who are facing discipline are not eligible to bid.

74.     If an officer is eligible to bid, he/she will indicate assignment preferences for the upcoming year.

75.     Those assignments are supposed to be made according to seniority, which is the sole factor in determining BRP assignments, provided an officer is not facing disciplinary issues at the time.

76.     In December, 2008 - January, 2009, Plaintiff received an e-mail instructing him to fill out a bid assignment sheet.

77.     The instructions told Plaintiff that he needed to bid and a failure to do so would result in him being assigned back to Passenger Processing.

78.     Plaintiff was forced to participate; although he should not have been. At

-11-

the time, Plaintiff had received a proposal for a 2-day suspension. Plaintiff should not have been required to bid because, at the time, he was facing disciplinary action.

79. At the time, Plaintiff was not eligible to participate in the BRP process. Section 1, paragraph B of the National Agreement between NTEU and CBP states that if an officer is facing a disciplinary issue, that officer cannot participate in the BRP process. Plaintiff, therefore, should not have been compelled to bid and should have been retained in Cargo.

80. Plaintiff was in Cargo at the time. Another officer, who was in Cargo at the time, was also facing disciplinary action. He was not required to bid and was kept in Cargo. This person, Officer Jeffrey Rochman, is Caucasian.

81. An African-American officer, Officer Brown, was told to bid, despite facing discipline. He won his bid to Cargo and then was precluded from exercising it because he was facing disciplinary action.

82. The proposal letter to suspend Plaintiff from duty for 2-days was dated March 17, 2008 and was still pending when Plaintiff was required to bid.

83. At the time, Plaintiff was not aware that his proposed discipline had been placed on hold while the Agency was allegedly investigating his claim that SCBPO Sachdeva had sexually harassed him. On the contrary, he was led to believe that the proposal was taking its course.

84. Plaintiff believes he was forced to participate in the bid assignment. Cargo

-12-

was his first choice. He cannot remember the other choices. He did not bid on Passenger Processing (Baggage).

85.    Plaintiff's seniority date is July 9, 2001. This placed him approximately 367 out of 1033. Only a handful of officers did not receive their choice of assignment. Of those, Plaintiff was the most senior.

86.    As a result of the BRP in February, 2009, Plaintiff was assigned to work at Passenger Processing (Baggage).

87.    Everyone with more seniority than Plaintiff received one of their choices.

88.    All relevant management officials were aware that plaintiff was a Hispanic male and had engaged in the said protected activity.

89.    Plaintiff believes that Supervisor Jernigan, one of his second line supervisors at the Mail Branch, ridiculed him for having complained of a hostile work environment. He also asked Plaintiff if he wanted to take his statements back on the day that he was transferred from the Mail Branch.

90.    Charles Mattina, another one of Plaintiff's first line supervisors, made anti-Hispanic remarks.

### Actions Subsequent to the Commencement of this Action

91.    On April 29, 2011, plaintiff filed the within action, which constituted protected activity that plaintiff undertake without the fear of retaliation and reprisal.

92.    On July 25, 2011, plaintiff's supervisor, Supervisory Customs and Border

Protection Officer (SCBPO) Pedro Cano, without cause, yelled at plaintiff and threatened him for working in an unassigned booth, despite the fact that the booth to which he was assigned was occupied by another CBPO.

93.     On July 29, 2011, Deputy Chief (DC) Chance Youngs required plaintiff to provide a written statement addressing the alleged incident that occurred between plaintiff and SCBPO Cano on July 25, 2011.  DC Youngs asked plaintiff to explain why he allegedly refused to report to an assignment and left his work assignment without supervisory approval.  DC Youngs marked plaintiff as absent without permission for 7¼ hours on July 25, 2011, even though he had adequate sick time in his leave bank.  DC Youngs did so in a demanding and interrogative manner without affording plaintiff his contractual rights to have a representative present.

94.     The allegations against plaintiff were false and in bad faith.

95.     Plaintiff responded to DC Youngs request on August 4, 2011, in which he denied that he refused to report to an assignment and that he departed because he was ill and went to seek medical treatment and had so reported to SCBPO Cano.

96.     In a Notice of Proposed Suspension dated November 29, 2011, Richard B. O'Connell, Assistant Port Director, Trade Operations, JFK Airport, proposed to suspend plaintiff for two (2) calendar days as a result of the incident that allegedly occurred on July 25, 2011.  Plaintiff was accused of "Failure to Follow Supervisory Instructions," "Absence Without Leave," and "Unprofessional Conduct."

-14-

97.    On November 28, 2011, plaintiff's supervisor, Frank Siniscalchi, Supervisory Firearms Instructor, advised plaintiff that DC Youngs was requesting a written statement concerning plaintiff's overtime assignment on November 25, 2011.    Moreover, specifically, Supervisor Siniscalchi requested that plaintiff explain why he allegedly refused a Medical Facility overtime assignment on November 25, 2011; why he was unable to drive on the field to the assignment; why he did not have his stamp and why he refused to retrieve it to go on another overtime assignment.

98.    The allegations against plaintiff were false and in bad faith.

99.    Plaintiff responded, in a Statement of Explanation dated December 2, 2011, the he could not drive to the Medical Facility because he had never been trained or certified to drive out into the field, a requirement of the Port Authority of NY/NJ and the FAA.  Plaintiff also validly explained the circumstances under which he did not have his stamp and why he could not retrieve it in an expeditious manner.

100.    In a Notice of Proposed Suspension dated February 22, 2012, John Mirandona, Assistant Port Director, Tactical Operations, JFK Airport, proposed to suspend plaintiff for fourteen (14) calendar days for "Willful and Intentional Refusal to Obey a Proper Order of a Supervisor."   This proposal concerned the events that allegedly occurred on November 25, 2011.

101.    In a letter of reply to the Notice of Proposed Suspension dated March 1, 2012, plaintiff asserted that he did not willfully and intentionally refuse to obey a proper

-15-

order of a supervisor.

## Count I

102.    Plaintiff alleges that the foregoing actions by defendant and her agents constitute unlawful employment practices because of retaliation and reprisal, in that defendant and her agents discriminated and retaliated against plaintiff, created a hostile work environment, and undertook the complained of actions because he engaged in the aforementioned prior protected activity.

103.    By their actions, defendant and her agents treated plaintiff differently from other employees on account of retaliation and reprisal and discriminated against him in compensation, terms, conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and appropriate regulations.

104.    Defendant and her agents cannot demonstrate any legitimate non-discriminatory reason for the actions complained of herein; nor can their actions be otherwise justified under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.. Any alleged non-discriminatory reason is nothing more than a pretext so that defendant and her agents could attempt to mask their actions.

105.    By reason of the actions and inactions of defendant and her agents, whereby defendant and her agents engaged in unlawful discriminatory practices based upon reprisal and retaliation, plaintiff has suffered and continues to suffer economic loss;

loss of salary; damage to his career and employment opportunities; suffered and continues to suffer damage to his reputation among his peers; embarrassment and humiliation and was otherwise greatly injured.

106.    By reason of the foregoing, plaintiff has become entitled to appropriate monetary relief, legal fees, and any other appropriate relief as a result of the actions of defendant and her agents.

107.    Plaintiff has also become entitled to an award of compensatory damages and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest.

## Count II

108.    Plaintiff alleges that the complained of actions violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and applicable regulations in that the Agency discriminated against him and created a hostile work environment on the basis of national origin (Hispanic) when it undertook the complained of actions.

109.    By their actions, defendant and her agents treated plaintiff differently from other employees on account of his national origin (Hispanic) and discriminated against him in compensation, terms, conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and appropriate regulations.

110.    Defendant and her agents cannot demonstrate any legitimate non-

-17-

discriminatory reason for the actions complained of herein; nor can their actions be otherwise justified under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.. Any alleged non-discriminatory reason is nothing more than a pretext so that defendant and her agents could attempt to mask their actions.

111.    By reason of the actions and inactions of defendant and her agents, whereby defendant and her agents engaged in unlawful discriminatory practices based upon national origin (Hispanic), plaintiff has suffered and continues to suffer economic loss; loss of salary; damage to his career and employment opportunities; suffered and continues to suffer damage to his reputation among his peers; embarrassment and humiliation and was otherwise greatly injured.

112.    By reason of the foregoing, plaintiff has become entitled to appropriate monetary relief, legal fees, and any other appropriate relief as a result of the actions of defendant and her agents.

113.    Plaintiff has also become entitled to an award of compensatory damages and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest.

### Count III

114.    Plaintiff alleges that the complained of actions violate Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., and applicable regulations in that the Agency discriminated against him and created a hostile work environment on the

-18-

basis of sex/gender (Male) when it undertook the complained of actions.

115.   By their actions, defendant and her agents treated plaintiff differently from other employees on account of his sex/gender (Male) and discriminated against him in compensation, terms, conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and appropriate regulations.

116.   Defendant and her agents cannot demonstrate any legitimate non-discriminatory reason for the actions complained of herein; nor can their actions be otherwise justified under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.. Any alleged non-discriminatory reason is nothing more than a pretext so that defendant and her agents could attempt to mask their actions.

117.   By reason of the actions and inactions of defendant and her agents, whereby defendant and her agents engaged in unlawful discriminatory practices based upon sex/gender (Male), plaintiff has suffered and continues to suffer economic loss; loss of salary; damage to his career and employment opportunities; suffered and continues to suffer damage to his reputation among his peers; embarrassment and humiliation and was otherwise greatly injured.

118.   By reason of the foregoing, plaintiff has become entitled to appropriate monetary relief, legal fees, and any other appropriate relief as a result of the actions of defendant and her agents.

119.    Plaintiff has also become entitled to an award of compensatory damages and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest.

### Jury Demand

120.    Plaintiff herein demands a trial by jury of all issues in this action.

### Prayer for Relief

WHEREFORE, plaintiff respectfully requests that judgment be entered, with respect to each count, as follows:

(1)    declaratory relief declaring that the acts alleged herein violate plaintiff's statutory rights;

(2)    on Count I, a judgment awarding plaintiff compensatory damages, other appropriate damages, attorney's fees, and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest;

(3)    on Count II, a judgment awarding plaintiff compensatory damages, other appropriate damages, attorney's fees, and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest;

(4)    on Count III, a judgment awarding plaintiff compensatory damages, other appropriate damages, attorney's fees, and costs and disbursements in an amount to be determined by a jury at trial with appropriate interest;

(5)    an award of pre-judgment interest on the money awards requested above;

(6)     a permanent injunction restraining defendant and her agents and all persons acting in concert with her or on her behalf from continuing to engage in discriminatory activity against plaintiff;

(7)     that the Court retain jurisdiction over this action until the defendant and her agents have fully complied with the Orders of this Court and that the Court require the defendant to file such reports as may be necessary to supervise such compliance; and

(8)     awarding plaintiff such other and further relief as this Court deems just and proper.

Dated: Jericho, New York
      October 16, 2012

WOLIN & WOLIN

By: Alan E. Wolin, Esq.
*Attorney for Plaintiff*
420 Jericho Turnpike, Suite 215
Jericho, New York 11753
Telephone: (516) 938-1199
Facsimile: (516) 938-1178
E-Mail: wolinlaw@aol.com

-21-

**VERIFICATION**

State of New York      )
                       )ss.:
County of Nassau       )

  Richard Figueroa, being duly sworn, deposes and says:

  I am the Plaintiff in the within action and I have read the foregoing Amended

Verified Complaint and know the contents thereof, the same is true to my knowledge,

except as to those matters therein stated to be based upon information and belief, and

as to those matters I believe them to be true.

              RICHARD FIGUEROA

Sworn to before me this
16th day of October, 2012

Notary Public

JILL A. FIEMAN
Notary Public, State of New York
No. 4993075
Qualified in Nassau County
Commission Expires March 9, 2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| RICHARD FIGUEROA, | : | Civil Action No. 11-2087 cv |
|  | : | (Kuntz, J.) (Levy, MJ) |
| Plaintiff, | : |  |
|  | : |  |
| - against - | : | **AFFIDAVIT OF SERVICE** |
|  | : |  |
| JANET NAPOLITANO, Secretary, | : |  |
| U.S. Department of Homeland Security, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

State of New York )
                              )Ss.:
County of Nassau     )

Jill Fieman, being duly sworn, deposes and says:

Deponent is not a party to the action, is over the age of 18 years and is a resident of the State of New York. On the 17th day of October, 2012, deponent served a copy of the within **Amended Verified Complaint**

**UPON:**     **Timothy Lynch, Esq.**
                  **Assistant U.S. Attorney**
                  **Eastern District of New York**
                  **271 Cadman Plaza E.**
                  **Brooklyn, New York 11201**

via electronic mail and by depositing a true copy of same enclosed in a post-paid properly addressed wrapper in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

Sworn to before me this
17th day of October, 2012

_____
Notary Public

Jill Fieman

JEROLD D. WOLIN
Notary Public, State of New York
No. 4673412
Qualified in Suffolk County
Commission Expires September 30, 2014

Exhibit B

Condensed Transcript

## In the Matter Of:

## RICHARD FIGUEROA vs. JANET NAPOLITANO

Civil Action No. CV-11-2087

---

# RICHARD FIGUEROA

*May 14, 2013*

---



**Tankoos Reporting**

1384 Broadway, 19th Floor
New York, NY 10018
212.687.8010

RICHARD FIGUEROA
May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO
9—12

Page 9

1          R. Figueroa
2   with Mr. Wolin this morning to prepare for
3   today's deposition?
4       A.  I may have looked over a document or
5   two.
6       Q.  Can you tell me which documents you
7   looked at?
8       A.  A complaint, an amended complaint.
9       Q.  When did you look over the complaint
10  and the amended complaint?
11      A.  Earlier this morning when I met with
12  Mr. Wolin.
13      Q.  And at the beginning of the
14  deposition, the address that you gave, 36
15  Metropolitan Oval in Bronx, New York, zip code
16  10462, that's your current residential
17  address?
18      A.  Yes, it is.
19      Q.  For how long have you lived there?
20      A.  Oh, approximately 21 years.
21      Q.  And do you rent?  Do you own the
22  apartment?
23      A.  I rent.
24      Q.  And who do you live with?
25      A.  My wife and my son.

Page 10

1          R. Figueroa
2       Q.  And who is your wife?
3       A.  My wife's name is Angela Figueroa.
4       Q.  And what is your son's name?
5       A.  Richard.
6       Q.  And how old is Richard?
7       A.  26 at the moment.
8       Q.  For the record, how old are you, Mr.
9   Figueroa?
10      A.  54.
11      Q.  Were you born in the United States,
12  sir?
13      A.  Yes.
14      Q.  Which state?
15      A.  New York.
16      Q.  And I know you were born in the
17  United States, but is there a national origin
18  that you have?
19      A.  Well, I'm an American citizen.
20      Q.  Right, but do you have a national
21  origin general that you identify with?
22      A.  Yes, I'm Hispanic.
23      Q.  Now, when you say "Hispanic," is
24  there a particular country from which your
25  parents or grandparents come from?

Page 11

1          R. Figueroa
2       A.  Well, I'm of Puerto Rican dissent.
3       Q.  You attended high school in the
4   United States; correct?
5       A.  Yes, I did.
6       Q.  Where did you attend high school?
7       A.  Well, I attended two high schools.
8       Q.  Which is the one you graduated from?
9       A.  Uniondale High School.
10      Q.  When did you graduate from Uniondale
11  High School?
12      A.  1977.
13          MR. LYNCH:  We can have that marked?
14          (Defendant's Exhibit 1, Answer to
15      interrogatories was so marked for
16      identification.)
17      Q.  Mr. Figueroa, I'm showing you what's
18  been marked as Defendant's Exhibit 1.
19      If you can just take a moment to look
20  at it, and I'm just going to ask you a couple
21  of questions.
22      A.  Okay.
23      Q.  Mr. Figueroa, you've been shown
24  what's been marked as Defendant's Exhibit 1.
25          Do you recognize it?

Page 12

1          R. Figueroa
2       A.  Yes, I do.
3       Q.  Can you tell me what it is, sir?
4       A.  It's a listing of interrogatories.
5       Q.  Do you recognize Defendant's
6   Exhibit 1 as your answer to interrogatories
7   that were served upon you?
8       A.  Yes, I do.
9       Q.  Do you recognize your signature on
10  the page 7 of the interrogatories?
11      A.  Yes, I do.
12      Q.  And do you recognize your signature
13  on the verification page that's behind that?
14      A.  Yes, I do.
15      Q.  And prior to signing on the
16  verification page, did you review your answers
17  to the interrogatories and make sure they were
18  accurate before signing?
19      A.  Yes.
20      Q.  And I just want to direct your
21  attention to your answer to interrogatory
22  number 1.
23      And in your answer to interrogatory
24  number one identifies all the educational
25  institutions, programs or classes that you've

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
13–16

Page 13

R. Figueroa

1 R. Figueroa
2 attended, dates of attendance, and all
3 degrees, credits or certificates received.
4     Other than what you've identified in
5 your answer to interrogatory number one, are
6 there any additional educational institutions,
7 programs or classes that you've attended since
8 answering that interrogatory?
9     A. Yes.
10     Q. Can you tell me what those are, sir?
11     A. I went to the Federal Law Enforcement
12 Training Center in West Virginia.
13     Q. When was that?
14     A. That was approximately a year ago,
15 April of 2012.
16     Q. And what did you take -- it's
17 commonly referred to as FLETC?
18     A. Yes.
19     Q. What did you take at FLETC?
20     A. I took a firearms officers training
21 course to become a certified firearms
22 instructor.
23     Q. And how long was the course?
24     A. Approximately three weeks.
25     Q. And did you receive a certificate at

Page 14

1 R. Figueroa
2 the end of the course?
3     A. Yes, I did.
4     Q. Is there an official title for the
5 certificate that you received?
6     A. Well, it's certifying me as a
7 firearms instructor for Customs and Border
8 Protection.
9     Q. Any additional certificate, programs
10 or classes you've taken since the one at FLETC
11 back in April of 2012?
12     A. None that I can think of at the
13 moment.
14     Q. And you work for the Federal
15 government; correct, Mr. Figueroa?
16     A. Yes.
17     Q. And when did you first begin working
18 for the Federal government?
19     A. July 9, 2001.
20     Q. And which agency did you begin
21 working for?
22     A. For the United States Customs
23 Service.
24     Q. And what position were you hired as?
25     A. As an inspector.

Page 15

1 R. Figueroa
2     MR. LYNCH: Let's have this marked.
3     (Defendant's Exhibit 2, Form 612 job
4 application was so marked for identification.)
5     Q. Mr. Figueroa, I'm showing you what's
6 been marked as Defendant's Exhibit 2. I'm
7 handing a copy to counsel.
8     Just take a moment to review it, let
9 me know when you are finished.
10     Do you recognize Defendant's
11 Exhibit 2?
12     A. Yes.
13     Q. Can you tell me what it is, sir?
14     A. It is an optional form number 612
15 that the Federal government uses as a job
16 application.
17     Q. Do you recognize your signature on
18 the third to last page of Defendant's
19 Exhibit 2?
20     A. Yes.
21     Q. And is this Defendant's Exhibit 2 one
22 of the applications you submitted to work for
23 the Federal government?
24     A. I believe it was, yes. I believe it
25 is, yes.

Page 16

1 R. Figueroa
2     Q. Can you tell me what were your duties
3 and responsibilities basically as a customs
4 inspector?
5     A. Well, we inspected internationally
6 arrived passengers and their possessions for
7 unlawful merchandise that may be brought into
8 the United States.
9     Q. And when you first began working as a
10 customs inspector, was there a facility with
11 which you were assigned?
12     A. Yes.
13     Q. And where was that?
14     A. Atlanta, Georgia.
15     Q. For how long of a period were you
16 assigned to work in Atlanta, Georgia?
17     A. I was assigned with training and --
18 because training was in Georgia as well. With
19 training and my work at the airport, it was
20 all total approximately a year.
21     Q. And which was the next facility that
22 you were assigned to?
23     A. JFK International Airport.
24     Q. And when were you assigned to work at
25 JFK International Airport?


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
17—20

| Page 17 |
|---|
| 1   R. Figueroa |
| 2   A. Around August of 2002. |
| 3   Q. And are you presently assigned to JFK |
| 4 International Airport? |
| 5   A. Yes, I am. |
| 6   Q. Can you tell me briefly prior to |
| 7 working as a custom inspector, what did you |
| 8 do, sir? |
| 9   A. I was with the New York City Police |
| 10 Department. |
| 11   Q. For how long of a period did you work |
| 12 for the New York City Police Department? |
| 13   A. Approximately 20 years. |
| 14   Q. And I'll refer to the New York City |
| 15 Police Department as NYPD. |
| 16    When was the last position you held |
| 17 with the NYPD before coming over as a customs |
| 18 inspector? |
| 19   A. I was a sergeant. |
| 20   Q. Can you tell me, did there come a |
| 21 time in which the agency that you worked for, |
| 22 U.S. Customs Agency was merged into a new |
| 23 Federal agency? |
| 24   A. Yes. |
| 25   Q. What agency is that? |

| Page 18 |
|---|
| 1   R. Figueroa |
| 2   A. It became the newly created Customs |
| 3 and Border Protection Agency. |
| 4   Q. And do you recall when that was? |
| 5   A. Approximately 2003. |
| 6   Q. And I'll on occasion refer to Customs |
| 7 and Border Protection as CBP. |
| 8   A. Yes. |
| 9   Q. Can you tell me what Federal |
| 10 department is CBP a part of? |
| 11   A. The Department of Homeland Security. |
| 12   Q. And occasionally, I'll refer to |
| 13 Department of Homeland Security as DHS. |
| 14   A. Yes. |
| 15   Q. Can you tell me, as part of that |
| 16 merger, did your position as a customs |
| 17 inspector change? |
| 18   A. Yes, we were no longer customs |
| 19 inspectors, we became Customs and Border |
| 20 Protection Officers. |
| 21   Q. When was your position converted, so |
| 22 to speak? |
| 23   A. In 2003 sometime. |
| 24   Q. Okay. On occasion, I'll refer to the |
| 25 position U.S. Customs Border Protection |

| Page 19 |
|---|
| 1   R. Figueroa |
| 2 Officer as a CBPO occasionally; okay? |
| 3   A. Yes. |
| 4   Q. Can you tell me, after your position |
| 5 was converted to Custom and Border Protection |
| 6 Officer, did your duties and responsibilities |
| 7 change in any way from that of a customs |
| 8 inspector? |
| 9   A. Well, it did, because now not only |
| 10 are we still looking for unlawful merchandise |
| 11 being brought into the country, we are |
| 12 concentrating heavily on terrorism. |
| 13   Q. Can you tell me briefly as a CBPO |
| 14 officer, in terms of your duties and |
| 15 responsibilities now, concentrating more now |
| 16 on terrorism, briefly what does that entail? |
| 17   A. Well, we look at passengers and their |
| 18 previous history with regard to travel, and if |
| 19 passengers are selected for intense |
| 20 inspection, we perform that inspection. |
| 21   Q. Since your position was converted to |
| 22 that of a CBPO officer, can you tell me have |
| 23 you held any other positions with Customs and |
| 24 Border Protection? |
| 25   A. In rank structure, no. |

| Page 20 |
|---|
| 1   R. Figueroa |
| 2   Q. Can you tell me, what's your present |
| 3 salary as a CBPO officer? |
| 4   A. $85,343. |
| 5   Q. And you receive health insurance as |
| 6 part of your compensation? |
| 7   A. No. |
| 8   Q. Do you have health insurance? |
| 9   A. Yes. |
| 10   Q. Who do you have health insurance |
| 11 through? |
| 12   A. That was part of my retirement |
| 13 package from The City of New York. |
| 14   Q. With the position of CBP officer, |
| 15 were you offered health insurance? |
| 16   A. Yes. |
| 17   Q. But you elected to keep the insurance |
| 18 that you had as part of your retirement |
| 19 package with the NYPD? |
| 20   A. Yes. |
| 21   Q. And who is your insurer? |
| 22   A. GHI, The Group Health Insurance |
| 23 Corporation. |
| 24   Q. As part of your GHI health insurance, |
| 25 are mental health insurance benefits included? |

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
21–24

Page 21
R. Figueroa
1
2     A.  They may be.
3     Q.  Have you ever utilized mental health
4  insurance benefits?
5     A.  No.
6     Q.  Do you have dental insurance?
7     A.  Yes.
8     Q.  Is that through CBPO?
9     A.  No.
10     Q.  Is that part of your retirement
11  package with the NYPD?
12     A.  Yes.
13     Q.  And in terms of other benefits with
14  Customs and Border Protection, what is your
15  annual leave?
16     A.  My annual leave is approximately
17  19 days a year.
18     Q.  What about sick leave, are you
19  afforded sick leave through CBP?
20     A.  Yes, that's approximately 12 days a
21  year.
22     Q.  And I know you have retirement
23  benefits through the NYPD, but are you offered
24  or do you have retirement benefits through
25  CBP?

Page 22
R. Figueroa
1
2     A.  Yes.
3     Q.  What are those retirement benefits?
4     A.  That's difficult to explain because
5  it's multi layered.
6     Q.  Briefly, as best you can explain what
7  it is.  If it's like, for example, a pension?
8     A.  Well, we receive a pension and a TSP
9  annuity account, in addition to social
10  security.
11     Q.  When you refer to TSP annuity
12  account, that's a thrift savings plan annuity
13  account?
14     A.  Yes.
15     Q.  And as a CBP officer, are you a
16  member of any union?
17     A.  Yes, The National Treasury Employees
18  Union, the NTEU.
19     Q.  And how long have you been a member
20  of NTEU?
21     A.  Since beginning with Customs.
22     Q.  So since 2001?
23     A.  Yes, since 2001.
24     Q.  Have you held any officer type
25  positions with the union?

Page 23
R. Figueroa
1
2     A.  No.
3     Q.  What about any representative
4  positions?
5     A.  No.
6     Q.  All right.  So I want to talk a
7  little bit about since you've worked for CBP
8  what your assignments have been up to the
9  present; okay?
10     A.  Okay.
11     Q.  Now, can you tell me when you first
12  began working at JFK Airport, can you tell me
13  which branch of CPB were you assigned?
14     A.  The baggage branch, also known as
15  passenger processing.
16     Q.  For how long of a period did you work
17  in passenger processing?
18     A.  I would say approximately maybe
19  five years.
20     Q.  So approximately until what year?
21     A.  Around 2005, maybe 2006.
22     Q.  Okay.  I'm just going to refer back
23  to Defendant's Exhibit 1, your answer to
24  interrogatories.  And specifically I'll refer
25  to the second page in your answer to

Page 24
R. Figueroa
1
2  interrogatory number 2 where you indicate
3  different branches of the agency you worked
4  with.
5         And at the top of the paragraph in
6  part of your answer, you indicate "I worked in
7  passenger processing baggage until
8  approximately 2006."
9         Does that refresh your recollection
10  if it was in about 2006 in which you worked in
11  passenger processing?
12     A.  Correct, yes, that would be
13  approximately five years.
14     Q.  Can you tell me what were your basic
15  duties and responsibilities when you were
16  assigned to work passenger processing until
17  about approximately 2006?
18     A.  Well, in passenger processing we
19  inspected passengers and their possessions for
20  unlawful merchandise and any articles related
21  to terrorism.
22     Q.  Can you tell me from 2001 to 2006
23  while assigned to work in passenger
24  processing, who were your supervisors?
25     A.  From 2001?


Tankoos Reporting

RICHARD FIGUEROA                                          May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                     29–32

Page 29

R. Figueroa

2   Q.  What about your co-workers when you
3   worked in passenger processing, just from 2001
4   to 2006, any that you can recall?
5       A.  Of people that I have worked with?
6       Q.  Yes, that are your co-workers in
7   passenger processing from 2001 up to 2006?
8       A.  Yes, I definitely can recall a few.
9       Q.  Okay, can you tell me who you recall
10  working with?
11      A.  Let's see, I worked with a fellow
12  named Robert Miller.  Another fellow named
13  Theo Servetas.
14      Q.  Okay.
15      A.  I'm trying to think, there have been
16  so many over the years.  Louis Florio.
17      Q.  Anyone else you can recall, just from
18  when you were working in passenger processing?
19      A.  Well, there is a myriad of people.
20      Q.  I'm sure, just as best you can
21  recall.  I understand you may not remember
22  everyone, it's only as best you can recall?
23      A.  Yes, for the moment that's about it.
24  I'm sure later on I can think of a few others.
25      Q.  Okay.  Mr. Robert Miller, is it fair

Page 30

R. Figueroa

2   to say he is a man?
3       A.  Yes.
4       Q.  What is his race?
5       A.  Male white.
6       Q.  What was Mr. Miller's national
7   origin?
8       A.  I don't know.
9       Q.  What about Theo Servetas?
10      A.  Yes, another male white.
11      Q.  What about Mr. Servetas' national
12  origin?
13      A.  I don't know.
14      Q.  Louis Florio, is he a male?
15      A.  Yes.
16      Q.  Race?
17      A.  Male white.
18      Q.  And national origin?
19      A.  I don't know.
20      Q.  So can you just tell me in terms of
21  how would you describe the work atmosphere
22  when you were working in passenger processing,
23  just from 2001 up to 2006, how would you
24  describe it?
25          MR. WOLIN:  Objection.

Page 31

R. Figueroa

2       You can answer it.
3          THE WITNESS:  I don't understand the
4   question.
5       Q.  Well, would you describe it as a
6   friendly work atmosphere?  Business-like?
7   Professional?  Intense atmosphere, just to
8   give you an example.
9       A.  It was a business-like atmosphere.
10      Q.  Did you enjoy working in passenger
11  processing from 2001 to 2006?
12      A.  Yes.
13      Q.  Can you tell me, what did you enjoy
14  working in passenger processing, from 2001 to
15  2006, what did you enjoy about it?
16      A.  Well, it was interesting.
17      Q.  What made it interesting?
18      A.  You never know when the next person
19  who comes along may be the one carrying
20  unlawful merchandise.
21      Q.  Okay.  Can you tell me in 2006 which
22  branch at JFK were you assigned to?
23      A.  The mail branch.
24      Q.  And for how long of a period were you
25  assigned to the mail branch?

Page 32

R. Figueroa

2       A.  Approximately two years.
3       Q.  So that would take us to about 2008?
4       A.  Yes.
5       Q.  And can you tell me when you were
6   assigned to the mail branch, what were your
7   basic duties and responsibilities when you
8   were assigned to work the mail branch?
9       A.  To inspect internationally arrived
10  mail for unlawful merchandise and articles of
11  terrorism.
12      Q.  And can you tell me from 2006 to 2008
13  while you were assigned to the mail branch who
14  were your supervisors during that time period?
15      A.  Armand Mitnick, Benjamin Sciacca and
16  Kompel Sachdeva.
17      Q.  And what about co-workers, did you
18  have any different co-workers when you were
19  assigned to work the mail branch from 2006 to
20  2008?
21      A.  Yes.
22      Q.  Who were they?
23      A.  Joseph Laviano.
24      Q.  How do you spell that last name, as
25  best you can?

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
33–36

Page 33

1         R. Figueroa
2     A. L-A-V-I-A-N-O. Joseph Sweeney.
3 Joseph Ianerrelli.
4     Q. How do you spell that as best you
5 can?
6     A. I-A-N-E-R-R-E-L-L-I.
7     Q. Any other co-workers you can recall
8 when you were assigned to the mail branch from
9 2006 to 2008?
10    A. Yes, but I can't think of her name
11 right now.
12    Q. Okay.
13    A. Helen Ashton.
14    Q. Helen Ashton?
15    A. Ashton.
16    Q. And Mr. Joseph Laviano, what's his
17 race?
18    A. Male white.
19    Q. And do you know Mr. Laviano's
20 national origin?
21    A. No.
22    Q. And with regard to Mr. Sweeney, is it
23 fair to say he is a male?
24    A. Yes.
25    Q. What about Mr. Sweeney's race?

Page 34

1         R. Figueroa
2     A. He is a male white.
3     Q. What about his national origin?
4     A. I don't know.
5     Q. With respect to Joseph Ianerrelli, is
6 it fair to say he was a male?
7     A. Yes.
8     Q. What about his race?
9     A. I don't know.
10    Q. What about Mr. Ianerrelli's national
11 origin?
12    A. Oh, his race is he is a male white.
13 His national origin, I don't know.
14    Q. Helen Ashton, is it fair to say she
15 was a female?
16    A. Yes.
17    Q. What about Ms. Ashton's race?
18    A. She is an African-American female.
19    Q. Do you know Ms. Ashton, if she has a
20 national origin?
21    A. I'm assuming they are all U.S.
22 citizens.
23    MR. WOLIN:  But we don't want you to
24 assume.
25    MR. LYNCH:  Right.

Page 35

1         R. Figueroa
2     MR. WOLIN:  One thing we are all in
3 agreement with is we don't want you to assume.
4     MR. LYNCH:  Right, and you know when
5 I'm referring to national origin that, for
6 example, even though they could be citizens,
7 if you identify with coming from the Caribbean
8 Jamaica, Italian.
9     THE WITNESS:  I don't know.
10    Q. Okay. Can you tell me when you were
11 assigned to work the mail branch from 2006 to
12 2008, how would you describe the work
13 atmosphere there?
14    A. It was business-like.
15    Q. Did you enjoy working in the mail
16 branch from 2006 to 2008?
17    A. Yes.
18    Q. What did you enjoy about working in
19 the mail branch during that time period?
20    A. Same thing, looking for unlawful
21 merchandise and articles of terrorism.
22    Q. So you enjoyed what you did in the
23 mail branch?
24    A. Yes.
25    Q. Can you tell me in 2008 which branch

Page 36

1         R. Figueroa
2 of CBP were you assigned to next while working
3 at the JFK Airport?
4     A. The cargo facility.
5     Q. And for how long of a period were you
6 assigned to the cargo facility?
7     A. Approximately 10 months.
8     Q. Do you recall the month in 2008 in
9 which you were assigned to the cargo facility?
10    A. I believe it may have been April, but
11 I'm not sure.
12    Q. All right. So I just want to refer
13 you back on the second page, your answer to
14 interrogatory number 2, which is also marked
15 Defendant's Exhibit 2.
16       It indicates on the third sentence in
17 your answer, "After the mail branch I was
18 assigned to work in the cargo facility in or
19 about April of 2008."
20       Does that refresh your recollection
21 if it was in about April of 2008 that you were
22 assigned to the cargo facility?
23    A. That would be correct, approximately
24 April of 2008.
25    Q. Okay. Can you tell me when you were

RICHARD FIGUEROA                                            May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                       37–40

Page 37

1              R. Figueroa
2    assigned to the cargo facility, what were your
3    duties and responsibilities?
4         A.  To look for unlawful merchandise and
5    articles of terrorism.
6         Q.  But in terms of what you were doing
7    in the cargo facility, did it differ from when
8    you were assigned to the mail branch in terms
9    of what your actual duties were?
10        A.  Yes, because now we are looking at
11   international mail.
12        Q.  Okay.  When you were assigned to the
13   mail branch, you weren't looking at
14   international mail?
15        A.  I'm sorry, sir.  I thought you were
16   asking me about the mail branch.
17           You were asking me about the cargo
18   facility; did you say?
19        Q.  Correct.
20        A.  Okay.  In the cargo facility, now we
21   are looking at internationally arrived cargo
22   for the same objective.
23           I thought you were repeating my
24   duties for the mail branch.
25        Q.  No, no, we are going from, you know,

Page 38

1    each facility that -- each branch, you know, I
2    just want to know, you know, from each time
3    you are assigned to a new branch how your
4    duties may have differed.
5           So in the cargo facility you are
6    looking at internationally arrived cargo?
7         A.  Yes.
8         Q.  And how would you do that when you
9    were assigned to work in the cargo facility?
10        A.  Well, we would scan paperwork for
11   irregularities, computer entries for the same.
12   And we would then physically inspect, open up
13   cargo shipments and examine them.
14        Q.  Anything else that you did when you
15   were assigned to work the cargo facility back
16   in 2008?
17        A.  Such as?
18        Q.  Any other that you can recall your
19   duties and responsibilities?
20        A.  No, that pretty much sums it up.
21        Q.  Okay.  And can you tell me in the
22   10 months that you were assigned to work for
23   the cargo facility, who were your supervisors?
24        A.  Joseph Smith, Anthony Contorno.

Page 39

1              R. Figueroa
2         Q.  How do you spell Mr. Contorno's last
3    name?
4         A.  C-O-N-T-O-R-N-O.
5         Q.  Any other supervisors you can recall?
6         A.  Yes, but let's see, I have to think
7    of their names.  There was a fellow who just
8    retired, I worked with him as well but I can't
9    recall his name.
10        Q.  Okay.  So Joseph Smith, is it fair to
11   say he is a male?
12        A.  Yes.
13        Q.  What about Mr. Smith's race?
14        A.  He is a male white.
15        Q.  What about Mr. Smith's national
16   origin?
17        A.  I don't know.
18        Q.  With regard to Mr. Anthony Contorno,
19   is it fair to say he is a male?
20        A.  Yes.
21        Q.  What about Mr. Contorno's race?
22        A.  He is a male white.
23        Q.  Okay, what about Mr. Contorno's
24   national origin; do you know?
25        A.  I don't know.

Page 40

1              R. Figueroa
2         Q.  What about your co-workers, when you
3    were assigned to work the cargo facility in
4    2008, who were your co-workers that you can
5    recall working with?
6         A.  Let's see, Charlie Borowski, Fred
7    Signer, Joseph Iparra, John Taylor and John
8    Tutone.
9         Q.  Mr. Charlie Borowski, is it fair to
10   say he was a male?
11        A.  Yes.
12        Q.  What was Mr. Borowski's race?
13        A.  He is a male white.
14        Q.  What is Mr. Borowski's national
15   origin?
16        A.  I don't know.
17        Q.  Fred Signer, is it fair to say he is
18   a male?
19        A.  Yes.
20        Q.  What is Mr. Signer's race?
21        A.  He is a male white.
22        Q.  And what's Mr. Signer's national
23   origin?
24        A.  I don't know.
25        Q.  Joseph Imparra, is it fair to say he



RICHARD FIGUEROA                                           May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                      41–44

Page 41

1                    R. Figueroa
2  is male?
3      A. Yes.
4      Q. What about Mr. Imparra's race?
5      A. He is a male white.
6      Q. Do you know Mr. Imparra's national
7  origin?
8      A. No.
9      Q. John Taylor, is it fair to say he was
10 a male?
11     A. Yes.
12     Q. What's Mr. Taylor's race?
13     A. He is a male white.
14     Q. And what about Mr. Taylor's national
15 origin, do you know?
16     A. I don't know.
17     Q. John Tutone, is it fair to say he is
18 a male?
19     A. Yes.
20     Q. What about Mr. Tutone's race?
21     A. He is a male white.
22     Q. What about Mr. Tutone's national
23 origin?
24     A. I don't know.
25     Q. How would you describe the work

Page 42

1                    R. Figueroa
2  atmosphere when you were assigned to work the
3  cargo facility back in 2008?
4      A. Business-like, professional.
5      Q. Did you enjoy working in the cargo
6  facility during that time period?
7      A. Yes.
8      Q. Can you tell me what did you enjoy
9  about working in the cargo facility back then?
10     A. Pretty much the same thing, looking
11 for the unlawful shipments.
12     Q. You mentioned you were assigned to
13 the cargo facility back in 2008 for about
14 10 months. So that takes us to approximately
15 2009?
16     A. Yes.
17     Q. Which branch of CBP at the JFK
18 facility were you assigned to next in 2009?
19     A. I was sent back to passenger
20 processing.
21     Q. And do you recall when in 2009 you
22 were sent back to passenger processing?
23     A. Approximately October.
24     Q. Why don't you hold onto that and
25 refer back to Defendant's Exhibit 2, and on

Page 43

1                    R. Figueroa
2  the second page in your answer to
3  interrogatory number 2, and just on the top
4  paragraph, the second to last sentence it says
5  "I was then reassigned to passenger processing
6  in or about February of 2009."
7      A. Okay.
8      Q. Does that refresh your recollection
9  if it was in February of 2009?
10     A. Then it would be February of 2009.
11     Q. Okay.
12     A. Yes.
13     Q. Now, can you tell me when you
14 returned to passenger processing back in
15 February of 2009, did your duties and
16 responsibilities change in any way from the
17 last time you were assigned to work there?
18     A. Repeat that question, please?
19        MR. LYNCH: Can you read it back?
20        (Question read.)
21     A. No, I was back doing passenger
22 processing duties.
23     Q. Did you have the same supervisors?
24     A. No, they were different supervisors.
25     Q. Okay. And who are the supervisors in

Page 44

1                    R. Figueroa
2  2009 when you were reassigned back to
3  passenger processing?
4      A. I can't remember who they were.
5      Q. Okay. What about co-workers, did you
6  have the same co-workers when you were
7  reassigned back to passenger processing?
8      A. Some were the same, some were
9  different.
10     Q. Who were the different co-workers?
11     A. I can't recall.
12     Q. Can you tell me how would you
13 describe the work atmosphere when you were
14 reassigned back to work in passenger
15 processing in February of 2009?
16     A. Generally business-like.
17     Q. And when you returned to work back in
18 passenger processing, did you enjoy working in
19 passenger processing during that time period?
20     A. No, I wanted to stay back in cargo.
21     Q. Why did you want to stay back in
22 cargo?
23     A. Because I enjoyed what I was doing in
24 cargo.
25     Q. Can you tell me what about working in

RICHARD FIGUEROA                                          May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                    45–48

Page 45

R. Figueroa

1
2  cargo made it more enjoyable than working in
3  passenger processing?
4     A.  Well, you got more adept the longer
5  you were there in cargo procedures and
6  facilities, and in the way the facility
7  operated, so you became better at spotting
8  shipments that you can target.
9     Q.  Was there a reason that you wanted to
10  become more adept at doing what you were doing
11  in cargo processing?
12     A.  Well, you always want to get better
13  at your job and utilize your skills to your
14  utmost.
15     Q.  So is it fair to say you felt back in
16  2009 your skills could be utilized better in
17  cargo than in passenger processing?
18        MR. WOLIN:  Objection.
19           You can answer it.
20     A.  Yes.  Well, I'm going to do my best
21  wherever I'm assigned, but you asked me
22  earlier if I enjoyed that better.  Yes, I did.
23     Q.  All right.  I'll take that back.
24        And for how long of a period were you
25  reassigned back to passenger processing?

Page 46

R. Figueroa

1
2     A.  At this stage of -- at this moment in
3  time, I was shifted back and forth a lot.
4     Q.  Can you tell me which was the next
5  branch you were assigned after passenger
6  processing?
7     A.  I believe I went back to the cargo
8  facility.
9     Q.  When did you return to the cargo
10  facility?
11     A.  Approximately October of that year.
12     Q.  So it was in approximately October of
13  2009 that you returned back to the cargo
14  facility?
15     A.  Yes.
16     Q.  When you returned to the cargo
17  facility, did you have the same supervisors as
18  from when you were there before?
19     A.  Yes.
20     Q.  What about co-workers?
21     A.  The same.
22     Q.  And when you returned to the cargo
23  facility, did your duties and responsibilities
24  change from when you were there before?
25     A.  No.

Page 47

R. Figueroa

1
2     Q.  For how long of a period were you
3  assigned to the cargo facility after going
4  back there in October of 2009?
5     A.  I would say approximately, maybe a
6  year.
7     Q.  So that takes us to sometime in 2010?
8     A.  Yes.
9     Q.  So where in 2010 were you assigned
10  next?
11     A.  I don't remember.
12     Q.  Why don't you tell me where you are
13  currently assigned?
14     A.  To the firearms unit.
15     Q.  And for how long of a period have you
16  been assigned to the firearms unit?
17     A.  Approximately a year now.
18     Q.  And when specifically were you
19  assigned to the firearms unit?
20     A.  It was October of 2012, excuse me.
21     Q.  Approximately eight months?
22     A.  Excuse me, hold on let me think.
23     Q.  Sure.
24     A.  Maybe October of 2011.
25     Q.  So since --

Page 48

R. Figueroa

1
2     A.  Yes, October of 2011.
3     Q.  So since October of 2011, you've been
4  assigned to the firearms unit?
5     A.  Yes.
6     Q.  And can you tell me what are your
7  basic duties and responsibilities in the
8  firearms unit at JFK?
9     A.  To oversee the progress and skill
10  level of the shooters, the officers who carry
11  weapons at JFK Airport.
12     Q.  How do you do that?
13     A.  We qualify them in a qualification
14  cycle, which is a firearms qualification
15  exercise that we put officers through to
16  assure that they are able to maintain firearms
17  proficiency.
18     Q.  Any other duties and responsibilities
19  in terms of while you were assigned to the
20  firearms unit?
21     A.  Well, we may have to remove officer's
22  weapons for failure to qualify.
23        We may have to pickup officer's
24  weapons whose authority to carry that weapon
25  has been suspended.  And we keep an inventory


Tankoos Reporting

RICHARD FIGUEROA                                                    May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                                     53–56

Page 53
R. Figueroa
1
2  think at this moment in time that she was my
3  supervisor just a short period, but I cannot
4  tell you exactly what the dates are, the time
5  parameters are.
6      Q.  Okay, but she was your supervisor you
7  recall prior to the incident itself?
8      A.  Yes.
9      Q.  So why don't you tell me prior to the
10  December 29, 2007 incident, how would you
11  describe your relationship with Ms. Sachdeva?
12      A.  It was an employer/supervisor
13  employee/worker relationship.
14      Q.  How would you describe it?  So we all
15  have employer/employee relationships,
16  supervisor folks that work under, but how
17  would you describe it?
18      A.  Other than what I just said, I don't
19  know exactly what it is that you are asking
20  me.
21      Q.  Okay.  Well, for example, did you get
22  along?  Prior to December 29, 2007, did you
23  get along with her?
24      A.  I still don't understand it, sir.
25          Are you asking me did -- were we --

Page 54
R. Figueroa
1
2  did we ever go out and socialize?
3      Q.  No.  I'm just asking you how would
4  you describe the relationship with Ms.
5  Sachdeva prior to December 29, 2007 so --
6      A.  It was professional.
7          MR. WOLIN:  Objection.
8          I think he's already answered it as
9  best he can.
10         MR. LYNCH:  He hasn't, okay.
11         THE WITNESS:  Professional.
12      Q.  Well, prior to December 29, 2007, did
13  you ever have any disagreements with her?
14      A.  I don't recall.
15      Q.  Can you tell me back in December of
16  2007, can you describe Ms. Sachdeva's physical
17  characteristics?  For example, height?
18  Weight?  Hair color?
19      A.  I couldn't guess at those.
20      Q.  Well, from what you recall?
21      A.  I don't know what her height was.  I
22  don't know what her weight was, and I believe
23  her hair color was dark.
24      Q.  Well how tall are you, sir?
25      A.  Five foot nine.

Page 55
R. Figueroa
1
2      Q.  Is Ms. Sachdeva taller than you?
3      A.  No.
4      Q.  So she is shorter than five foot
5  nine?
6      A.  Yes.
7      Q.  And how much do you weigh, sir?
8      A.  How much do I weigh now?
9      Q.  Well, let me clarify.  Back in
10  December of 2007, approximately how much did
11  you weigh?
12      A.  I don't know.
13      Q.  Well, do you know back in December of
14  2007 from what you recall, did you weigh more
15  than Ms. Sachdeva?
16      A.  Sir, I can't answer that.  I don't
17  know what she weighed, so I can't tell you --
18      Q.  Let me just -- what I always tell
19  folks, remember I wasn't there, you lived
20  there, so I don't know.  So a lot of my
21  questions are very specific but they are
22  specific, sir, because I wasn't there, I don't
23  know what these people look like, I don't know
24  what your relationship was and so forth.
25          So some of it might seem a little

Page 56
R. Figueroa
1
2  irritating, but I need to ask that so I can
3  get as best a picture as --
4      A.  No, it's not that it's irritating
5  it's, just open-ended.
6      Q.  Well, when I ask in terms of your
7  weight, we, you know, in terms of how we
8  compare weight-wise to someone else as best
9  you recall.
10         Did she, from what you recall back in
11  December of 2007, did she weigh more than you?
12      A.  Without knowing any factual
13  specifics, I would say that I weighed more
14  than Ms. Sachdeva.
15      Q.  When you say "without knowing any
16  factual specifics," what do you mean?
17      A.  I don't know what Ms. Sachdeva's
18  weight was, she may have weighed more than me.
19      Q.  Okay.  Now, prior to Ms. Sachdeva
20  becoming your supervisor, did the two of you
21  work together as co-workers?
22      A.  Yes, on occasion, briefly.
23      Q.  When did the two of you begin to work
24  together as co-workers?
25      A.  Oh, I couldn't give you a date, but


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
57—60

Page 57

1       R. Figueroa
2   it was shortly after I arrived at JFK in 2002,
3   and it was sporadically, it wasn't anything
4   routine or ongoing.
5       Q.  So it was sometime in 2002 you and
6   Ms. Sachdeva began to work together as
7   co-workers?
8       A.  Well, let me clarify that a little
9   bit more.  We worked at the same place at the
10  same time.  We never worked shoulder to
11  shoulder.  We never were assigned to the same
12  assignment, you know, we were at the same
13  place at the same time, maybe the same
14  terminal working during the same hours, but we
15  never shared duties.
16      Q.  Okay.
17      A.  Or our duties were never incorporated.
18      Q.  Is it fair to say sometime in 2002 is
19  when you first met Ms. Sachdeva?
20      A.  I would say that, yes.
21      Q.  And when the two of you were
22  co-workers, just focusing before she became
23  your supervisor, how did the two of you get
24  along?
25      A.  As well as I got along with anyone

Page 58

1       R. Figueroa
2   else.
3       Q.  When you say that, what does that
4   mean?
5       A.  It was a working relationship.
6       Q.  And when you say it was "a working
7   relationship," that means many different
8   things to many different people.  What do you
9   mean when you say that you and Ms. Sachdeva
10  had a working relationship when the two of you
11  were just co-workers?
12      A.  We were just co-workers who worked at
13  the same place at the same time, nothing more,
14  nothing less.
15      Q.  Did you ever joke around with her
16  when the two of you were co-workers?
17      A.  I don't recall that ever happening.
18      Q.  So why don't you tell me what time of
19  day did the incident between you and Ms.
20  Sachdeva occur on December 29th of 2007?
21      A.  I don't remember.
22      Q.  Well, can you tell me what shift were
23  you assigned to work on December 29th of 2007?
24      A.  To the best of my recollection, a
25  4:00 to 12:00 shift.

Page 59

1       R. Figueroa
2       Q.  And a 4:00 to 12:00 shift, is that
3   4:00 p.m. to 12 midnight?
4       A.  Yes.
5       Q.  Okay.  And what time did you report
6   to work that day?
7       A.  At 4:00 p.m.
8       Q.  And on December 29, 2007, which
9   branch did you report to?
10      A.  The mail branch.
11      Q.  Okay.  Now, on December 29, 2007,
12  before the incident with Ms. Sachdeva
13  occurred, did you have any interactions with
14  her that day before the incident?
15      A.  I don't recall.
16      Q.  Can you tell me what were you doing
17  immediately before the incident on
18  December 29, 2007?
19      A.  I must have been at my work
20  assignment.
21      Q.  What was your work assignment?
22      A.  I don't remember.
23      Q.  Well, was there a building that you
24  reported to work back in December of 2007?
25      A.  Yes, the mail facility.

Page 60

1       R. Figueroa
2       Q.  Where specifically is the mail
3   facility at JFK Airport?
4       A.  You mean the address?
5       Q.  Focusing on December of 2007, where
6   was the mail facility at JFK Airport that you
7   reported to work?
8           MR. WOLIN:  Objection.
9           You can answer it.
10      A.  I'm not exactly sure how to answer
11  that.  The mail facility is on the grounds of
12  JFK Airport.
13      Q.  Okay, but is there a specific
14  building location?  Building location number?
15      A.  There is only one mail facility.
16      Q.  Okay?
17      A.  And that's where I reported to.  Now,
18  it does have a building number I can't recall
19  what the building number was, and I definitely
20  don't have an address for you, but the
21  location has not changed.
22      Q.  Okay.  So back in December of 2007,
23  can you describe what the mail facility at JFK
24  Airport looked like that you reported to work
25  at?

 Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
65—68

Page 65

```
1              R. Figueroa
2  to the merge in your respective agency has now
3  been given the title legacy customs or legacy
4  INS.
5          Well, the mail facility were being
6  run by legacy customs people.  So if you were
7  a legacy person you'd want to work there
8  because it was with other people from your
9  previous agency and they ran things according
10 to what I was used to.
11         So when I went to the mail branch,
12 the way things were occurring with regard to
13 seniority, holidays and vacations, everything
14 was done according to seniority.
15         My first year at the mail branch, I
16 was told you are the lowest senior member in
17 the entire mail branch command.  So,
18 therefore, you are going to have to work
19 Thanksgiving and Christmas because we have a
20 scanner in the back.  When mail trucks come
21 into the facility, they have to drive passed a
22 radiation scanner in the event there is
23 anything bad in its cargo, the truck stops and
24 we come out and examine and find the cause of
25 that radiation alarm.
```

Page 66

```
1              R. Figueroa
2      So they needed someone to monitor
3  that during the Thanksgiving and Christmas
4  holidays.  It was pointed out to me that I was
5  the least senior member working there, and
6  that I would have to pull that duty on both
7  those two holidays, but at that time, that's
8  how things ran, it ran according to seniority,
9  as well as it did the following year.
10         So I checked, I was the least senior
11 individual, and I was there -- as a matter of
12 fact, I showed up early on both those holidays
13 so I can give the fellow who was watching
14 it --
15    Q.  Which holidays and years are you
16 referring to?
17    A.  Thanksgiving and Christmas.
18    Q.  Of which year?
19    A.  Of 2006, I believe.
20    Q.  Okay.
21    A.  So I showed up early to give the
22 fellow a head start in going on with his
23 holiday, no sense in ruining his any further,
24 and I took my position.
25         The following year, I was no longer
```

Page 67

```
1              R. Figueroa
2  the least senior man, there were five officers
3  who were junior to me.
4    Q.  And who were the five officers that
5  were junior to you?
6    A.  Well, the most junior man was Officer
7  Redacted F Redacted.  And then there were four
8  other officers, I believe an officer -- let me
9  know when you are ready, because I know you
10 are taking notes.
11    Q.  No, we have the court reporter here,
12 so I'm listening.
13    A.  There was an Officer V Redacted, an
14 Officer Sa Redacted, an Officer Sz Redacted,
15 Officer Fischetti and one other officer that I
16 can't think of right now, but there were five
17 officers who had lower seniority than mine,
18 with Officer F Redacted being the least senior
19 officer, I was told during this holiday
20 season.
21    Q.  When you say "this holiday season,"
22 you are referring to the 2007 holiday season?
23    A.  Yes, for Thanksgiving and Christmas
24 by Supervisor Sachdeva that I was going to
25 have to work Thanksgiving and Christmas.
```

Page 68

```
1              R. Figueroa
2  Okay.  Well, what do you mean, I worked
3  Thanksgiving and Christmas the previous year,
4  because I was the least senior guy.  And
5  that's all well documented and can be proven
6  at any time.
7    Q.  So when were you told by Ms. Sachdeva
8  that you were going to have to work
9  Thanksgiving and Christmas of 2007?
10    A.  Sometime in November.
11    Q.  So sometime in November of 2007 you
12 were told by Ms. Sachdeva that you were going
13 to have to work the Thanksgiving and Christmas
14 holiday that season?
15    A.  I believe just the Thanksgiving
16 holiday --
17    Q.  So --
18    A.  -- because we weren't up to
19 Thanksgiving yet.
20    Q.  All right.  So just let me make sure
21 I understand this.
22         So sometime in November of 2007 you
23 are told by Ms. Sachdeva you are going to have
24 to work Thanksgiving; correct?
25    A.  Yes.
```

RICHARD FIGUEROA                                           May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                      69–72

Page 69

R. Figueroa

2    Q.  And tell me about that conversation
3  itself?  Do you recall when in November of
4  2007 it was prior to Thanksgiving?
5    A.  It was prior to Thanksgiving.  We
6  were given notices as to the holidays we were
7  going to be assigned.
8    Q.  Now, let me ask you, how were the
9  holiday schedules assigned during that period?
10  So, in other words, did people put in to say I
11  want to not work on Thanksgiving, Christmas or
12  any other holiday?
13    A.  No, the way the procedure worked was
14  we know Thanksgiving and Christmas are primary
15  holidays, as well as New Year's Eve and New
16  Year's Day.  So officers don't have to put in
17  for them, because the seniority takes care of
18  it.
19      I am a senior man here, I will not be
20  working those holidays.  The junior people,
21  there is no need to put in for it.  Okay,
22  that's how the system operated.
23    Q.  When you say "that's how the system
24  operated" in 2007, is there a specific policy
25  that you know about that you can refer to

Page 70

R. Figueroa

2  during that period in terms of how holiday
3  schedules worked?
4    A.  Yes, the union contract.
5    Q.  So the NTE union contract for that
6  period governed how the holiday schedule would
7  be assigned?
8    MR. WOLIN:  Objection.
9      You can answer it.
10    A.  It stipulated that holidays will be
11  assigned as per seniority basis.
12    Q.  Okay.
13    A.  Okay.  Now, what happens is you do
14  get assigned holidays, but you get what's
15  considered by most people the non-important
16  holidays, such as, I don't know maybe Martin
17  Luther King day because it's not a big family
18  day, and it sometimes falls within the week,
19  so it's not like a Christmas or a
20  Thanksgiving, which is a big family holiday
21  that often falls around the weekend or part of
22  the weekend.
23      So sometimes it's even extended.  So
24  a holiday such as that, Veterans or Memorial
25  Day, although it's very big with people who

Page 71

R. Figueroa

2  are patriotic and Veterans, once again, it's
3  not like a Christmas or a Thanksgiving.  So if
4  your seniority called for you to work on one
5  of these holidays, you worked your holidays.
6      Now, I was given a holiday that was
7  unheard of for a man of my seniority.
8    Q.  So let's focus on that conversation
9  back in November of 2007.
10      What do you recall Ms. Sachdeva
11  saying to you when she told you you'd have to
12  work the Thanksgiving holiday?
13    A.  Well, I believe she gave everyone
14  notices as to the holidays that we were
15  working.  And I approached her and I said,
16  "Excuse me, I'd like to speak to you about my
17  working on Thanksgiving.  How is this
18  possible?  Seniority dictates that I'm to be
19  off on that day."
20    Q.  What did she say in response?
21    A.  She said, "That's how the holidays
22  are going to fall and that's how you are going
23  to be working on that day."
24      She is making up a rule on her own
25  that's totally against the way we are

Page 72

R. Figueroa

2  operating there at JFK by virtue of the union
3  contract.  She is not entitled to do that.
4  She has to go along with the union contract as
5  per the higher echelon of the airport in the
6  area of management that has to follow along
7  the union guidelines as well.
8    Q.  So what happened next?
9    A.  So she says, "That's the holiday you
10  are going to be working and you are going to
11  have to figure a way out on your own."
12      All right.  So I started going
13  speaking with other managers as well as the
14  union, and I pointed out how the year before I
15  was the least senior individual and worked the
16  two holidays that were very popular, because
17  of the fact my seniority dictated that.  And
18  my seniority dictates this year, this
19  particular year, that I do not work on these
20  holidays, yet she is assigning me this
21  holiday, all right.
22      I didn't get any assistance.  I got
23  supervisors that told me I didn't prepare the
24  holiday schedule, if I did, it surely would
25  not have worked out this way.


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
73—76

Page 73

1    R. Figueroa
2      Q. Can you tell me back in 2007 when you
3  were assigned to the mail branch, how many CBP
4  folks worked in the mail branch during that
5  period?
6      A. I can't give you a specific number,
7  but for some reason the number 16 stands out
8  in my mind, but I can't be held to it because
9  I may be wrong, but suffice to say
10  approximately 20 people, 20 officers assigned
11  to the mail branch. We also have civilian
12  personnel assigned there as well.
13      Q. But in terms of officers, there are
14  approximately 20 were assigned to the mail
15  branch back in 2007, approximately?
16      A. Approximately.
17      Q. Okay. Now, back then in 2007, even
18  if you are a senior CBP officer in the mail
19  branch, would you get all of the major
20  holidays off normally back in 2007?
21      A. Yes.
22      Q. So every major holiday you would get
23  off based on seniority?
24      MR. WOLIN: Objection.
25      A. Well, that's what the contract called

Page 74

1              R. Figueroa
2  for. You know, when a union contract is
3  established, it's established between the
4  union party and the port that you are working
5  at. And this is a contract that's in effect
6  throughout the entire United States.
7      So suffice to say, that an officer
8  working at JFK, when it comes to holiday
9  assignments, it works the same way, you know,
10  it's supposed to work the same way at all the
11  other ports as well.
12      Q. Back just in 2007, if you are a
13  senior person in the mail branch, are you
14  saying that you would be entitled to all of
15  the major holidays that year off?
16      MR. WOLIN: Objection.
17      A. Well, once again, the contract
18  dictated that holidays are to be assigned as
19  per seniority.
20      Q. Okay.
21      A. So if you had high seniority, you
22  would not get the holiday.
23      Q. All right. So it's fair to say you
24  were not pleased that you had been assigned to
25  work the Thanksgiving holiday back in 2007; is

Page 75

1              R. Figueroa
2  that correct?
3      A. No, I was not satisfied, because it's
4  going against the contract, and I adhered to
5  the contract parameters the prior year,
6  nothing has changed.
7      Q. Okay.
8      A. Now, if I adhered to the rules and
9  regulations, why can't someone in the stature
10  of supervisor do the same.
11      Q. So it was your belief that the
12  contract had not been followed in relation to
13  you being a senior person back then with
14  regard to how the way the holiday schedule had
15  been assigned?
16      THE WITNESS: Repeat that again for
17  me?
18      MR. LYNCH: Can you repeat my
19  question?
20      (Question read.)
21      A. It's not my belief or disbelief. The
22  fact of the matter is the contract was not
23  followed.
24      Q. Well, that's what I'm asking though,
25  your belief, though. You know, that's what --

Page 76

1              R. Figueroa
2  we all have beliefs, whether they are based on
3  facts or not.
4      So just my question was, was it your
5  belief back in November of 2007 that when you
6  had been assigned to work the Thanksgiving
7  holiday that the union contract had not been
8  followed; is that correct?
9      A. Right, but it goes beyond just my
10  belief, sir. It was --
11      MR. WOLIN: He already made that
12  clear and he already explained what he meant
13  by "your belief."
14      A. That the contract had not been
15  followed.
16      Q. Right. And you had complained to
17  your union back in November of 2007 that you
18  didn't believe that the union contract had
19  been followed with regard to the holiday
20  schedule, you being a senior person; is that
21  right?
22      A. That is correct.
23      Q. Okay.
24      A. Furthermore, I have to add that she
25  gave Officer F▮Redacted▮, the least senior



RICHARD FIGUEROA                                        May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                   77–80

Page 77
1            R. Figueroa
2  individual that holiday off.
3     Q.  Okay.  And how did you know that
4  Officer F[Redacted] had the Thanksgiving holiday
5  off?
6     A.  Well, the holiday schedule was
7  printed up.
8     Q.  Okay.  So let's just backup because
9  again, I'm not there.
10       Sometime in November of 2007
11  Sachdeva, as a supervisor, hands out cards
12  letting folks know which CBP officers are
13  assigned to work the holidays for that year;
14  is that correct?
15    A.  Well not card, but she prints up a
16  memorandum and she'll post it indicating this
17  is the holiday schedule for the time period
18  concerned.
19    Q.  Okay, so there is a holiday schedule
20  memo that gets posted of who is going to be
21  working the holidays for the rest of 2007?
22    A.  Yes.
23    Q.  And that was sometime in November of
24  2007; correct?
25    A.  Yes.

Page 78
1            R. Figueroa
2     Q.  Okay.  And is it that you found out
3  from looking at the general memo that was
4  posted that you would have to work that
5  Thanksgiving holiday?
6     A.  Yes.
7     Q.  And where was this memo posted in
8  relation to --
9     A.  I don't remember, but it was in an
10  area conspicuous where we congregate, either
11  the lunchroom or the lineup area where we
12  begin our shift, but it was somewhere posted
13  conspicuously, and in more than one location.
14    Q.  And that memo lists where every
15  officer for the remainder of 2007 is going to
16  be working a holiday?
17    A.  It will stipulate what holidays you
18  will be working.  And by stipulating what
19  holidays you are working, therefore, tells you
20  what holidays you will be off.
21    Q.  Okay.  And when you had went to your
22  union, did you see a union rep?
23    A.  Yes, I did.
24    Q.  Who was the union rep that you saw to
25  complain?

Page 79
1            R. Figueroa
2     A.  I believe it was John Will.
3     Q.  Okay.  And did you ask Mr. Will to
4  file a grievances on your behalf?
5     A.  Oh, yes, but the idea was for them to
6  make phone calls, because a grievance is
7  something that takes time, it doesn't address
8  the matter in the immediate.
9     Q.  So when you went to see John Will,
10  who was your union rep back in November of
11  2007, what did you say to him?
12    A.  I told him that -- just what I
13  explained here, that the prior year I was the
14  least senior man, I worked my holidays this
15  year, I am not the least senior man, there are
16  five people underneath me.  And the least
17  senior guy got the Thanksgiving holiday off
18  and I have to come in on Thanksgiving?
19    Q.  What did Mr. John Will say in
20  response?
21    A.  He said that we'll initiate a
22  grievance, but we'll try to make phone calls
23  to see if we can get this resolved so it
24  doesn't have to go that route.
25    Q.  And do you know if the union did make

Page 80
1            R. Figueroa
2  phone calls on your behalf with regard to this
3  Thanksgiving holiday issue?
4     A.  They told me they did.
5     Q.  Okay.  And when did they tell you
6  that they did make phone calls on your behalf?
7     A.  Probably the next day or the day
8  after, but, you know, within a couple of days.
9     Q.  Was it Mr. Will as a union rep that
10  reported to you that they made phone calls on
11  your behalf?
12    A.  Yes.
13    Q.  What did Mr. Will say to you?
14    A.  That phone calls were made, but we
15  are waiting to hear back from some people, but
16  so far it doesn't look good.
17    Q.  Did you ask Mr. Will why didn't it
18  look good?
19    A.  Yes, and he told me this is what she
20  did and they are going along with her
21  scheduling of the holidays.
22    Q.  When he said "they," who was Mr. John
23  Will referring to?
24    A.  Upper management.
25    Q.  And did Mr. John Will explain why


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
81–84

Page 81

R. Figueroa
1
2  they were going along with Ms. Sachdeva?
3      A. No.
4      Q. Did you ask him?
5      A. Yes.
6      Q. What did he say?
7      A. I don't know why.
8      Q. And ultimately, how was the
9  Thanksgiving issue back in 2007 resolved?
10  Were you being assigned to work?
11      A. It wasn't resolved. I was assigned
12  to work that holiday.
13      Q. When did you receive notice that it
14  was not going to be resolved in your favor?
15      A. Just naturally prior to the holiday
16  arriving, and it was verbal.
17      Q. Do you recall what day that was?
18      A. No, I don't.
19      Q. So tell me about how did you verbally
20  find out that the Thanksgiving 2007 holiday
21  issue hadn't been resolved in your favor?
22      A. Well, Mr. Will told me and also
23  Officer Fasano.
24      Q. So tell me about the day Mr. Will
25  told you that the Thanksgiving holiday issue

Page 82

R. Figueroa
1
2  hadn't been resolved in your favor?
3      A. Well, basically I already stated that
4  he just told me they are not budging on it,
5  you are going to have to work the Thanksgiving
6  holiday and they are giving this kid, meaning
7  Officer Fischetti, the day off.
8      Q. Did you ask him why?
9      A. Yes, I did.
10      Q. What did he say?
11      A. He said, "I have no answer for you.
12  I don't know why."
13      Q. And you also mentioned that you had
14  found out from Officer Fasano that the
15  Thanksgiving 2007 holiday issue hadn't been
16  resolved.
17      When did you speak to Mr. Fasano?
18      A. All throughout the same time I was
19  speaking with Mr. Will.
20      Q. Who exactly is Mr. Fasano?
21      A. Mr. Fasano is a senior officer who
22  handled most administrative functions at the
23  mail branch, including making up the holiday
24  schedule, because the supervisor does not have
25  to make that up because the rules are clear.

Page 83

R. Figueroa
1
2  So, therefore, you look and see who's got the
3  most seniority and who's got the least
4  seniority and you schedule them accordingly.
5      Q. How did Mr. Fasano though get
6  involved with this Thanksgiving holiday 2007
7  issue?
8      A. Well, he said that --
9      Q. Did you go complain to Mr. Fasano?
10      A. Yes, I did.
11      Q. Why did you go to complain to Mr.
12  Fasano?
13      A. Because he is a de facto senior
14  person who pretty much acts as a senior
15  adviser, if you will, to management and
16  management listens to him and his opinions
17  practically all the time.
18      So he is generally a problem solver
19  for the members who work there and as a
20  go-between between us and management.
21      Q. But he wasn't one of your supervisors
22  back then?
23      A. No, he wasn't one of the supervisors,
24  but he was a union representative as well.
25      Q. Okay. So in addition to Mr. Will,

Page 84

R. Figueroa
1
2  Mr. Fasano also functioned as a union
3  representative?
4      A. Yes, he did.
5      Q. Okay. And so tell me about the
6  conversation with Mr. Fasano when you learned
7  that the Thanksgiving issue hadn't been
8  resolved in your favor?
9      A. Well, basically it was the same
10  conversation. I said, "Look I was working the
11  holiday before because I was the least senior
12  guy. This year I have five officers
13  underneath me, with Officer Fischetti being
14  the least senior individual, and can someone
15  explain to me how he gets Thanksgiving off and
16  I have to come in on Thanksgiving day?"
17      He said, "That's not right, I'll look
18  into it. We have to get that corrected."
19      Q. And then there came a time that Mr.
20  Fasano said that it hadn't been resolved;
21  correct?
22      A. Right, he told me "for some reason
23  they want you to work Thanksgiving, and I
24  don't know why."
25      Q. And what did you do next after you


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
105–108

Page 105

1          R. Figueroa
2  fact that Ms. Sachdeva had assigned you to
3  work the Thanksgiving holiday?
4      A. No, sir, because I'm going to tell
5  you something, even though I'm irritated now,
6  I'm actually downright nervous, because I
7  don't know what she is going to do at this
8  point in the game.
9      Q. But just in terms of why you didn't
10  want to speak to Ms. Sachdeva leading up to
11  the two of you going into the detention room
12  when you say she had asked to speak with you
13  not once, not twice, but three times, is it
14  fair to say you were angry about the fact that
15  she had assigned you to work the Thanksgiving
16  holiday?
17      MR. WOLIN:  Objection.
18      You can answer it.
19      A. Well, I certainly didn't want to
20  speak to her because of what she had done, and
21  it's painfully obvious what you did, you
22  disregarded the union contract.  You
23  disregarded the procedure on how to assign
24  people holidays.  You gave the least senior
25  guy the holiday off.  Okay, how is anyone

Page 106

1          R. Figueroa
2  supposed to feel in their right mind.
3      Q. So at the point that she had assigned
4  you to work the holiday, the Thanksgiving 2007
5  holiday and it hadn't been resolved, you
6  really didn't want to have anything to do with
7  her unless it related to official business as
8  you say; do I understand correctly?
9      A. Yes, that is my prerogative, and that
10  is one of the freedoms I enjoy under the
11  constitution, I don't have to engage in your
12  company unless it relates to what I'm being
13  paid to do.
14      Q. All right.  So now we are going back
15  into the detention room, and after you tell
16  Ms. Sachdeva what exactly do you want from me,
17  what happens next?
18      A. Well, she begins to say "What's the
19  matter?  Did I do something?"
20      "Did you do something?  That whole
21  holiday thing, are you forgetting that?  Why
22  did you do that?"
23      Then she begins to say, "Well, you
24  gotta understand I didn't mean for it to turn
25  out that way."

Page 107

1          R. Figueroa
2  "Didn't mean for it to turn out that
3  way?  I brought it to your attention or it was
4  brought to your attention you still did
5  nothing about it, okay."
6      Furthermore, what you went ahead and
7  did was -- we have a computer, a scheduling
8  system, it's known as COSS, I think it stands
9  for Customs Officers Scheduling System, okay,
10  anyone can sign-in to this system if you want
11  to see where a particular officer is working,
12  all right.  If you want to see if a particular
13  officer is going to be working anywhere nearby
14  you or you are going to be working with a
15  particular officer, anyone is entitled to do
16  an inquiry into the system, okay.
17      They have Officer Fworking
18  on Thanksgiving Day listed in the computer,
19  okay.  Prior to Thanksgiving Day coming, it
20  was switched.  So what you did was, so
21  everybody in the rest of the airport, and then
22  there isn't a bigger outcry, you made it look
23  like F[Redacted] was going to work, and then at
24  the last minute you switched him to having the
25  holiday off so it's too late for anybody to do

Page 108

1          R. Figueroa
2  anything about it, in the event they inquiry
3  COSS, okay.  My guess is it was Officer
4  Sachdeva that did that.
5      Q. Why do you guess that it was Ms.
6  Sachdeva?
7      A. Well, she gave him the day off.  Who
8  else was going to put him in as having the day
9  off, and why did you wait until the last
10  minute?
11      Q. So, I'm sorry, I'm not understanding
12  what the issue was with Mr F[Redacted] and the
13  COSS system.
14      A. Everyone knows Officer F[Redacted] is a
15  new officer, okay.  Everyone is well aware of
16  their seniority and their standing.  If they
17  look up and they see who is getting a holiday
18  off and they know that that's a junior officer
19  and he is getting the holiday off and they
20  have to work a holiday, there will be more of
21  an outcry.
22      So that Ms. Sachdeva doesn't have to
23  suffer the pangs of that outcry, it would
24  behoove someone to change Officer F[Redacted]'s
25  assignment at the last possible second to

RICHARD FIGUEROA                                                    May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                                  109–112

Page 109

1              R. Figueroa
2  having the holiday off.
3      Q.  But I thought there was the memo, the
4  holiday schedule?
5      A.  We knew at the mail branch that he
6  was going to have it off.
7      Q.  Right?
8      A.  But now airport-wide doesn't know
9  about this, unless people speak about it.
10     Q.  But the memo is posted in a
11 conspicuous area?
12     A.  For ourselves in the mail branch.
13 Chances are the news is going to get out, but
14 just so people can't point to it and say look,
15 it's documented, he is going to have the day
16 off, okay, it was done at the last minute.
17     Q.  So you are saying at the last minute
18 it was entered into the COSS system that
19 Officer F[Redacted] was not going to be working
20 the Thanksgiving 2007 holiday?
21     A.  That's right.  All the other holiday
22 assignments were in there except for Officer
23 F[Redacted]'s.
24     Q.  And how do you know this?
25     A.  Because I knew what was going on.  I

Page 110

1              R. Figueroa
2  looked it up.  Anybody who works there knows
3  how to substantiate what their accusations
4  are.
5      MR. WOLIN:  I think the question was
6  what was discussed at the meeting in the
7  detention room.
8      MR. LYNCH:  Well, we are going to get
9  there.
10     MR. WOLIN:  Listen to the question.
11     THE WITNESS:  Yes, but if I said look
12 at what you did with Officer F[Redacted] and
13 COSS, you are not going to understand what I
14 mean.
15     MR. LYNCH:  Okay.  Can you just read
16 his answer before that?
17     Q.  Why don't you tell me exactly what
18 you said to Ms. Sachdeva while you were in the
19 detention room?
20     MR. WOLIN:  Was your question
21 concerning the COSS?
22     Q.  Right, what exactly did you say to
23 Ms. Sachdeva as far as the COSS system when
24 you were in the detention room back on
25 December 29, 2007?

Page 111

1              R. Figueroa
2      A.  Now, you guys got me lost.
3      Q.  Just -- you explained to me earlier
4  you spent sometime explaining to me the COSS
5  system and with F[Redacted]
6      Right now I want to know exactly what
7  you said to her with respect to the COSS
8  system, because now I get it.  So just what
9  you said to her?
10     MR. WOLIN:  He is asking you what you
11 said to her.
12     Q.  Right, what did you say to her as far
13 as the COSS system?
14     A.  Well, I told her, you know, "look at
15 what you did in COSS.  You put him in so that
16 people wouldn't have a complaint."
17     Q.  And what did she say in response?
18     A.  She said, "Well you have to
19 understand, in order to get this whole thing
20 done, I had papers all over the floor of my
21 house, this was such a difficult exercise that
22 I wish you could have seen the big mess I have
23 in order to get this accomplished, but you
24 can't see it because I threw it all away."
25     I'm saying "I don't understand how it

Page 112

1              R. Figueroa
2  can be this big drawn out thing, you only have
3  but a couple of people to assign on that day,
4  so how is it that you have the floor strewn
5  with paperwork in order to get it done?"
6      She said, "Well, if you thought it
7  was so easy, then maybe you should have done
8  it."
9      I said, "A lot of people have said
10 they wish they could have done it and that you
11 shouldn't have, if this is how it's going to
12 turn out."
13     Q.  And what happened next?
14     A.  Well, she kept saying "I didn't mean
15 for it to happen, that wasn't my intention."
16     "You are lying, it was your intention
17 to do that, because you had to skip over a lot
18 of people just to get to me and assign me on
19 that day, so you are lying to me, okay.  I
20 don't want to talk to you anymore."
21     Q.  And then what happened?
22     A.  As far as I remember, we left the
23 room.
24     Q.  How long did the incident itself last
25 on December 29, 2007?

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
113–116

Page 113

R. Figueroa

1
2    A. Maybe a minute or two, three
3  possibly. No longer than that.
4    Q. No longer than?
5    A. A couple of minutes.
6    Q. So you are saying the whole
7  conversation lasted no more than a couple of
8  minutes?
9    MR. WOLIN: Objection.
10   Can you just clarify? You are
11 referring to the conversation in the detention
12 room?
13   Q. In terms of the incident itself
14 between you and Ms. Sachdeva in the detention
15 room?
16   A. A few minutes.
17   Q. How long did that incident last in
18 the detention room?
19   A. A few minutes.
20   Q. Okay. When you say "a few minutes,"
21 is that under 10 minutes?
22   A. I would say so.
23   Q. More than five minutes?
24   A. I don't know. I don't know, it's a
25 few minutes. I mean the whole thing was

Page 114

R. Figueroa

1
2  recorded. I'm sure you can retrieve it.
3    Q. Why do you say it was recorded?
4    A. We know the detention room is
5  recorded. That's why I went in there. We
6  store drugs and weapons in there, it has to be
7  recorded.
8    Q. Well, how would you characterize the
9  incident between you and Ms. Sachdeva in the
10 detention room? For example, would you refer
11 to it as an argument? A conversation? How
12 would you characterize the incident between
13 you two in the detention room?
14   A. Being as how I didn't want to be
15 there, but I was there through coercion and
16 not knowing where else I can turn --
17   Q. Well, when you say you were "there
18 through coercion," what do you mean? She
19 didn't order you to go into the detention
20 room?
21   A. She is a supervisor, she is not
22 another officer. A supervisor keeps telling
23 you I want to have a chance to talk to you, I
24 want to talk to you three times, how many
25 times before you wind up saying yes.

Page 115

R. Figueroa

1
2    No isn't working, because she is
3  still there. There was no confusion as to my
4  intention. I did not want to talk to you
5  lady, but why are you still insisting.
6    Q. Okay, but when you use the word
7  coerced, how were you coerced into going into
8  the detention room?
9    MR. WOLIN: Objection.
10   I think he already answered it.
11   A. I already answered it.
12   MR. LYNCH: You can make the
13 objection.
14   MR. WOLIN: I know, no speaking
15 objections.
16   Q. When you say coerced, sir --
17   A. You are constantly telling me you
18 want to talk to me and you are not leaving me
19 alone. You are not allowing me to engage in
20 free will at that point. You are a
21 supervisor, you have rank, okay. You are
22 telling me constantly that you want to talk to
23 me, you want to talk to me, you want to talk
24 to me, you have rang. Okay, the playing field
25 is not equal at that point. And your

Page 116

R. Figueroa

1
2  repetition, repetition, I felt coerced and I
3  think anyone else would have categorized it
4  the same way.
5    MR. LYNCH: Okay. Can you just read
6  my last question back?
7    (Question read.)
8    Q. Well, would you say it was an
9  argument between the two of you when you were
10 in the detention room?
11   A. I would say it was a heated
12 discussion.
13   Q. Why do you say "a heated discussion?"
14   A. I didn't want to be there, sir.
15   Q. Okay. All right. But when you say
16 "a heated discussion" and again, Mr. Figueroa,
17 let me be clear, when you say certain terms, I
18 don't know what they mean, so when you say
19 them the natural response is going to be to
20 explain. You can't just tell me a heated
21 discussion. What does that mean? A heated
22 discussion, and you are a CBO officer, means
23 one thing to somebody else than another.
24   What does a heated discussion mean to
25 you when you are describing the incident

RICHARD FIGUEROA

RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013

117–120

Page 117

R. Figueroa

2 between the two of you in the detention room?
3    A. Okay, I didn't want to be in the
4 detention room. I felt coerced by being in
5 there. I don't know what this woman is
6 capable of doing, okay. You already lied to
7 me, all right, and you went ahead and flat out
8 did this boldface move, disregarding
9 everything that you needed to adhere to, and
10 you disregarded it and you went ahead and you
11 did it anyway.
12       So it's leading me to believe that
13 she is capable of fabricating just about
14 anything.
15    Q. Okay. When you say it was "a heated
16 discussion" sir, were you raising your voice
17 to Ms. Sachdeva?
18    A. I don't recall. I know that she was
19 raising her voice to me. So I may have raised
20 my voice to match hers.
21    Q. How do you remember that she raised
22 her voice to you, but you don't know if you
23 raised your voice to her?
24    A. Because I remember her actions.
25 Remember, I'm there to see what she is going

Page 118

R. Figueroa

2 to do. I'm not going to be there so that
3 one day I can write down thinking that this
4 might turn into a play or something along
5 those lines. I'm there to see what she is
6 there to do. I'm focusing on her.
7    Q. But Mr. Figueroa, my question is
8 focused because you were there, you also know
9 what you did, sir, okay. So you have present
10 sense impression and you were there, okay.
11       So if you are seeing Ms. Sachdeva,
12 okay, naturally I'm going to ask you, what did
13 you do, because you were there.
14       So if you know that she raised her
15 voice at you, why don't you know, sir, whether
16 or not you raised your voice back at her?
17    A. I probably did.
18    Q. So you probably did raise your voice
19 to her?
20    A. Yes.
21    Q. So when you described this as a
22 heated discussion, is that because the two of
23 you were raising your voices at one another?
24    A. Yes.
25       MR. LYNCH: All right. So let's take

Page 119

R. Figueroa

2 a look at -- let's have this marked as
3 Defendant's Exhibit 4?
4       THE WITNESS: Is all that documents
5 from this case?
6       MR. WOLIN: Wait. You don't ask any
7 questions. If you want to ask me a question,
8 we can step outside.
9       MR. LYNCH: You can mark this.
10       (Defendant's Exhibit 4, January 3,
11 2008 memorandum was so marked for identification.)
12    Q. I'm showing you what's been marked as
13 Defendant's Exhibit 4. Just take a moment to
14 look at it and just let me know when you are
15 finished, Mr. Figueroa?
16    A. Okay, I'm finished.
17    Q. Okay. Do you recognize Defendant's
18 Exhibit 4?
19    A. Yes.
20    Q. Can you tell me what it is, sir?
21    A. I had to write up a written memo
22 concerning the incident with Ms. Sachdeva.
23    Q. And is what you are looking at,
24 Defendant's Exhibit 4, a copy of that memo?
25    A. I believe it is, yes.

Page 120

R. Figueroa

2    Q. And was the memo that you are
3 referring to that's Defendant's Exhibit 4, is
4 this a copy of a memo that you prepared, sir?
5    A. Yes.
6    Q. Okay. And the memo is dated
7 January 3, 2008, is that around the time that
8 you prepared the memo that's been marked
9 Defendant's Exhibit 4?
10    A. Well, I don't remember exactly what
11 date, but I would say that's probably correct.
12    Q. All right. So I'm going to also
13 refer to Defendant's Exhibit 4 as the
14 January 3, 2008 memorandum okay?
15    A. Okay.
16    Q. Now, just focusing on the second full
17 paragraph on Defendant's Exhibit 4?
18    A. The second paragraph?
19    Q. The second full paragraph.
20 Specifically, I want to direct your attention
21 to the second to last sentence where it
22 states, "At the end of the conversation, I
23 felt ill and told SCBPO Sachdeva that I was
24 sick."
25       Can you tell me when you said, "at

RICHARD FIGUEROA                                      May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                 157–160

| Page 157 | Page 159 |
|---|---|
| 1 R. Figueroa | 1 R. Figueroa |
| 2  A. No. | 2 to acknowledge receipt of this March 17, 2008 |
| 3  Q. Okay.  So then what happened at that | 3 notice of proposal to suspend you? |
| 4 point? | 4  A. Well, it didn't matter what the |
| 5  A. I waited for my union representation. | 5 intention was.  Every officer has a right to |
| 6  Q. So even without knowing what it was | 6 refuse to sign.  I exercised my right, it's as |
| 7 about that Chief Rios wanted to speak with | 7 simple as that. |
| 8 you, you had asked to have a union | 8  Q. Okay.  So after you received the |
| 9 representative present? | 9 March 17, 2008 notice of proposal to suspend |
| 10  A. Yes. | 10 also marked Defendant's Exhibit 4, what, if |
| 11  Q. And for what reason? | 11 anything, did you do in response now that you |
| 12  A. I wasn't told what they wanted to | 12 had this in your hand? |
| 13 speak with me about. | 13  A. I spoke with the union. |
| 14  Q. And so at a certain point on | 14  Q. Okay.  Well, when you look on the |
| 15 March 18, 2008, your union rep came to see | 15 second page of this March 17, 2008 notice of |
| 16 you? | 16 proposal to suspend you, it indicates in the |
| 17  A. Yes. | 17 second full paragraph that you had a right to |
| 18  Q. Do you remember who that union rep | 18 reply to the proposal orally or in writing or |
| 19 was? | 19 both, okay. |
| 20  A. No, I don't. | 20   Did you provide any type of response |
| 21  Q. What happened when he or she arrived? | 21 to this March 17, 2008 notice of proposal? |
| 22  A. I believe it was a he.  I believe it | 22  A. Well, I didn't provide an oral reply, |
| 23 may have been John Will, and he was informed | 23 not an immediate oral reply. |
| 24 as to what was going to go on, and then he | 24  Q. Did you provide a reply that was in |
| 25 told me. | 25 writing? |

| Page 158 | Page 160 |
|---|---|
| 1 R. Figueroa | 1 R. Figueroa |
| 2  Q. Okay.  And how was Mr. Will informed | 2  A. I cannot recall. |
| 3 what was going on? | 3   MR. LYNCH:  If we can have that |
| 4  A. He must have been told by Chief Rios. | 4 marked as Defendant's Exhibit 5. |
| 5  Q. So at a certain point on March 18, | 5   (Defendant's Exhibit 5, April 8, 2008 |
| 6 2008, Chief Rios asked you to sign this | 6 e-mail response was so marked for identification.) |
| 7 March 17, 2008 memo? | 7  Q. I'm going to show you a document |
| 8  A. Yes. | 8 that's been marked as Defendant's Exhibit 5. |
| 9  Q. Okay.  And at the point that she had | 9 Just take a moment to review it and let me |
| 10 asked you to sign it, was your union rep | 10 know when you have finished reviewing it, sir. |
| 11 present at that point? | 11  A. Okay. |
| 12  A. Yes. | 12  Q. Do you recognize what's been marked |
| 13  Q. Okay.  And at that point, why did you | 13 as Defendant's Exhibit 5? |
| 14 refuse to sign it? | 14  A. Yes. |
| 15  A. That's my right. | 15  Q. Can you tell me what it is, sir? |
| 16  Q. Okay. | 16  A. It must be a written response to the |
| 17  A. That's any officer's right. | 17 charges that I received on March 18th. |
| 18  Q. Okay, but I understand that that's | 18  Q. Okay.  And do you recognize |
| 19 your right, but my question is why?  Did you | 19 Defendant's Exhibit 5 as the written response |
| 20 believe that by signing this that you were | 20 that you provided to the March 17, 2008 notice |
| 21 agreeing to what was written in the March 17, | 21 of proposal to suspend you? |
| 22 2008 memo? | 22  A. I'm sorry, I didn't hear the last |
| 23  A. Well, I was thinking more along the | 23 half of your question. |
| 24 lines why should I sign the memo? | 24   MR. LYNCH:  Can you read it back? |
| 25  Q. Did you understand that it was just | 25   (Question read.) |

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
161–164

Page 161

R. Figueroa

1
2    A.  Yes.
3    Q.  And according to Defendant's
4  Exhibit 5, your written response was provided
5  in the form of an e-mail dated April 18, 2008?
6    A.  Yes.
7    Q.  Okay.  Does reviewing Defendant's
8  Exhibit 5 refresh your recollection as to
9  whether you provided a written response to the
10  March 17, 2008 notice of proposal to suspend
11  you?
12    A.  Well, this would -- this serves as my
13  written response to the March 18th notice.
14    Q.  March 17, 2008 notice of proposal to
15  suspend?
16    A.  Okay, but I received it on the 18th,
17  according to this notation.
18    Q.  Okay.
19    A.  Oh, but you are referring to it as
20  the March 17th -- okay.
21    Q.  Yes.  As I said, I'm just going to
22  refer to the proposal as the March 17, 2008?
23    A.  Certainly.
24    Q.  Okay.  So I'm going to refer to
25  what's been marked as Defendant's Exhibit 5 as

Page 162

R. Figueroa

1
2  your April 8, 2008 e-mail response, okay?
3    A.  Yes.
4    Q.  All right.  And again, this April 18,
5  2008, e-mail response marked Defendant's
6  Exhibit 5, that's what you provided in
7  response to this March 17, 2008 notice of
8  proposal to suspend you; correct?
9    A.  Yes.
10    Q.  Now, in your April 18, 2008 e-mail
11  response marked Defendant's Exhibit 5, you
12  claim that Ms. Sachdeva had "created a hostile
13  work environment that I am a target of in
14  order to distance herself from her actions."
15    Can you explain at the time that you
16  wrote this April 18, 2008 e-mail response how
17  had Ms. Sachdeva created a, as you say,
18  hostile work environment for you?
19    A.  Well, for one thing, as I'm walking
20  in the hallways, Chief Rios is looking at me
21  with distortions in her face and uttering
22  under her breath, and there is no one else
23  around.
24    MR. WOLIN:  Can I ask to have the
25  question repeated?

Page 163

R. Figueroa

1
2    MR. LYNCH:  You can read the question
3  and answer back.
4    (Record read.)
5    Q.  Okay.  When you are saying that for
6  one thing when you are walking in the hallway
7  Chief Rios was looking at you, what day are
8  you referring to?
9    A.  I can't tell you a specific day.
10    Q.  As best you can recall, around what
11  time period are you referring to when you are
12  saying that Chief Rios was looking at you
13  essentially funny?
14    A.  Well, this all began after the
15  December 29, 2007 incident.
16    MR. WOLIN:  I'm confused now.
17    MR. LYNCH:  Yes.
18    MR. WOLIN:  Your question was
19  Sachdeva -- and he is talking about -- and now
20  you are talking about Rios.
21    MR. LYNCH:  You want to just read my
22  question back one more time?
23    Q.  Let me just ask it again.  I'm asking
24  you from what you wrote in this April 18, 2008
25  e-mail response, how at the time that you

Page 164

R. Figueroa

1
2  wrote this April 18, 2008 e-mail response, how
3  had Ms. Sachdeva created a hostile work
4  environment for you?
5    A.  Well, she is writing me up on a
6  charge that I think is unwarranted.  The other
7  supervisors are treating me differently now,
8  they are being stern with me, where they
9  weren't before.
10    Q.  Okay.
11    A.  Other supervisors are telling me, you
12  know, to watch out, that they are coming after
13  you.
14    Q.  Okay.  Well, when are you alleging
15  that other supervisors began treating you
16  differently?
17    A.  Well, they wouldn't assist me if I
18  needed it.
19    Q.  Okay, but I'm asking you when?
20  Specifics?
21    A.  Oh, when?
22    Q.  Yes.
23    A.  It all began after the December 29th
24  incident.
25    Q.  So you are saying after the December

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
193–196

Page 193

1          R. Figueroa
2  through and they'll let you in."
3       Not I'd love to do it for you but I
4  don't have my card with me to let you in.
5       As a matter of fact, he went for his
6  card to let me in and then he said, you know
7  what, I'm not going to let you in."
8       He put his card back, that's how I
9  knew he had it.
10      Q.  Did you have a follow-up with him as
11  to why you won't let me in at that point?
12      A.  No, well, it's pretty obvious.
13      Q.  What was pretty obvious?
14      A.  If you are not letting me in, you are
15  basically tell me to go jump in a lake, I'm
16  not letting you in.
17      Q.  So after supervisor Mattina told you
18  that he wouldn't let you into the detention
19  room in January of 2008, what happened next?
20      A.  I waited until somebody came,
21  somebody who was assigned to the detention
22  room, because they have access, and they
23  opened up the door, I got my keys and I went
24  and began my work.
25      Q.  And how long did this incident with

Page 194

1          R. Figueroa
2  supervisor Mattina take back in January of
3  2008?
4       A.  Again, a matter of seconds.
5       Q.  And prior to that day in January of
6  2008, had you had any issues or conflicts, so
7  to speak, with supervisor Mattina?
8       A.  No.
9       Q.  And why do you believe that this
10  incident that took place with supervisor
11  Mattina in January of 2008 had anything to do
12  with what happened between you and Ms.
13  Sachdeva on December 29, 2007?
14      A.  Because exactly what you just said,
15  we worked in baggage and we never had a
16  problem.
17       Now, he is working in mail and we had
18  a good relationship and the incident with
19  Sachdeva takes place, and now you are not even
20  going to let me into this room and you have
21  access and you are standing in front of the
22  door, it takes two seconds so that I can get
23  my keys and begin my work?
24       What other reasonable explanation
25  could there possibly be?

Page 195

1          R. Figueroa
2       Once again, it's the poisoning of the
3  well. Ms. Sachdeva is creating a hostile work
4  environment for me.
5       Q.  But what I'm not clear about focusing
6  on supervisor Mattina is just how did you come
7  to believe that it was based on this poisoning
8  of the well from Sachdeva?
9       A.  Well, what other reason would you
10  deny me access to a room that you have access
11  for?  You are a supervisor.  You are supposed
12  to see to it that I get to my work, and if I'm
13  having some sort of a problem to get to my
14  assignment, it is incumbent upon you to
15  rectify that problem so that I can get to my
16  job.
17       You are supposed to do everything in
18  your power to see to it that your employees
19  are doing their jobs, and you are telling me
20  no, you are not going to open the door for me?
21  I'll have to wait until somebody else does it
22  for me?
23       What other explanation on God's green
24  earth could there possibly be for that kind of
25  disrespect?

Page 196

1          R. Figueroa
2       Q.  Okay.  So you felt disrespected when
3  supervisor Mattina told you he wasn't going to
4  let you in?
5       A.  I certainly did, and I think anybody
6  else in my situation would have felt the same
7  way.  I've got the access to let in you that
8  door and I'm telling you I'm not going to do
9  it for you and I in fact don't and I turn
10  around and walk away from you.  Yes, I do.
11      Q.  All right.  So I'm just going to
12  refer back to the April 18, 2008 e-mail
13  response, it's marked Defendant's Exhibit 5.
14       Okay, and I'm focusing on the third
15  paragraph in your April 18, 2008 e-mail
16  response.  And in it you claim Ms. Sachdeva
17  had "made numerous unwanted overtures towards
18  me, referring to you, that can only be
19  classified as improper."
20       Can you tell me exactly what were
21  these numerous unwanted overtures that you are
22  referring to?
23      A.  Ms. Sachdeva was batting her eyes at
24  me, constantly smiling at me.  When I'm
25  sitting down having lunch, she will sit right


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
209–212

Page 209

1           R. Figueroa
2  seductively towards you, how long did this
3  entire incident take place?
4      A.  The first time?
5      Q.  The first time.
6      A.  Just the two or three seconds that I
7  stated before, then she got up, walked over to
8  give me access, and while she is walking to
9  give me -- she turned around at least two
10  times to look at me to see what I was doing, I
11  don't know.  To see what my demeanor was, I
12  don't know, but she just turned around two
13  times to look at me.
14      Q.  And you felt when Ms. Sachdeva turned
15  around twice to look at you, as she walked to
16  take you to the detention room area, that this
17  was a seductive look?
18      A.  That's the only way that I can
19  describe it.
20      Q.  And as Ms. Sachdeva looked twice at
21  you, as the two of you were walking towards
22  the detention room area, did you say anything
23  to her?
24      A.  No.
25      Q.  Anything else happen to you that day

Page 210

1           R. Figueroa
2  between you and Ms. Sachdeva?
3      A.  No.
4      Q.  So then tell me about the next
5  incident with her where you believe she was
6  batting her eyes at you?
7      A.  Well, this happens a little time
8  later.
9      Q.  Okay?
10      A.  Now, when I say a little time, I mean
11  maybe a few weeks later, three or four weeks
12  later.
13      Q.  Okay.  Was that still in September or
14  was it in October?
15      A.  No, it had to have been in October or
16  maybe even the beginning of November.
17      Q.  Okay.  So sometime in October or
18  November of 2006 there is another incident
19  with you and Ms. Sachdeva where you say she is
20  batting her eyes at you again?
21      A.  Yes.
22      Q.  Tell me about that incident?
23      A.  Once again, I had to go get her for
24  something, this time I think a supervisor sent
25  me to the office to get her and to tell her

Page 211

1           R. Figueroa
2  that the supervisor wanted her where he was
3  standing, on that side of the mail facility.
4      So once again, I walked in and
5  disregarding the first incident, just writing
6  the that off as maybe a fluke and/or some kind
7  of an unexplainable happenstance and I walked
8  in and I told her that a supervisor needed her
9  and I was met with the same response.
10      Q.  When you say you were met with the
11  same response, tell me specifically what
12  happened?
13      A.  Just like I explained the first time,
14  the batting of the eyes, the smiles, the
15  looking at me up and down again.
16      MR. LYNCH:  Can you just read his
17  answer back?
18      (Answer read.)
19      Q.  And how long did this incident take
20  place with you and Ms. Sachdeva, that was the
21  second one that took place in October/November
22  of 2006?
23      A.  Approximately the same amount of
24  time.
25      Q.  When you say "approximately the same

Page 212

1           R. Figueroa
2  amount of time," how much time?
3      A.  Two, three, seconds.
4      Q.  So what happened next when you say
5  that she was batting her eyes looking you up
6  an down when you told her that a supervisor
7  needed to see her?  What happened next?
8      A.  Well, once again, she got up from the
9  chair, went to go let herself into the --
10  through that door that allows her access to
11  the mail floor, and I was heading back to my
12  post.
13      And once again, she turned around,
14  looked at me again two more times until we
15  separated, and she went her way and I went
16  mine.
17      Q.  And you believe in this second
18  occasion that took place in October,
19  November 2006, that when she looked back at
20  you two or three times that this was
21  seductively?
22      A.  Yes.
23      Q.  And why so?
24      A.  Well, you know, I've been in
25  situations where I followed people to other



Page 213

R. Figueroa

places and no one's ever looked back to see what I was doing on anything.

I've walked people into places and I've never looked back to examine them. I just -- maybe I'll hold a door open and I'll slant my head a little bit to make sure that the door isn't being shut on you, but I'll continue walking to wherever it is that I'm going.

Q. Okay. During either this first incident with Ms. Sachdeva in September of 2006 or the second one that took place in October/November 2006, are there any other witnesses besides you and her?

A. No, I don't believe so.

Q. All right. And can you tell me any other instances with you and Ms. Sachdeva where you believe that she was batting her eyes and looking seductively?

We already talked about two, were there any others that you remember?

A. When I would have my lunch and she would walk in, sit down next to me and lean over, look to see what it is that I'm having.

Page 214

R. Figueroa

Q. Okay. Well, when was the first time that you recall sitting down in the lunchroom area and having your lunch, and Ms. Sachdeva sitting close to you?

A. It was shortly after that second trip to the door when the supervisor asked me to go get her.

Q. Okay. So can you tell me when though in 2006 that took place?

A. No, I couldn't tell you when, but it didn't -- it wasn't too long thereafter.

Q. Okay. So why don't you tell me about this incident the first time that you sat in the lunchroom and Ms. Sachdeva sat close to you? I want everything that you can recall about the first time this occurred?

A. Well, I was sitting at a table pretty much like this one here and I was having my lunch, and Ms. Sachdeva comes on my left side, sits in a chair that's next to me and she is sitting very, very close.

Q. So let's backup. Describe how the lunchroom area in the JFK facility looked back in 2006?

Page 215

R. Figueroa

A. Okay. It's a large room, pretty much -- approximately the size of this one, okay. It's got a couple of tables, eating tables.

Q. What kind of tables? Round? Rectangular?

A. Folding leg type tables, you know, wood top.

Q. Are they round? Rectangle?

A. Rectangle.

Q. Rectangle. How many can these tables seat?

A. On one side possibly three or four people. So another person on each end, and maybe another three or four people on the other side.

Q. Okay. So approximately 8 to 10 people per table?

A. I would say so.

Q. How many rectangle tables were there in the lunchroom area in the JFK facility back in 2006?

A. There were -- I believe there were two rows of tables.

Page 216

R. Figueroa

Q. Two rows of tables. So is that two tables?

A. No, two tables side by side in one row, and another two tables side by side in a second row.

Q. So four tables total?

A. Yes.

Q. Okay. So back in 2006 in the CBP lunchroom area, we had four rectangle tables in the lunchroom?

A. Yes.

Q. Approximately how large was the lunchroom back in 2006?

A. Approximately the size of this room. So whatever -- maybe it was a little longer.

Q. Okay.

A. But it was not a small room. It's not a small place. Plenty of elbow room, plenty of room to sit in other places.

Q. And the first time in 2006 when you say you were sitting in the lunchroom area and Ms. Sachdeva sat close to you, tell me exactly what you mean by that?

A. Well, I was sitting at the table

RICHARD FIGUEROA                                                    May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                              221–224

Page 221

1               R. Figueroa
2   to you in the lunchroom, this is in 2006, I
3   want to make sure I'm clear.  When she came up
4   next to you, was she actually touching you?
5          I understand you say she is near your
6   personal space, but was she actually touching
7   you?
8      A.  Yes, her body was -- the side of her
9   body was pressed up against the side of mine.
10     Q.  Well, did you say anything to Ms.
11  Sachdeva at that point when the side of her
12  body was pressing up against yours back in
13  2006 when you were in the lunchroom?
14     A.  No.  I mean, I was in complete shock.
15  I answered her question as to where I got my
16  lunch.  And that was it.
17     Q.  So what exactly did you say to her in
18  terms of where you got your lunch?
19     A.  Well, she asked me where I got it and
20  there was a salad bar on Farmers Boulevard.
21  So I told her "I got it at the salad bar on
22  Farmers Boulevard."
23     Q.  Tell me in sum and substance the
24  entire conversation?
25     A.  Pretty much that's it.  She slid

Page 222

1               R. Figueroa
2   over, leaned into me, said "oh, what do you
3   got there and where did you get that?"
4          "The salad bar at Farmers Boulevard."
5      Q.  So this first lunchroom incident with
6   Ms. Sachdeva, this took place in 2006?
7      A.  Yes.
8      Q.  And how long did this first encounter
9   with Ms. Sachdeva in the lunchroom where you
10  say she sat unusually close to you, how long
11  did that take?
12     A.  Seconds, less than 10 seconds, but
13  nowhere near two or three.
14     Q.  How many encounters total did you
15  have with Ms. Sachdeva in the lunchroom in the
16  CBP lunchroom area?
17     A.  Three.
18     Q.  So there were three total?
19     A.  Yes.
20     Q.  Okay.  So this first one lasted no
21  more than 20 seconds?
22     A.  Oh, definitely, yeah, no more than
23  20.  I'd say really no more than 10 seconds.
24     Q.  This first encounter took place in
25  2006 sometime after September; correct?

Page 223

1               R. Figueroa
2      A.  Yes.
3      Q.  Okay.  And during this first
4   encounter in 2006 in the lunchroom other than
5   sitting very close to you and asking you what
6   you had for lunch, anything else that Ms.
7   Sachdeva did that you can recall during that
8   first encounter?
9      A.  No, that was it.
10     Q.  So when did this second encounter
11  between you and Ms. Sachdeva in the CBP
12  lunchroom take place?
13     A.  Shortly thereafter, I'd say within a
14  week.
15     Q.  Okay, but when was that?  Was that
16  still in 2006?
17     A.  It was still 2006, yes.
18     Q.  So tell me about the second encounter
19  in that lunchroom between you and Ms.
20  Sachdeva, what happened?
21     A.  It was almost identical to the first.
22  She came on my left side, in a chair, she
23  didn't slide over this time, because the chair
24  was already close to me.  She sat in the
25  chair, but it wasn't bothering me.

Page 224

1               R. Figueroa
2      Q.  Why wasn't it bothering you?
3      A.  It was close to me, but it wasn't so
4   close to me that oh, Geez, let me move this
5   away because it's -- you know, I don't feel
6   like I have any elbow room.  So it was close
7   to me, but not close to me to the point where
8   it bothered me.
9      Q.  So the first encounter in the
10  lunchroom you felt she sat unusually close to
11  you?
12     A.  Yes.
13     Q.  But in the second lunch encounter
14  with Ms. Sachdeva in 2006, you felt that she
15  was at an appropriate distance?
16     A.  Oh, no, no, that is not what I said.
17     Q.  Okay.
18     A.  I said when I sat down at the table
19  there was a chair next to me, but it wasn't
20  too close to me, so I left the chair there, I
21  didn't move the chair away from me.
22          Then Ms. Sachdeva walks into the
23  room, sees me there again, sits in the chair
24  this time and moves it over.
25     Q.  Okay.  And this second lunchroom

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
225–228

Page 225

1          R. Figueroa
2  encounter with Ms. Sachdeva in 2006, was
3  anybody else in the lunchroom when it took
4  place?
5      A.  No, there were people in the
6  lunchroom, yes, I don't remember who they
7  were.
8      Q.  How many people do you recall being
9  in the lunchroom area?
10      A.  A few, like two, three, four maybe.
11      Q.  During the second lunchroom encounter
12  there are approximately two to three other CBP
13  folks besides you and Ms. Sachdeva in the
14  lunchroom; correct?
15      A.  Yes.
16      Q.  So tell me what exactly happened in
17  this second lunchroom encounter?
18      A.  It was an almost identical encounter
19  to the first.  She moved over, once again, she
20  leaned over me, asked me what I was having for
21  lunch, didn't ask me where I got it this time.
22      Q.  Okay.  And what were you having for
23  lunch?
24      A.  I don't remember, probably some
25  vegetables and chicken, something -- nothing,

Page 226

1          R. Figueroa
2  it wasn't Peking Duck, I'll tell you that.  It
3  wasn't anything out of the ordinary where it
4  would arouse someone's interest.
5          And, you know, once again she said
6  "Oh, what are you having for lunch?"
7          You know, I told her.
8      Q.  What did you tell her?
9      A.  I forgot, whatever it was, chicken,
10  you know.
11          I wasn't encouraging this kind of
12  behavior, so I wasn't engaging in any
13  welcoming banter between the two of us.
14      Q.  But you don't recall specifically
15  what you told her in response when she said
16  what are you having for lunch?
17      A.  Well, I told her what I was having
18  for lunch, but I don't remember what it was.
19      Q.  You don't remember exactly what you
20  told her that you had for lunch?
21      A.  Right.
22      Q.  So after you told Ms. Sachdeva what
23  you had for lunch during that second lunchroom
24  encounter, what else occurred?
25      A.  She said "looks good."

Page 227

1          R. Figueroa
2          Then she just looked at me and then
3  walked away.
4      Q.  And how long did this second
5  lunchroom encounter with Ms. Sachdeva take
6  place?
7      A.  Approximately the same amount of
8  time.
9      Q.  Which was how long?
10      A.  About 10 seconds.
11      Q.  So the second lunchroom encounter
12  with you and Ms. Sachdeva, that incident took
13  no more than 10 seconds?
14      A.  Right.
15      Q.  And other than asking you what you
16  had for lunch and you telling Ms. Sachdeva
17  what you had for lunch, nothing else
18  transpired?
19      A.  No, I mean -- I was a little shocked
20  as to why she even asked, because you can
21  plainly see what I'm having.  If it was
22  chicken, it's chicken.
23      Q.  So you felt there was no reason that
24  she really should even have been asking you
25  what you had for lunch?

Page 228

1          R. Figueroa
2      A.  No, I mean judging from where she
3  was, I think she can completely see, because
4  my container was the clear plastic container
5  that you get at salad bars, you can clearly
6  see what I'm having, you don't have to get
7  that close to tell what's in it.
8      Q.  Okay.  And so, did you feel during
9  the second lunchroom encounter with Ms.
10  Sachdeva that your personal space had been
11  invaded?
12      A.  Oh, yes.
13      Q.  And why did you feel your personal
14  space had been invaded for that second
15  lunchroom encounter?
16      A.  Because once again she was so close
17  that I couldn't continue eating.
18      Q.  When you say she was so close that
19  you couldn't continue eating, what exactly did
20  you mean by that?  Because that means
21  different things to different people?
22      A.  Once again, she was right up on top
23  of me.
24      Q.  When you say "right up on top of me,"
25  describe what you mean during that second


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
229–232

Page 229

R. Figueroa

1 lunchroom encounter when you say "she was
2 right up on top of me?"
3 A. Well, this isn't, made to sound, you
4 know, funny or anything, but I'm telling you,
5 you couldn't slip an envelope between the two
6 of us, there was just no room.
7 Q. Was her body touching yours during
8 the second lunchroom encounter in 2006?
9 A. Yes, it was.
10 Q. What part of her body was touching
11 yours?
12 A. Her chest, her torso and her -- the
13 side of her arm.
14 Q. What side of her torso and arm was
15 touching yours?
16 A. The right side.
17 Q. So the right side of her torso and
18 arm were touching your body?
19 A. Yes.
20 Q. What part of your body was the right
21 side of her torso and arm touching when she
22 sat next to you during the second lunchroom
23 encounter in 2006?
24 A. Here on my left. Like where the

Page 230

R. Figueroa

1 crevice between my arm and my chest is, right
2 here on the left side.
3 Q. Okay. Well, tell me, how were your
4 arms exactly positioned when you were having
5 lunch during the second lunchroom encounter?
6 A. My hands were on the table, so when
7 she came over and slid over, my left hand
8 dropped, because I didn't know what she was
9 doing, I thought that, you know, maybe she is
10 going to find something -- maybe she is
11 looking for something on the floor, I don't
12 know, so I was going to help her if that was
13 the case.
14 But when I saw it was a repeat of the
15 last one, you know, actually I'm looking
16 around to see if anybody is looking at this.
17 No one walked in. No one walked in, and by
18 the time, you know, I'm recollecting myself,
19 you know, the whole thing started to end.
20 So I just kept my mouth shut, because
21 I didn't want to say something that would
22 encourage her to sit back down and start it up
23 all over again.
24 Q. Well, when you say you didn't want to

Page 231

R. Figueroa

1 say something that would encourage her, what
2 do you mean?
3 A. Well, I didn't say anything like,
4 "Oh, you are leaving so soon"?
5 I definitely didn't say anything
6 along those lines.
7 Q. So --
8 A. And I wasn't going to ask her a
9 question about work, you know, something that
10 I may have had on my mind, because then she
11 would have stayed there.
12 Q. So did you feel uncomfortable during
13 the second lunchroom encounter?
14 A. Yes, I did.
15 Q. Did you ever tell Ms. Sachdeva during
16 that second lunchroom encounter that you felt
17 uncomfortable with her sitting next to you?
18 A. No, I did not.
19 Q. And why not?
20 A. Because once again, she asked what I
21 was having for lunch and I said,
22 matter-of-factly in a very cold and distanced
23 way, "chicken" if it was chicken, so she would
24 -- so that anyone would get the idea, you

Page 232

R. Figueroa

1 know, you are bothering me.
2 Q. And for the first lunchroom encounter
3 with Ms. Sachdeva that also took place in
4 2006, did you feel uncomfortable when she sat
5 next to you?
6 A. Yes.
7 Q. So why didn't you tell her during
8 that first lunchroom encounter that you felt
9 uncomfortable with her sitting so close to
10 you?
11 A. Because these things happened so
12 quickly. First of all, you are not expecting
13 it to happen, because once again I'm eating
14 lunch, I'm watching TV and then something like
15 this happens out of the blue. You know, it's
16 not often that, you know, a gentleman is
17 having lunch and a lady is thrown into his lap
18 practically. So it's shocking.
19 And then we are at work, and it's
20 like don't you realize that if you do
21 something -- I'm thinking to myself, that if
22 you do something like this we are going to be
23 talked about? We are going to be the subject
24 of gossip?


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
233–236

Page 233

1          R. Figueroa
2      Q.  Well, were you and Ms. Sachdeva the
3  subject of gossip?
4      A.  No.
5      Q.  So why don't you tell me about this
6  third lunchroom encounter with you and Ms.
7  Sachdeva?  When did that take place?
8      A.  Well, once again, that took place
9  shortly thereafter, I would estimate maybe
10  two weeks later.
11      Q.  So that was also in 2006?
12      A.  Yes.
13      Q.  So what time of day in 2006 did this
14  third lunchroom encounter with Ms. Sachdeva
15  take place?
16      A.  It was break-time, so I'm thinking it
17  might have been around 7:30.  It could have
18  been around one of the earlier break times,
19  but my guess would be 7:30.
20      Q.  All right.  So is it fair to say that
21  for each of these lunchroom encounters that
22  you had with Ms. Sachdeva that they took place
23  after 5:00 p.m.; is that fair to say?
24      A.  Yes.
25      Q.  So why don't you tell me, let's talk

Page 234

1          R. Figueroa
2  about this third lunchroom incident with Ms.
3  Sachdeva, can you tell me what happened?
4      Let's just backup.  For that third
5  lunchroom encounter, how did it begin?
6      A.  Well, I was eating my lunch at the
7  table again, but this time I'm a little bit
8  further down, I'm down towards the middle of
9  the table.
10      Q.  Okay.  Were you having your lunch
11  with anyone at that time?
12      A.  No, no.
13      Q.  Do you recall what you were having
14  for lunch?
15      A.  No, but once again, it would have
16  been something very benign.
17      Q.  Okay.
18      A.  This time she was talking to two
19  other officers.
20      Q.  Okay.  And when you say she was
21  talking to two other officers, was Ms.
22  Sachdeva at the time you were having lunch for
23  that third lunchroom encounter, was she
24  talking to two other officers in the
25  lunchroom?

Page 235

1          R. Figueroa
2      A.  Yes, but they were this way, they
3  were standing. (Indicating.)
4      Q.  Okay.  So you were sitting down
5  eating your lunch for this third lunchroom
6  encounter and Ms. Sachdeva was standing
7  talking to two other officers?
8      A.  Yes.
9      Q.  And who are the two other officers
10  that she was talking to?
11      A.  One of them was Officer Marguerite
12  Caropolo.
13      Q.  And who were the other officers?
14      A.  I believe it could have been Helen
15  Ashton again.
16      Q.  Okay.  So besides you Ms. Sachdeva,
17  Marguerite Caropolo and Helen Ashton, who else
18  was in the lunchroom area for this third
19  lunchroom encounter?
20      A.  I don't know.
21      Q.  Okay.  So Ms. Sachdeva is standing
22  talking to officers Marguerite Caropolo and
23  Helen Ashton, you are eating your lunch
24  sitting down at the table?
25      A.  Yes.

Page 236

1          R. Figueroa
2      Q.  What happens next?
3      A.  Almost a repeat from the first
4  incident.  She walks over quickly, slides into
5  the chair that's next to me and leans over and
6  once again inquires about my lunch, and then
7  asked me where I got it, but this time she put
8  her hand on my right inner thigh.
9      Q.  So let's talk about that.  Tell me
10  how exactly did it transpire that Ms. Sachdeva
11  put her hand on your right thigh?
12      A.  Because when she slid into the chair,
13  she was -- even though her legs were still
14  facing forward as she was sitting in the
15  chair, her body was twisted to the point that
16  now more of her upper torso is actually facing
17  me.  And as she leaned over, she put her right
18  hand on my inner thigh.  I mean, she put her
19  hand on my right inner thigh.
20      Q.  Do you recall what hand Ms. Sachdeva
21  used?
22      A.  I believe it was her right hand.
23      Q.  And what happened when she put her
24  right hand on your right inner thigh?
25      A.  Well, at this point I was definitely

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
237–240

Page 237

1  　　　　R. Figueroa
2  going to say something, but I was chewing on
3  something because she caught me at an awkward
4  moment. So by the time I swallowed, she had
5  already gotten up and left.
6  　　Q. Well, tell me exactly how did Ms.
7  Sachdeva place her hand on your right thigh?
8  　　A. As she was in this position leaning
9  over, her hand came over and rested on my
10  right thigh.
11  　　Q. So when her hand came over and rested
12  on your right thigh, was she massaging your
13  thigh? How exactly was it placed on your
14  right thigh?
15  　　A. No, I think she just kind of left it
16  there. It did move a little, but I think it
17  moved in response to her moving. It wasn't
18  like a massage effort, at least I didn't
19  perceive it to be that way.
20  　　　　But her hand was on the inner
21  portion, mid section of my right thigh.
22  　　Q. And for how long of a period was it
23  on the mid section of your inner right thigh?
24  　　A. It honestly seemed forever, but I
25  think in practicality, maybe a second or two.

Page 238

1  　　　　R. Figueroa
2  　　Q. And did Ms. Sachdeva say anything to
3  you at the point that her hand was on your
4  right inner thigh?
5  　　A. No, not, oh, excuse me, that was a
6  slip, I leaned forward, I was off balance,
7  nothing, nothing.
8  　　Q. So she didn't say anything to you?
9  　　A. No. Well, once again, she asked me
10  where I got my lunch.
11  　　Q. Right, but I'm just saying when her
12  hand was on your right inner thigh, did she
13  say anything to you at that point?
14  　　A. No.
15  　　Q. Okay. At what point did she ask you
16  when she got into a chair and slid it next to
17  you and asked what you had for lunch? Was
18  that before she put her hand on your right
19  inner thigh?
20  　　A. No, I think she looked over -- I
21  think she said something -- she commented, I
22  don't know what the comment was. Then she
23  slid over, put her hand on my thigh and said
24  "that looks good, where did you get that?"
25  　　Q. And what did you say in response?

Page 239

1  　　　　R. Figueroa
2  　　A. In response, you know, "the salad bar
3  on Farmers Boulevard."
4  　　Q. Now, did you say anything to Ms.
5  Sachdeva over the fact that her hand had been
6  on your right inner thigh?
7  　　A. No, I was going to, but as I said,
8  she caught me at an awkward moment.
9  　　Q. And what was that awkward moment
10  exactly?
11  　　A. Well, not only did she catch me by
12  surprise but, you know, I was chewing. So it
13  wasn't like I was just sitting there watching
14  TV that I could immediately speak.
15  　　Q. Okay?
16  　　A. It was all I can do to just say, you
17  know, "the salad bar at Farmers Boulevard," I
18  think I blurted that out.
19  　　Q. But when she had asked you "that
20  looks good, where did you get it"?
21  　　　　And you answered her, you were eating
22  at that point in time; correct?
23  　　A. Yes.
24  　　Q. So why didn't you also say anything
25  to her? I understand you were eating still

Page 240

1  　　　　R. Figueroa
2  when her hand was placed on your right thigh?
3  　　A. There was no time, you know, with the
4  amount of breath I had, you know, I'm getting
5  ready to be in the process of chewing. There
6  was just no time to get it out.
7  　　Q. So when you finished chewing, what,
8  if anything, did you say to her at that point?
9  　　A. Well, I was about to say something
10  when she got her hand off of my thigh and she
11  started getting up and leaving.
12  　　　　The other two women were looking at
13  this, and their eyes were wide up and their
14  jaws were wide open as well, they couldn't
15  believe what they were seeing.
16  　　Q. How do you know that they were
17  responding to what took place between you and
18  Ms. Sachdeva?
19  　　A. There was nothing else that happened
20  in that room that will cause someone to open
21  up their eyes in amazement as well as open up
22  their mouths in amazement.
23  　　Q. So you are saying that both Ms.
24  Marguerite Caropolo and Helen Ashton both saw
25  Ms. Sachdeva place her hand on your right



RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
241–244

Page 241

1          R. Figueroa
2   inner thigh?
3      A.  Right.
4      Q.  Okay.  Did you ever speak to
5   Marguerite Caropolo or Helen Ashton about what
6   they saw during this third lunchroom encounter
7   that you had with Ms. Sachdeva?
8      A.  Not with Officer Caropolo, with
9   Officer Ashton.
10     Q.  Well, when did you speak with Ms.
11  Ashton about this third lunchroom encounter?
12     A.  Later in the evening.
13     Q.  What time of the day?
14     A.  Approximately an hour or two later.
15  So I would venture a guess and say around
16  9:30-ish.
17     Q.  Okay.  So tell me how long total did
18  this third lunchroom encounter with Ms.
19  Sachdeva take place?  How long did that last?
20     A.  Again, another 10, 11 seconds maybe.
21     Q.  Now, at that point, this is now the
22  third lunchroom encounter with you and Ms.
23  Sachdeva, okay.  At that point, why didn't you
24  say something to her that you felt that either
25  she was sitting very close to you, that there

Page 242

1          R. Figueroa
2   was something that was bothering you about her
3   invading your personal space?  At that
4   point -- this is now the third lunchroom
5   encounter, why didn't you say anything to her
6   at that point?
7      A.  This is an extremely embarrassing
8   thing and --
9      Q.  What makes it extremely embarrassing?
10     A.  Well, you know, for a man to say that
11  a woman is bothering him, where most guys will
12  say Jesus, I wish I had that problem, it's a
13  little bit embarrassing.
14        And when that person is your
15  supervisor, you are not exactly quite sure
16  what to say, how to approach it and I've never
17  had anything like that happen to me before.
18     Q.  But now at the point that in this
19  third lunchroom encounter when Ms. Sachdeva
20  puts her hand on your right thigh, why didn't
21  you say something to her after that --
22     A.  Well, I thought I'd handle it in a
23  less affront type of way, I stopped having
24  lunch.
25     Q.  Were you concerned that it could

Page 243

1          R. Figueroa
2   happen again, that she would place her hand on
3   your thigh or any other more intimate part of
4   your body?
5      A.  Well, no, because I started avoiding
6   her.  If someone said they wanted her, I said,
7   "I'll tell you what, I'll wait here, you go
8   get her yourself."
9      Q.  And at the point now in which you had
10  this third lunchroom encounter where you say
11  Ms. Sachdeva put her hand on your right thigh,
12  did you report this to anyone in upper
13  management in 2006?
14     A.  No.
15     Q.  Why not?
16     A.  Because I was hoping it would go
17  away.
18     Q.  And other than these three lunchroom
19  encounters with Ms. Sachdeva, did you have any
20  other lunchroom encounters with her?
21     A.  No.
22     Q.  Was there ever any other occasion
23  besides this one incident during the third
24  lunchroom encounter where Ms. Sachdeva had put
25  her hands on your thigh or any other part of

Page 244

1          R. Figueroa
2   your body that maybe you regarded as more
3   intimate?
4      A.  No.
5      Q.  Now, you mentioned that you had
6   spoken to Helen Ashton a few hours after this
7   third lunchroom encounter.
8        What did you speak to Ms. Ashton
9   about specifically?
10     A.  Well, she brought it up.
11     Q.  Okay.  What did she say?
12     A.  Something along the lines of "I see
13  you are having company with your lunch these
14  days."
15        And I said, "Can you believe that?
16  Can you believe how boldface and not caring
17  that other people are in the room?  That's
18  incredible.  If a man did that, he'd be
19  arrested."
20     Q.  Is that what you said to Ms. Ashton?
21     A.  Yes.
22     Q.  And what did Ms. Ashton say in
23  response?
24     A.  Something along the lines, "Oh, I'm
25  telling you."


Tankoos Reporting

RICHARD FIGUEROA

RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013

245–248

Page 245

1           R. Figueroa
2       That was it.  That was the whole
3   conversation.
4       Q.  Well, did Ms. Ashton say that she saw
5   Ms. Sachdeva put her hand on your right inner
6   thigh?
7       A.  No, but being as how she brought it
8   up, I know she was there, her jaw hit the
9   floor, I saw her seeing it, and then she
10  brought it up later, I didn't.
11      Q.  Right.  When you say she brought it
12  up, you haven't told me anything that said --
13  where she said that she saw Ms. Sachdeva put
14  her hand on your right thigh.  So that's why I
15  want to be clear on what Ms. Ashton said to
16  you when you guys talked a few hours after
17  that third lunchroom encounter?
18      A.  All she said to me was, "I see you
19  are having company with your lunch these
20  days."
21      Q.  Anything else you can recall Ms.
22  Ashton saying to you a few hours after this
23  third lunchroom encounter besides "I see you
24  are having company with your lunch these
25  days"?

Page 246

1           R. Figueroa
2       A.  No.
3       MR. LYNCH:  Let's take 10 minutes.
4       (Recess taken.)
5       Q.  Okay.  All right.
6       Now, you also mentioned in this
7   April 18th, the 2008 e-mail response I'm still
8   referring to that's been marked Defendant's
9   Exhibit 5, okay.
10      And I'm just going to focus on that
11  third full paragraph where you indicate, "When
12  Ms. Sachdeva was rebuffed, I started
13  experiencing negative actions on the work
14  front at her request."
15      Can you just explain what you meant
16  when you say that when you started to rebuff
17  Ms. Sachdeva and what specific advances were you
18  rebuffing?
19      A.  The lunchroom incidents.  I did not
20  encourage her.  If she asked me a question, I
21  answered her pointblank and dispassionately as
22  I possibly could.
23      I never, once again, encouraged her.
24  I never asked her out.  I never did anything

Page 247

1           R. Figueroa
2   to further advance her actions.
3       Q.  Okay.  Now, you say that you never
4   did anything to ask Ms. Sachdeva out.  So it
5   was your belief that she had a romantic
6   interest in you?
7       A.  That is the only conclusion I can
8   come to.
9       Q.  Okay.  And at any point in 2006 or in
10  2007, did Ms. Sachdeva ever ask you out?
11      A.  No.
12      Q.  And you believe that the ways in
13  which you responded during the three lunchroom
14  encounters with Ms. Sachdeva and the way you
15  would answer her in response to questions in
16  a, as you say, a dispassionate manner, that
17  you are rebuffing so-to-speak her advances?
18      A.  Without a doubt.
19      Q.  Okay.  Can you explain to me, and
20  again just focusing on this April 18, 2008
21  e-mail response, Defendant's Exhibit 5 that's
22  been marked, when you say that you started to
23  experience negative actions on the work front
24  at her bequest after rebuffing her advances,
25  as you say, what were the negative actions on

Page 248

1           R. Figueroa
2   the work front that you believe you experienced?
3       A.  I was assigned to work holidays as a
4   senior member of the service when the contract
5   that the agency is required to adhere to was
6   completely disregarded.
7       I had supervisors not helping me when
8   I needed to.
9       I received hostile treatment by way
10  of angered faces and lack of support.
11      I was no longer eligible for
12  transfers, promotions or anything along those
13  lines.  And I began to receive disciplinary
14  suspensions.
15      Q.  Okay.  Now, these three lunchroom
16  encounters took place in 2006.  And when you
17  say that Ms. Sachdeva was batting her eyes at
18  you during two other incidents, those also
19  took place in 2006.
20      Now, you hadn't been assigned to work
21  the Thanksgiving holiday until that following
22  year in November of 2007, so what makes you
23  believe that the being assigned to work the
24  Thanksgiving holiday in 2007 was related to
25  these, as you say, rebuffing her advances in

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
249–252

Page 249

1                 R. Figueroa
2  2006?
3      A.  Because I was no longer held in high
4  esteem anymore.
5      Q.  How were you no longer held in high
6  esteem?
7      A.  Well, when people are walking passed
8  you and they are grimacing at your very
9  appearance, they are uttering under their
10  breath.
11      Q.  But that wasn't until after the
12  December 29, 2007 incident?
13      A.  Yes.
14      Q.  So I'm just focusing on one of the
15  first things you listed as a negative action
16  on the work front after you so-called rebuffed
17  her advances.
18          The three lunchroom encounters and
19  the incident with batting the eyes took place
20  in 2006.  We don't get to the Thanksgiving
21  holiday 2007 issue until November of 2007.
22          So what makes you believe that that
23  was related to what occurred in 2006?
24      A.  What happened was, Ms. Sachdeva was
25  given a temporary assignment to go into

Page 250

1                 R. Figueroa
2  Manhattan and work at our office at Penn
3  Plaza.
4          There was a lady who was the
5  department spokesman at the time, and she was
6  leaving for another position.
7          Ms. Sachdeva was being groomed for
8  that position.  So she was sent over there to
9  learn how things were working so that her
10  transition would be an easy one.
11          So she disappeared from the mail
12  branch for quite sometime.
13      Q.  Okay.  And when did Ms. Sachdeva
14  return to the mail branch?
15      A.  I don't recall, but --
16      Q.  But it was sometime in 2007?
17      A.  But she did return and these mishaps
18  started to happen in bigger numbers.
19      Q.  Okay.  Well, with regard to when you
20  say supervisors not helping you, how do you
21  attribute that to you so-called rebuffing Ms.
22  Sachdeva's advances in 2006?
23      A.  Well, because everything started
24  happening, but in a slow pace.
25          It wasn't an avalanche of things that

Page 251

1                 R. Figueroa
2  just started happening all in one day.  They
3  started happening slowly.
4      Q.  Okay.  So with regard to supervisors
5  not helping you, you had mentioned supervisor
6  Mattina back in January of 2008 not letting
7  you into the detention room, what other
8  incidents of supervisors not helping you would
9  you be referring to besides that one?
10      A.  Well, I was told by a supervisor who
11  retired, you can't put in for any assignments
12  or jobs with CBP any longer.
13      Q.  And which supervisor was this?
14      A.  That was supervisor Mitnick.
15      Q.  And when did supervisor Mitnick tell
16  you this?
17      A.  I don't recall, but it was after the
18  holiday troubles began.
19      Q.  So that had to be sometime after
20  November of 2007?
21      A.  Yes.
22      Q.  Okay, but again going back to 2006
23  when you said you -- in your mind you rebuffed
24  Sachdeva's advances, those took place in 2006,
25  so how was it that you attribute the

Page 252

1                 R. Figueroa
2  supervisors not helping you to you rebuffing
3  Sachdeva's advances back in 2006 that that was
4  somehow related?
5      A.  Nothing else in a negative manner
6  ever occurred that this treatment could be
7  attributed to, to anything other than my
8  problems with supervisor Sachdeva.
9      Q.  Okay.  All right, but now when you --
10  according to you, rebuffed her advances in
11  2006, there wasn't anything negative that
12  happened to you in 2006; correct?
13      A.  Yes.
14      Q.  So there wasn't anything negative
15  when you had rebuffed in these three lunchroom
16  encounters in 2006; correct?
17      A.  Correct.
18      Q.  Okay.  And the incidents where you
19  say she was batting her eyes and looking
20  seductively at you in 2006, when you didn't
21  respond, there wasn't anything negative that
22  happened to you at CBP in 2006; correct?
23      A.  No, nothing in 2006 that I can
24  recall.
25      Q.  Right.  And that bomb squad incident


Tankoos Reporting

RICHARD FIGUEROA
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 14, 2013
257–260

Page 257

R. Figueroa

1   just one or two positions, they are looking
2   for a multitude of people, repeated open
3   vacancies for the same position, and I can't
4   get hired?  There's got to be something wrong.
5       Q.  But what I just want to get at is how
6   you attribute that to your relationship with
7   Ms. Sachdeva?
8       A.  Because I believe that if those
9   incidences never occurred that I would have
10  been able to obtain one of those positions.
11      Q.  And what other positions or transfers
12  did you put in for that you believe are
13  related to issues that you've had with Ms.
14  Sachdeva?
15      A.  Well, let's see, I have a list at
16  home.  Mostly the U.S. Mint, that's the job I
17  really wanted.  And I believe that if I put in
18  for supervisor now, I'll never get it.
19      Q.  When you say if you believe you put
20  in for a supervisor now, you are talking about
21  being a supervisor at CBP?
22      A.  Yes.
23      Q.  And why do you believe you'd never
24  get a supervisory position now at CBP?

Page 258

R. Figueroa

1       A.  Because of my disciplinary record
2   that they created and that they initialized
3   and instituted.
4       Q.  When you say that they created and
5   that they initialized, who specifically are
6   you referring to?
7       A.  The management at JFK.
8       Q.  And who specifically in management at
9   JFK?
10      A.  I can't tell you who in particular.
11  The management at JFK, whose ever calling the
12  shots on these things.
13      Q.  Well, let me ask you, can you tell me
14  why did you wait until after the March 17,
15  2008 notice of proposal to suspend you that's
16  also marked Defendant's Exhibit 3 had been
17  issued to you before raising with CBP
18  management in this April 18, 2008 e-mail
19  response the issue of a hostile work
20  environment and you allegedly being on the
21  receiving end of unwanted overtures by Ms.
22  Sachdeva?
23      A.  Well, no, I've been complaining to
24  the union, and I showed them the suspension

Page 259

R. Figueroa

1   proposal.  And their response to me, and this
2   was a different union at the time, "It's just
3   a proposal, they haven't done anything to you
4   yet, so just wait, just wait."
5       Well, I waited, and I wound up with a
6   suspension.
7       Q.  No, but my question to you is why did
8   you wait until after the March 17th -- just
9   look at the March 17, 2008 e-mail response?
10      A.  Right.
11      Q.  Okay.  Why did you wait until
12  after --
13      A.  Wait, March 17th you say?
14      Q.  Right, 2008, it's marked Defendant's
15  Exhibit 3.  So just look for Defendant's
16  Exhibit 3.
17      A.  Okay.
18      Q.  It's the March 17, 2008 notice of
19  proposal to suspend.
20      A.  Okay.
21      Q.  So I'm asking that why did you wait
22  until after that had been issued, because you
23  received that on March 18, 2008, correct?  If
24  you look on the last page?

Page 260

R. Figueroa

1       A.  March 18th, yes.
2       Q.  Right.  So sometime after that on
3   April 18, 2008, you sent this e-mail response
4   that we have been discussing; correct?
5       A.  Yes.
6       Q.  So why did you wait until after you
7   had been served and it had been issued, that
8   March 17, 2008 notice of proposal to suspend
9   you had been issued before raising in this
10  April 18, 2008 e-mail response an issue of
11  there being a hostile work environment with
12  regard to you working under Ms. Sachdeva and
13  her making unwanted overtures towards you, as
14  you say?
15      A.  Because the union kept telling me
16  that, listen, this is just a proposal for
17  two days, you haven't gotten anything yet, so
18  you haven't been injured yet.
19      I beg to differ.
20      Q.  But my question though is why did you
21  wait until after you got -- I'm just focusing
22  on the notice of proposal to suspend you, this
23  March 17, 2008, we haven't gotten to you
24  actually being suspended yet, we are not there

RICHARD FIGUEROA                                          May 14, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                     261—264

Page 261

1            R. Figueroa
2   yet.
3        So just sticking with that, the March
4   17, 2008 notice of proposal to suspend you,
5   why did you wait until after you received that
6   on March 18, 2008 before raising in this April
7   18, 2008 e-mail response an issue of there
8   being a hostile work environment and Ms.
9   Sachdeva making unwanted overtures to you?
10  That's all that I'm asking.
11      A.  Because I thought that this would
12  eventually fade away.  There is people that
13  have disputes at their jobs all the time, but
14  it doesn't remain a constant campaign,
15  eventually it fades away.
16       When I realized that it wasn't going
17  to fade away and I had no knowledge of how the
18  government system worked, I had to do my
19  research to see what were my options, by the
20  time all that time had lapsed, it became later
21  in the month, March -- April 18th and I began
22  to exercise my rights.
23      Q.  Okay, but why not have raised either
24  in 2007 an issue -- why didn't you raise an
25  issue that you believe you were working under

Page 262

1            R. Figueroa
2   a hostile work environment then with CBP
3   management?
4       A.  Because I was told by other officers,
5   listen, if you go the EEO route, your career
6   is going to be finished and you will be done,
7   they will find some way to fire you.
8       Q.  Who were these other officers that
9   you spoke to who told you that?
10      A.  The other senior officers at work.
11      Q.  Who were they?
12      A.  I don't remember who they were.  The
13  officers who knew about my problem and they
14  brought it up and we spoke briefly about it
15  and they suggested that, you know, don't do
16  anything, don't do anything.
17       Well, that's not my way of handling a
18  problem, but I didn't know which way to go and
19  which way to turn.  By the time I learned how
20  the system worked and everything, that's when
21  I got myself into gear and I began seeking
22  counsel, and I began preparing my EEO
23  complaints.
24      MR. WOLIN:  Off the record.
25      (Discussion off the record.)

Page 263

1            R. Figueroa
2       MR. LYNCH:  Can you just read his
3   answer back?
4       MR. WOLIN:  We have agreed to start
5   9:30 on Monday.
6       MR. LYNCH:  Right.  So the deposition
7   is going to continue next Monday, May 20th at
8   9:30 a.m. okay.
9       MR. WOLIN:  That's correct.
10      MR. LYNCH:  Thank you very much.
11  Thank you both for your time.
12      (Time noted:  5:01 p.m.)
13  _____
14      RICHARD FIGUEROA
15  Subscribed and sworn to
16  before me this _____ day of
17  _____, 2013.
18
19  _____
20  Notary Public
21
22
23
24
25

Page 264

                    I N D E X

WITNESS          EXAMINATION BY          Page No.
R. FIGUEROA      MR. LYNCH                    4

                    *****

DEFENDANT'S
Exhibit No.     DESCRIPTION                Page No.

1          Answer to interrogatories        11
2          Form 612 job application         15
3          Notice of proposal to            50
           suspend from CBP dated
           March 17, 2008
4          January 3, 2008 memorandum      119
5          April 8, 2008 e-mail            160
           response

Condensed Transcript

In the Matter Of:

RICHARD FIGUEROA vs. JANET NAPOLITANO

Civil Action No. CV-11-2087

---

# RICHARD FIGUEROA

*May 20, 2013*

*Volume II*

---



**Tankoos Reporting**

1384 Broadway, 19th Floor
New York, NY 10018
212.687.8010

RICHARD FIGUEROA Volume II                    May 20, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO              301–304

Page 301

1          R. Figueroa
2          MR. LYNCH:  All right.  So let's have
3  this marked as Exhibit 9.
4          (Defendant's Exhibit 9, Letter dated
5      April 6, 2009 was so marked for identification.)
6      Q.  Okay.  Mr. Figueroa, I'm showing you
7  what's been marked as Defendant's Exhibit 9.
8  I just want you to take a moment to review it,
9  sir, and just let me know when you are
10  finished looking at it.
11         Are you finished reviewing it?
12     A.  Yes.
13     Q.  Do you recognize this document,
14  Defendant's Exhibit 9?
15     A.  Yes, I do.
16     Q.  Can you tell me what it is, sir?
17     A.  It is a suspension proposal letter.
18     Q.  Okay.  Well, do you also recognize
19  Exhibit 9 as a letter dated April 6, 2009 to
20  you from CBP area director Camille Polimeni?
21     A.  Yes.
22     Q.  And you recognize your name at the
23  top of Defendant's Exhibit 9 on the first
24  page?
25     A.  Yes.

Page 302

1          R. Figueroa
2      Q.  And on the second page of Defendant's
3  Exhibit 9, there is an indication that you had
4  refused to acknowledge receipt of it on or
5  around April 6th of 2009.
6          Do you recall refusing to sign
7  Exhibit 9?
8      A.  Yes.
9      Q.  And why was that, sir?
10     A.  Once again, it is our right within
11  our union constitution to sign a form or not
12  to sign a form.
13     Q.  All right.  Well, according to
14  Defendant's Exhibit 9, on April 6, 2009 CBP
15  notified you by letter that its inquiry into
16  the allegations you had raised concerning Ms.
17  Sachdeva had been completed.
18         Now, do you recall reviewing
19  Defendant's Exhibit 9 on or around April 6th
20  of 2009, sir, when it's dated?
21     A.  Yes.
22     Q.  Now, according to the first paragraph
23  of Defendant's Exhibit 9, the March 18, 2008
24  notice of proposal to suspend that we
25  discussed last week "was held abeyance until

Page 303

1          R. Figueroa
2  the allegations were investigated."
3          And the allegations are referring to
4  the sexual harassment allegations you had made
5  against Ms. Sachdeva.
6          Now, when you read that sentence back
7  in April of 2009, what was your understanding
8  as to what it meant with respect to the
9  suspension that CBP had originally proposed
10  via the March 18, 2008 notice of proposal to
11  suspend?
12     A.  That they are going to go ahead with
13  the suspension.
14     Q.  Okay, but my question was with regard
15  to the sentence, when you look at it in the
16  first paragraph, where it says specifically
17  "the final decision regarding the proposal you
18  received was held in abeyance until the
19  allegations were investigated."
20         What was your understanding when you
21  read that as far as the notice of proposal to
22  suspend that had been issued, specifically the
23  statement that it was held in abeyance, what
24  did that mean to you when you read that, sir,
25  what was your understanding?

Page 304

1          R. Figueroa
2      A.  That Mr. Parisi completed his
3  investigation.
4      Q.  Okay.  I understand the terms of --
5  not referring to the first sentence where it
6  says the inquiry had been completed, but just
7  referring to the third sentence where it says
8  that a final decision regarding the proposal
9  to suspend you was held in abeyance, did you
10  have an understanding when you were told that
11  your suspension was held in abeyance?  What
12  that word "abeyance" meant, sir?
13     A.  I had no idea that my suspension was
14  held in abeyance.  I thought that they were
15  proceeding with the suspension proposal as
16  they notified me prior to this.
17         So I had no idea that it was being
18  temporarily suspended pending the outcome of
19  this investigation.
20     Q.  But when you received Defendant's
21  Exhibit 9 and you read the sentence that the
22  final decision regarding proposal you had
23  received, this March 18, 2008 notice of
24  proposal to suspend had been held in abeyance,
25  did you understand then, sir, that the notice



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
305–308

Page 305

R. Figueroa

1  of proposal had essentially been frozen in
2  time until this inquiry had been completed?
3  MR. WOLIN:  Objection.
4  You can answer it.
5  A.  I told you, I had no idea that my
6  suspension was being held in abeyance.
7  Q.  Right, but I'm just referring to at
8  the time that you reviewed Defendant's
9  Exhibit 9.
10  MR. WOLIN:  Objection.
11  I think you've asked him the same
12  thing five times.
13  Q.  It's a different question.
14  I understand you didn't understand
15  before.
16  MR. WOLIN:  Objection.
17  Answer it.
18  A.  I'm not sure exactly is it what you
19  are asking me.
20  Are you asking me do I understand
21  what the word "abeyance" means?
22  Q.  Well, you reviewed Defendant's
23  Exhibit 9 back in April of 2009; correct, sir?
24  A.  In April of 2009, yes.

(lines renumbered)

Page 305

1  R. Figueroa
2  of proposal had essentially been frozen in
3  time until this inquiry had been completed?
4  MR. WOLIN:  Objection.
5  You can answer it.
6  A.  I told you, I had no idea that my
7  suspension was being held in abeyance.
8  Q.  Right, but I'm just referring to at
9  the time that you reviewed Defendant's
10  Exhibit 9.
11  MR. WOLIN:  Objection.
12  I think you've asked him the same
13  thing five times.
14  Q.  It's a different question.
15  I understand you didn't understand
16  before.
17  MR. WOLIN:  Objection.
18  Answer it.
19  A.  I'm not sure exactly is it what you
20  are asking me.
21  Are you asking me do I understand
22  what the word "abeyance" means?
23  Q.  Well, you reviewed Defendant's
24  Exhibit 9 back in April of 2009; correct, sir?
25  A.  In April of 2009, yes.

Page 306

1  R. Figueroa
2  Q.  Okay.  And when you reviewed it, it
3  contained a number of information.  The first
4  was this administrative inquiry had been
5  completed.
6  So you understood that when you got
7  it; right?
8  A.  Yes.
9  Q.  So then you had another bit before
10  information that's in that first paragraph
11  that indicated that this proposal to suspend
12  had been held in abeyance.
13  I understand before, before you
14  received this notice in April of 2009 you
15  didn't know your suspension was in abeyance,
16  but then you got the notice.
17  So that's my question.  My question
18  was now at the point you got the notice where
19  it says this proposal, the March 18, 2008, had
20  been held in abeyance, did you understand at
21  that point in time, sir, that your suspension
22  had been held in abeyance?  At that point in
23  time?  Not before, we are talking about when
24  you got the letter in your hand?
25  A.  Yes, at that moment in time, only

Page 307

1  R. Figueroa
2  because it's stated there that it was held in
3  abeyance did I come to realize that the
4  proceedings were halted temporarily.
5  Q.  All right.  Now, also in that first
6  paragraph of Defendant's Exhibit 9, CBP had
7  also advised you the area director Camille
8  Polimeni specifically that the allegations you
9  had raised against Ms. Sachdeva had been found
10  to be unsubstantiated.
11  When you learned of the results of
12  the investigation, how did you feel at that
13  point in time?
14  A.  Well, I was told by my union
15  representative that that was the outcome.  So
16  I wasn't shocked when I read it in the notice.
17  Q.  All right.  Now, according to
18  Defendant's Exhibit 9, with the inquiry into
19  the allegations you had raised against Ms.
20  Sachdeva, now that they had been completed,
21  CBP was ready to proceed with the March 18,
22  2008 notice of proposal to suspend you.
23  And in Defendant's Exhibit 9 it
24  indicates you'd have another opportunity to
25  provide a written and/or oral reply.

Page 308

1  R. Figueroa
2  Now, in response to Defendant's
3  Exhibit 9, did you ever submit an additional
4  written and/or oral reply to the March 18,
5  2008 notice of proposal to suspend?
6  A.  I don't recall.  I've submitted many
7  documents, so I can't recall that specific
8  one.
9  MR. LYNCH:  Let's have this marked as
10  the next exhibit.
11  (Defendant's Exhibit 10, May 21, 2009
12  letter from CBP area director Camille
13  Polimeni was so marked for identification.)
14  Q.  Okay.  You've been handed what's been
15  marked as defendants Exhibit 10, a copy has
16  also been handed to your counsel.  If you can
17  just take a moment to review Defendant's
18  Exhibit 10, and I'm just going to ask you a
19  couple of questions about it, sir; okay?
20  A.  Yes.
21  Q.  Do you recognize this document,
22  Defendant's Exhibit 10, Mr. Figueroa?
23  A.  Yes.
24  Q.  Can you tell me what it is, sir?
25  A.  It is a notification to me stating

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
309–312

Page 309

R. Figueroa

1 that I will be suspended for one day.
2
3    Q.   And Defendant's Exhibit 10 is a
4 letter dated May 21, 2009.  Do you also
5 recognize it as a May 21, 2009 letter from CBP
6 area director Camille Polimeni indicating that
7 the March 17, 2008 notice of proposal to
8 suspend the charges made in that had been
9 sustained against you?
10      MR. LYNCH:  Do you need the question
11 read back?
12      THE WITNESS:  Yes, please.
13      (Question read.)
14    A.   Yes, I recognize that she is stating
15 that.
16    Q.   All right.  So according to
17 Defendant's Exhibit 10, the CBP area director
18 Camille Polimeni had, in sustaining the
19 charges made in the March 17, 2008 notice of
20 proposal to suspend, had decided to reduce the
21 proposed penalty from two days to one and that
22 your suspension was to be carried out on
23 June 16th of 2009.
24      Did you, in fact, carry out a one day
25 suspension on June 16th of 2009?

Page 310

R. Figueroa

1
2    A.   I did, in fact, serve a one day
3 suspension --
4      MR. WOLIN:  Objection to form.
5    A.   -- on June 16, 2009.
6    Q.   All right.  So following receipt of
7 Defendant's Exhibit 10 you did serve your
8 suspension on June 16th of 2009?
9    A.   Yes.
10    Q.   Okay.  And can you tell me after you
11 served your suspension on June 16, 2009, when
12 did you return to duty?
13    A.   I believe it was the following day.
14    Q.   So that would be June 17, 2009?
15    A.   Yes.  If that was a weekday, yes.
16      MR. LYNCH:  Mark this, please.
17      (Defendant's Exhibit 11, November 29,
18      2011 letter from CBP notifying of a
19      proposal to suspend was so marked
20      for identification.)
21    Q.   You've been handed what's been marked
22 as Defendant's Exhibit 11.
23      I just want you to take a moment to
24 review it.  A copy has also been hand to your
25 counsel.

Page 311

R. Figueroa

1
2      Are you finished reviewing
3 Defendant's Exhibit 11?
4    A.   Yes.
5    Q.   All right.  Mr. Figueroa, do you
6 recognize this document, Defendant's
7 Exhibit 11?
8    A.   Yes, it's another suspension proposal
9 letter.
10    Q.   Do you also recognize Defendant's
11 Exhibit 11 specifically as a November 29, 2011
12 letter from CBP notifying of a proposal to
13 suspend you?
14    A.   Yes.
15    Q.   I'll also refer to Defendant's
16 Exhibit 11 from time to time as the
17 November 29, 2011 notice of proposal to
18 suspend, okay?
19      Now, according to the November 29,
20 2011 notice of proposal to suspend, CBP
21 proposed to suspend you for two days in
22 connection with an incident that occurred on
23 July 25th of 2011.
24      And this November 29, 2011, notice of
25 proposal to suspend, it sets forth three

Page 312

R. Figueroa

1
2 charges upon which CBP proposed suspending
3 you.
4      Charge number 1, failure to follow
5 supervisory instructions.
6      Charge number 2, absent without
7 leave.
8      And charge number 3, unprofessional
9 conduct.
10      Now, before going into each charge, I
11 want to talk about the incident that arose
12 from, specifically, July 25, 2011.
13      So let's talk about that day.  On
14 which branch were you assigned to work on
15 July 25, 2011, sir?
16    A.   Passenger processing.
17    Q.   And what shift were you scheduled to
18 work on July 25th of 2011?
19    A.   A 4:00 to 12:00 shift.
20    Q.   And what time did you report to work
21 that day?
22    A.   Early, about 3:15 in the afternoon.
23    Q.   When you reported to work, did you
24 have an assigned area with which you were
25 supposed to work?

RICHARD FIGUEROA Volume II                                          May 20, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                               329–332

Page 329

1         R. Figueroa
2 to be working, stamping, like I am.  I don't
3 understand what you mean by "here."
4      What's wrong with there?  But if
5 there is some kind of a problem, why don't you
6 just get a supervisor to come over here and
7 straighten this all out?
8    Q.  Okay.  And on July 25, 2011, Pedro
9 Cano was your supervisor; correct?
10    A.  Well, he was a supervisor assigned to
11 that day.  He wasn't my supervisor.  We all
12 have assigned supervisors.
13    Q.  Okay.  So you told this officer, "Why
14 don't you get a supervisor to straighten this
15 out"?
16      And what happened?
17    A.  Well, then a few minutes later
18 supervisor Cano comes over.
19    Q.  Tell me around -- this is still
20 around 4:00 p.m. on July 25, 2011?
21    A.  Yes.
22    Q.  Okay.  And --
23    A.  Excuse me, obviously a few minutes
24 past 4:00 p.m.
25    Q.  Okay.  So this is approximately a few

Page 331

1         R. Figueroa
2 remember the number.
3    Q.  Okay?
4    A.  I'm sure I notated it down somewhere.
5    Q.  Okay.  So what happened next?
6    A.  He says, "You are supposed to work in
7 that booth."
8      "There is someone working in that
9 booth.  How can I work in a booth that's
10 already occupied by somebody?"
11    Q.  How did you know somebody else was
12 working in the booth that supervisor Cano had
13 directed you to?
14    A.  The officer's possessions were in
15 that booth.
16    Q.  How did you know the officer's
17 possessions were in the booth that supervisor
18 Cano had directed you to report to?
19    A.  Because I can see the officer's
20 possessions in the booth.
21    Q.  Okay.  Well, were the booths next to
22 one another, the one that you were in and the
23 one that supervisor Cano was directing you to?
24    A.  No, I think they were a little bit
25 apart.

Page 330

1         R. Figueroa
2 minutes past 4:00 p.m. on July 25, 2011 that
3 this occurred?
4    A.  Yes.
5    Q.  So what happens when you tell the
6 officer to get a supervisor?
7    A.  Supervisor Cano comes to my location.
8    Q.  And what happens when supervisor Cano
9 comes to your location?
10    A.  He says, "Officer Figueroa, you are
11 working in the wrong booth."
12      I didn't understand that.  I have
13 been in this booth for the last half hour
14 processing people, I didn't understand what
15 the "wrong booth" means.  Is this booth
16 inoperable?  Is it shut down for some reason?
17      He says, "No, no, no, everybody has
18 assigned booths."
19      I go, "Well this is new to me."
20      "And you are in the wrong one."
21      I go, "What booth am I supposed to be
22 in?"
23      "That one."
24    Q.  And which booth was that?
25    A.  I don't remember the number.  I don't

Page 332

1         R. Figueroa
2    Q.  Okay.  Now, did you see an officer's
3 possessions in the booth that supervisor Cano
4 had directed you to before you went into the
5 unoccupied booth that you were sitting in?
6    A.  Well, I must have, because it wasn't
7 an unoccupied booth.  I went to the first
8 unoccupied booth I could find.
9    Q.  Okay.  So you went to the booth that
10 supervisor Cano had directed you to before you
11 went into this unoccupied booth that you were
12 in?
13    A.  No.
14      MR. LYNCH:  Can you read my question
15 back, please?
16      (Question read.)
17    Q.  No?  So can you explain?
18    A.  There is a row of booths, and you
19 walk down the row.
20    Q.  Okay.  So let's --
21      MR. WOLIN:  Are you finished
22 answering the question?
23      I don't know if he was finished
24 answering the question.
25      MR. LYNCH:  I know, I wanted to

 Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
349–352

Page 349

R. Figueroa

2    Q. And what, if anything, did you say in
3  response?
4    A. "Well, if you are bewildered, how do
5  you expect me to feel?"
6        Okay.  Let's not forget the fact the
7  man threatened me and something will be done
8  about that.  I am going to report that.
9    Q. So then what happened?
10    A. He was making a phone call speaking
11  to someone else in the union, Officer Sweeney
12  was speaking to someone else in the union,
13  because he quite frankly is literally stumped
14  at this point.
15    Q. Okay.  Did Officer Sweeney say who he
16  was going to call?
17    A. He did, but I don't remember.
18    Q. Okay.
19    A. Someone higher than his position.  He
20  is a steward in the union, someone on the next
21  level.
22    Q. So there came a point in time after
23  Officer Sweeney came to speak to you after he
24  had already spoken with supervisor Cano which
25  he indicated he needed to make a phone call to

Page 350

R. Figueroa

2  someone else in the union higher up than him?
3    A. Yes.
4    Q. Did Officer Sweeney, in fact, make
5  that phone call to a higher union person?
6    A. Yes.
7    Q. And do you know who Officer Sweeney
8  called?
9    A. No.
10    Q. So what happened after the telephone
11  call that Officer Sweeney made to a higher
12  person within the union?
13    A. I told Officer Sweeney I was not
14  feeling well, I'm going home.
15    Q. Okay.  And why were you not feeling
16  well?
17    A. I don't understand why I was not
18  feeling well, I was just not feeling well.
19    Q. Okay?
20    A. I am aggravated, okay.  I feel my
21  blood pressure surging, all right.  This is
22  literal insanity.  It's like a child arguing
23  that I stepped over his half of the bedroom,
24  this is ridiculous.
25    Q. You told Officer Sweeney that you

Page 351

R. Figueroa

2  were not feeling well, how specifically were
3  you feeling at that point?
4    A. I was feeling sick.
5    Q. When you say you were feeling sick,
6  how exactly did you feel sick?
7    A. I was feeling hot, nauseous, I had a
8  headache at that time.
9    Q. Okay.  Besides feeling hot, nauseous,
10  having a headache, how else did you not feel
11  well when you were speaking to Officer Sweeney
12  on July 25, 2011?
13    A. That was enough.  That was plenty.
14  It was very intense, each symptom.  That was
15  enough.  Definitely enough to know I was not
16  feeling well.
17    Q. Okay.  Well when you had reported to
18  work earlier on July 25, 2011, did you feel
19  hot, nauseous, have a headache at all?
20    A. No, I felt fine.
21    Q. So it was only after the point that
22  Officer Sweeney came back to talk to you after
23  Officer Sweeney had talked to supervisor Cano
24  that you started to feel hot, nauseous and
25  have a headache?

Page 352

R. Figueroa

2    MR. WOLIN:  Objection.
3    A. No, I started feeling ill, I don't
4  remember exactly at what point.  I was not
5  taking my temperature, naturally, and I am not
6  a medical person or ever had medical training.
7  I was feeling sick and I felt it was coming on
8  ever since this whole thing began unfolding.
9    Q. When you say you started to feel sick
10  when this whole thing began unfolding, when
11  specifically did you begin to feel sick that
12  day?
13    A. Well, once I was threatened, I began
14  to feel sick.
15    Q. So it was after the point that
16  supervisor Cano had spoken to you and
17  indicated you would be sorry, that you started
18  to feel ill; is that correct?
19    A. Yes.
20    MR. LYNCH:  Let's have this marked.
21    (Defendant's Exhibit 12, E-mail
22    notification dated July 27, 2011 was so
23    marked for identification.)
24    Q. Okay.  Mr. Figueroa, you've been
25  handed what's been marked as Defendant's



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
353–356

Page 353

R. Figueroa

1    Exhibit 12. A copy has been handed to your
2    counsel. If you can just take a moment to
3    review it, sir, and I'm going to ask you some
4    questions.
5
6       A. Okay.
7       Q. Do you recognize this document,
8    Defendant's Exhibit 12?
9       A. Yes.
10      Q. Can you tell me what Defendant's
11   Exhibit 12 is?
12      A. It was an e-mail notification I sent
13   supervisor Cano's -- supervisor Cano's
14   supervisor.
15      MR. LYNCH: Can you just read his
16   answer back?
17      (Answer read.)
18      Q. And according to Defendant's
19   Exhibit 12, this e-mail notification that you
20   sent is addressed to DCBPO Chance Young.
21      Is that the individual that when you
22   are referring to supervisor Cano's supervisor
23   you are referring to?
24      A. Yes.
25      Q. And do you also recognize Defendant's

Page 354

R. Figueroa

2    Exhibit 12 as an e-mail notification that you
3    sent on July 27, 2011?
4       A. I'm sorry, please repeat that.
5       MR. LYNCH: Read it back.
6       (Question read.)
7       A. Yes.
8       Q. And according to Defendant's
9    Exhibit 12 you sent this e-mail notification
10   to Mr. Chance Young on July 27, 2011 in
11   connection with what you wrote on the subject
12   line, "threats to CBPO by SCBPO, P. Cano?"
13      A. Yes.
14      Q. Okay. All right. Now, directing
15   your attention to the first paragraph of
16   Defendant's Exhibit 12, and I'll refer also to
17   Defendant's Exhibit 12 from time to time as
18   your July 27, 2011 e-mail notification.
19      And in your July 27, 2011 e-mail
20   notification also marked Defendant's
21   Exhibit 12, you wrote on the first full
22   paragraph that, "On Monday, July 25, 2011, at
23   approximately 16:30 hours, SCBPO, P. Cano
24   threatened CBPO Richard Figueroa at primary
25   booth number 42."

Page 355

R. Figueroa

2       And I'll stop there.
3       Q. Does that refresh your recollection
4    that the incident with Mr. Cano occurred
5    around 4:30 p.m. on July 25th of 2011?
6       A. Yes, at approximately 4:30 p.m., yes.
7       Q. And does this also refresh your
8    recollection from what I just read that the
9    booth where the incident occurred with Mr.
10   Cano was booth number 42?
11      A. Yes.
12      Q. Okay. All right. Now, directing
13   your attention to the second full paragraph,
14   the second sentence -- actually, I'll just
15   backup. I'll refer beginning with the first
16   sentence where it says, "On Monday, July 25,
17   2011 at approximately 15:30 hours, CBPO
18   Richard Figueroa, badge number 3020 reported
19   for a 4 by 12 shift at terminal 4 at
20   immigration primary."
21      Your badge number at that time was
22   3020; is that correct?
23      A. Yes.
24      Q. Is that still your badge number?
25      A. Yes.

Page 356

R. Figueroa

2       Q. And I think you testified earlier
3    that you did work a 4 by 12 shift on July 25,
4    2011. So that's also correct; right?
5       A. Yes.
6       Q. And the next sentence you wrote, "At
7    that time it was noted on the sign-in sheet
8    that I was assigned to booth number 32."
9       So according to what you wrote on
10   this July 27, 2011 e-mail notification, that's
11   also marked as Defendant's Exhibit 12, when
12   you reported to work, it was noted on a
13   sign-in sheet that you were assigned to booth
14   number 32.
15      Does that refresh your recollection,
16   sir, when you signed in on July 25, 2011 to
17   report to work, that on the sign-in sheet, it
18   was noted that you were to report to booth
19   number 32?
20      A. Yes, I subsequently learned what the
21   number next to my name meant.
22      Q. Okay. I don't understand when you
23   say you subsequently learned?
24      A. When you sign-in, okay, you'll have
25   your name there, okay, and you just sign-in



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
357–360

Page 357

1         R. Figueroa
2 next to it, all right.
3         There was a number next to my name.
4 I don't know what it meant. It did not say go
5 directly to booth 32. There was just a number
6 next to my name. I didn't know what that
7 meant, that I'm not preparing this document.
8         All my obligations to this document
9 are is for me to sign-in.
10      Q. Okay. According to what you wrote
11 here on this July 27, 2011 e-mail notification
12 marked Defendant's Exhibit 12, according to
13 your words, at the time that you had reported
14 to work you wrote "it was noted on the sign-in
15 sheet that I was assigned to booth number 32?"
16      A. Yes, I subsequently learned what it
17 meant and I said oh, I remember seeing that
18 number, and I didn't know what that number
19 meant.
20      Q. So you are saying at the time that
21 you had reported to work on July 25, 2011, you
22 are saying you did not understand that the
23 booth you are assigned to was booth number 32?
24      A. No. Once again, there was no
25 procedure, policy in place to state that from

Page 358

1         R. Figueroa
2 this day forward, this is how we are going to
3 operate.
4       Q. But my question just wasn't about
5 policy. I'm just referring to what you wrote
6 here.
7       A. Yes. And according to what I wrote
8 here, I subsequently learned that there was a
9 number next to my name and what that number
10 meant. So I included that in my e-mail.
11      Q. Okay. Well, let me make sure I
12 understand correct.
13        You recall when you went to sign-in
14 on the sign-in sheet on July 25, 2011, that
15 there was a number next to your name; is that
16 correct?
17      A. Yes.
18      Q. Okay, but it's your testimony that
19 you didn't understand what that number meant?
20      A. No, there are many notations on that
21 sheet, okay, and I don't know what those
22 notations stand for. They are made by the
23 supervisor that prepares everything.
24        So there are many notations made on
25 these sheets.

Page 359

1         R. Figueroa
2       Q. Well, prior to July 25, 2011 when you
3 went to sign-in, had you seen numbers next to
4 your name?
5       A. Sometimes you did, sometimes you
6 didn't.
7       Q. Okay. So you do recall prior to
8 July 25, 2011 when you would sign-in that you
9 would see sometimes a number next to your name
10 when you were working in passenger processing?
11        MR. WOLIN: Objection.
12      A. Sometimes you would see a number.
13 Sometimes you'd see other notations.
14 Sometimes you saw nothing.
15      Q. But again, sir, you just need to
16 answer my question.
17        Can you read the question back?
18        (Question read.)
19      Q. So the answer is yes, sometimes when
20 you would sign-in prior to July 25, 2011 at
21 passenger processing, you would see a number
22 next to your name on the sign-in sheet;
23 correct?
24      A. Sometimes I would see a number,
25 sometimes I would see other notations.

Page 360

1         R. Figueroa
2       MR. LYNCH: Can you read the question
3 back?
4       MR. WOLIN: Objection.
5       It's already been answered three
6 times
7        (Question read.)
8       Q. All right. So prior to July 25, 2011
9 when you would see a number next to your name
10 when you would sign-in, did you ask anybody
11 what that meant?
12      A. No.
13      Q. Why not?
14      A. It's not my sheet to prepare. It's
15 -- all my obligation is is to sign it when I
16 appear for work. That is it.
17        It is not my job to interpret
18 scratchings or notations on this sheet.
19      Q. Okay. Well, when you would sign-in
20 prior to July 25, 2011 and you would see a
21 number next to your name, did that number
22 correspond to a booth that you would go to,
23 sir?
24      A. No.
25      Q. Never at all prior to July 25, 2011?


Tankoos Reporting

*1384 Broadway, 19th Floor*
*New York, NY 10018 | 212.687.8010*

RICHARD FIGUEROA Volume II                                  May 20, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                       377–380

Page 377
R. Figueroa

1          R. Figueroa
2    Q. Okay.
3    A. I don't know if there was a second
4 one -- if there is a second one floating
5 around anywhere, but I believe I corrected the
6 time.
7       But I started feeling sick, and with
8 my union representative there, I notified the
9 supervisor that I was feeling ill and I'm
10 going home sick.
11    Q. How exactly did you notify supervisor
12 Cano that you were sick?
13    A. I told him, "I'm not feeling well,
14 I'm going home sick."
15    Q. And what did he say in response?
16    A. Well, he told me that I had to go all
17 the way to the office and I had to sign-out on
18 the sign-out sheet.
19    Q. Okay. What did you say in response?
20    A. "I'm feeling ill. I'm not going to
21 do anything along the lines of administrative
22 duties. I'm feeling ill, I'm going go home.
23 I'm not arguing at this point with you. I'm
24 going home."
25    Q. What specifically were the

Page 378
R. Figueroa

1          R. Figueroa
2 administrative duties or functions that
3 supervisor Cano was telling you needed to be
4 done?
5    A. He told me to sign-out on the
6 sign-out sheet. The sign-out sheet is way on
7 the other side of the terminal.
8       I'm not delaying seeking medical
9 attention one minute. I'm packing my things,
10 I'm out of here, I'm leaving.
11    Q. Well was there a procedure with which
12 you were supposed to fill out a certain form
13 before going home sick?
14    A. No, sir. Funny you mention that.
15 When an officer is home and he is sick, all he
16 does is call up, speak to a supervisor, tells
17 him he is going sick and he hangs up the
18 phone, no forms are ever filled out.
19    Q. Okay, but we are talking about when
20 you are at work. So on the day when the
21 incident occurred on July 25, 2011, was there
22 a procedure with which if an officer wanted to
23 go home that day because he was feeling sick
24 that needed to be filled out, a procedure that
25 needed to be followed administratively?

Page 379
R. Figueroa

1          R. Figueroa
2    A. No, the rules of the contract
3 stipulate that you have to notify a supervisor
4 that you are going home sick. Once you do
5 that -- okay, you just can't walk off the
6 floor and then later on say you were sick.
7 You have to notify them that you are going
8 home sick and that's all you have to do.
9 That's all you have to do.
10    Q. So, can you tell me after this
11 July 25, 2011 incident, were you asked by CBP
12 management to address certain aspects of it?
13    A. Yes. Unlawfully I was, yes.
14    Q. When you say "unlawfully," what do
15 you mean?
16    A. Once an incident like this begins and
17 if you need to question me, there is a
18 procedure to follow. They didn't follow it.
19    Q. Well, what are you saying they should
20 have followed? And when you say something is
21 unlawful, that's a pretty strong word. So
22 what exactly are you stating?
23    A. If you are going to interrogate me,
24 there are certain forms and notices that you
25 have to give me before you can interrogate me.

Page 380
R. Figueroa

1          R. Figueroa
2    Q. Okay?
3    A. Okay. I was being interrogated
4 without being given those documents.
5    Q. What forms and notices are you
6 referring to that you believe you should have
7 received?
8    A. Something known as the Weingarten
9 Rights. And one or two other forms, I was
10 given that much later, but I was interrogated
11 prior. And they are not allowed to do that.
12       MR. LYNCH: This is 13.
13       (Defendant's Exhibit 13, E-mail dated
14 August 3, 2011 was so marked for
15 identification.)
16    Q. Okay. I'm showing you what's been
17 marked as Defendant's Exhibit 13. Just take a
18 moment to review it and then I'm going to ask
19 you some questions.
20       Do you recognize this document,
21 Defendant's Exhibit 13, Mr. Figueroa?
22    A. Well, I can't say that I do.
23 Something has been scratched out of here, I
24 don't know why.
25    Q. Okay. I understand that you see a


Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
381–384

Page 381

1          R. Figueroa
2  mark out on the two, but can you tell, me do
3  you recognize this document, Defendant's
4  Exhibit 13, what's written on the first page?
5          Do you recognize this document,
6  Defendant's Exhibit 13, as an e-mail that you
7  sent dated August 3, 2011 in response to an
8  e-mail on July 29, 2011 that Deputy Supervisor
9  Chance Young sent to you regarding the
10  July 25, 2011 incident?
11      A.  Yes, I remember Deputy Young's e-mail
12  to me.
13      Q.  Okay.  And do you recognize on the
14  first page of Defendant's Exhibit 13 the top
15  portion being a response that you sent on
16  August 3, 2011 regarding this July 25, 2011
17  incident?
18      A.  Well, I can't say for sure, counsel,
19  it's been redacted.  If I sent it, I don't
20  know why any information is being redacted
21  from this.
22      Q.  I understand you see the redaction on
23  the "to" line, sir.
24          I'm just asking you do you recognize
25  this document, Defendant's Exhibit 13, as an

Page 382

1          R. Figueroa
2  e-mail that you sent on August 3, 2011, just
3  in response to Chance Young's e-mail to you on
4  July 29, 2011 requesting you to address
5  certain aspects of the July 25, 2011 incident.
6  That's all I'm asking.
7          Can you read the question back for
8  him, please?
9          (Question read.)
10      A.  Well, without being able to see the
11  whole thing, I will say for the purpose of
12  these proceedings, I would answer yes.
13      Q.  Okay.  So on Defendant's Exhibit 13
14  towards the bottom of the first page you see
15  an e-mail, this July 29, 2011 e-mail from
16  Chance Young to you where he had requested you
17  to address certain aspects of this July 25,
18  2011 incident, specifically there were three
19  aspects that Deputy Supervisor Chance Young
20  asked you to address.  And when you look
21  towards the bottom of the first page carrying
22  over onto the second page of Defendant's
23  Exhibit 13, you see those three specific
24  aspects, the first being that SCBPO Cano
25  instructed you to report to primary booth

Page 383

1          R. Figueroa
2  number 32 and you refused.
3          The second, SCBPO Cano instructed you
4  several times to fill out a leave slip for the
5  requested sick leave and you refused.
6          And the third, that you left your
7  assignment without supervisory approval.
8          So those are three aspects that Mr.
9  Chance Young's July 29, 2011 e-mail to you, he
10  asked you to respond to.
11          And we will look at the top of
12  Defendant's Exhibit 13, do you recognize that
13  as your response that you sent on August 3,
14  2011 in response to that e-mail; is that
15  right?
16          MR. WOLIN:  Objection.
17      A.  Without being able to see the entire
18  thing --
19          MR. WOLIN:  I mean, he already
20  answered the same exact question, Tim.
21          Read back two questions ago.  He said
22  that for the purposes of this deposition he
23  will say yes.
24      A.  For purpose of this deposition I will
25  say yes.

Page 384

1          R. Figueroa
2      Q.  So let's just go through each of the
3  responses that you noted on top of Defendant's
4  Exhibit 13.  And let's start -- okay, so in
5  response to the question of whether you
6  refused to report to primary booth number 32
7  after being instructed to do so by Mr. Cano
8  you wrote, "I did not refuse to report to
9  primary booth number 32."
10          Can you explain to me how did you not
11  refuse to report to primary booth number 32
12  after being told to do so by Mr. Cano?
13          MR. WOLIN:  Objection.
14          Answer it.
15      A.  I didn't refuse.
16      Q.  How did you not refuse?
17      A.  I did not refuse.
18          MR. WOLIN:  Objection.
19      Q.  But I'm asking you how.  You are
20  telling me you did not refuse.  My question to
21  you, sir, is how did you not refuse?
22          Did you tell him that I would go to
23  booth 32?  Did you indicate to him by
24  gestures?  How exactly, sir, did you refuse to
25  report to primary booth 32?



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
385–388

Page 385

1           R. Figueroa
2       A. Once again, I did not refuse to
3   report to primary booth 32.
4       Q. How did you not refuse to go to booth
5   number 32? How?
6       A. I told him the booth 32 is occupied,
7   I couldn't occupy an already occupied booth.
8   That is not a refusal.
9           How can I sit down in a booth that's
10  already taken by somebody else? How am I
11  going to do that? That is not a refusal.
12      Q. But at a certain point in time
13  supervisor Cano had told you to report to
14  booth 32; right?
15          MR. WOLIN: Objection.
16          MR. LYNCH: Correct.
17          MR. WOLIN: Objection.
18      A. No.
19      Q. So you are saying at no point in time
20  on July 25, 2011 that supervisor Cano directed
21  you to report to booth 32?
22      A. No, he didn't. He told me you are
23  supposed to work at booth number 32. He never
24  told me your assignment today is booth number
25  32. He never told me that.

Page 386

1           R. Figueroa
2       Q. Okay. So then that's my question.
3   At a certain point in time he directed you to
4   report to booth 32?
5           MR. WOLIN: Objection.
6           He just said no.
7           MR. LYNCH: Can you read his answer?
8           (Answer read.)
9       Q. So he told you on July 25, 2011, that
10  you were to report to booth 32; correct?
11      A. He advised me that I was supposed to
12  work in booth number 32. He never told me I
13  had to work in booth number 32.
14      Q. Okay. Well, did there come a point
15  in time on July 25, 2011 when you were having
16  this discussion with supervisor Cano, okay,
17  that he said to you you are to report to booth
18  32?
19          MR. WOLIN: Objection.
20      A. No, he did not.
21      Q. So at no point in time did he tell
22  you, supervisor Cano, that you are to go to
23  booth 32?
24          MR. WOLIN: Objection.
25          He just said no.

Page 387

1           R. Figueroa
2           MR. LYNCH: Just state your objection
3   Alan, that's it.
4       A. I'll put an end to this. No, he did
5   not.
6       Q. Okay. All right. So now in response
7   to the question basically of whether you
8   refused to fill out a leave slip for requested
9   sick leave after Mr. Cano instructed you to
10  fill one out you wrote, "I was ill, reported
11  my condition to SCBPO Cano and departed to
12  seek medical attention."
13          Now, when you began feeling ill, did
14  you request an ambulance or some other
15  immediate medical attention that day on
16  July 25, 2011?
17      A. I requested that I wanted to go home
18  and seek medical attention.
19      Q. So you indicated that you wanted to
20  go home?
21      A. I indicated that I was sick and I
22  wanted to go home to seek medical attention.
23      Q. Well, and did you explain why you
24  wanted to go home to seek medical attention?
25      A. What do you mean did I explain?

Page 388

1           R. Figueroa
2       Q. In other words, you are saying I need
3   to go home to seek medical attention.
4           Did you explain further what was the
5   medical attention you needed to seek when you
6   got home?
7       A. I said that I was feeling ill. "I'm
8   feeling sick, I'm going to go home and seek
9   medical attention."
10      Q. Did you, in fact, go home on July 25,
11  2011?
12      A. Eventually I went home, yes.
13      Q. What time did you go home?
14      A. I don't remember.
15      Q. When you got home on that day,
16  July 25, 2011, did you seek medical attention?
17      A. I sought medical attention before I
18  went home.
19      Q. Okay. At what point in time on
20  July 25, 2011 did you seek medical attention?
21      A. Immediately leaving the airport.
22      Q. What time did you leave the airport?
23      A. Around 4:30.
24      Q. So when you left the airport, JFK
25  Airport on July 25, 2011, what did you do?


Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
397–400

Page 397

R. Figueroa
1
2  on the first page of Defendant's Exhibit 13
3  and you also wrote that "In regards to being
4  listed as AWOP, as I had sufficient sick leave
5  accrued on July 25, 2011, COSS should be
6  adjusted."
7        What's AWOP that you are referring
8  to?
9     A.  Absent without permission.
10    Q.  And when you were referring to COSS,
11  can you explain that?
12        MR. WOLIN:  Objection.
13        I think we had that testimony last
14  time, but you can answer it again.
15    A.  That's a computer scheduling system.
16    Q.  And when you say that you had accrued
17  sufficient sick leave on July 25, 2011, how
18  much sick leave did you have accrued during
19  that period?
20    A.  I don't remember, but it was in
21  abundance of the time that I was going to be
22  absent for that day.
23    Q.  So do you believe that the sick leave
24  that you had accrued as of July 25, 2011 had
25  entitled you to be able to take sick leave

Page 398

R. Figueroa
1
2  without having to fill out any type of forms?
3        MR. WOLIN:  Objection.
4        You can answer it.
5     A.  No, I told you, the procedures were
6  you have to notify a supervisor that you are
7  going sick.
8        Once you have done that, you have
9  satisfied your obligation and you go sick.
10       I explained to you as an example,
11  when an officer calls in and he is at home and
12  he calls in over the phone, there are no forms
13  to be filled out.  They don't instruct the
14  officer, fill out a form and fax it to me.
15  There are no forms that are filled out at that
16  time or when the officer arrives back from
17  work.
18       I don't understand why it was in
19  officer Cano's forefront of his mind that I
20  fill out a form, no one else does.
21       MR. LYNCH:  All right.  Mark this.
22       (Defendant's Exhibit 14, Copy of
23  CBP's leave handbook as of February of 2007
24  was so marked for identification.)
25    Q.  I'm going to show you what's been

Page 399

R. Figueroa
1
2  marked as Defendant's Exhibit 14.  I want you
3  to take a moment to review it and then I'm
4  going to ask you some questions.
5        Are you finished?
6     A.  Yes.
7     Q.  Okay.  All right.  So Defendant's
8  Exhibit 14 is a copy of CBP's leave handbook
9  as of February of 2007, and I want to direct
10  your attention to what's Bates stamped page
11  number DHS 1701.
12       It's at the top of the page is the
13  section regarding requesting sick leave, and
14  it's number 6 in that section.
15       Do you see what I'm referring to?
16    A.  Yes.
17    Q.  Okay.  And specifically I want to
18  direct your attention to the section under the
19  requesting sick leave paragraph that's
20  entitled "unscheduled sick leave."
21       And according to the second paragraph
22  it says that, "The employee should submit a
23  completed OPM form 71 paper or electronic to
24  his or her supervisor immediately upon return
25  to duty and is responsible for providing

Page 400

R. Figueroa
1
2  administratively acceptable evidence to
3  support his or her request for sick leave as
4  required by the supervisor."
5        Now, after you had went out sick on
6  July 25, 2011, did you ever submit this OPM
7  form 71 to your supervisor at that time, Mr.
8  Cano, when you returned to work after leaving
9  early on July 25, 2011?
10    A.  No.
11    Q.  Okay.  And why not?
12    A.  He never requested it.  As it
13  stipulates here, he's got to request it.  It
14  was never requested.  Or do you have something
15  in your file that shows he did?  Because I
16  never got it.
17    Q.  Well, according to here, just
18  focusing, it says "The employee should submit
19  a completed OPM form 71 to his supervisor
20  immediately upon return to duty and he is
21  responsible for providing administratively
22  acceptable evidence to support his or her
23  request for sick leave as required by the
24  supervisor."
25       So what you are referring to is just


Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
405–408

Page 405

R. Figueroa
1
2  that you would clear out the booth and go to
3  the assigned booth he was directing you to?
4      A.  Sir, first of all, I'm not a janitor.
5  Are you going to let me answer?
6          My duties are just to show up and do
7  an officer's duty.  These possessions belonged
8  to someone else.  I am not touching someone
9  else's possessions.
10         If supervisor Cano wanted to get the
11  officer who these possessions belong to and
12  have him remove it, then that would have been
13  fine, the booth would have been empty, I would
14  have occupied it.
15     Q.  Did you tell supervisor Cano that you
16  would occupy the booth if the other officer's
17  belongings were removed on July 25, 2011?
18     A.  Well, I don't see --
19         MR. WOLIN:  Just answer the question.
20     A.  I don't see how supervisor Cano
21  didn't think of that option himself.
22         MR. LYNCH:  Can you read the question
23  back?
24         MR. WOLIN:  I don't know that she has
25  to read the question back.

Page 406

R. Figueroa
1
2      MR. LYNCH:  Well, read the question
3  back because I don't want any misunderstanding.
4      MR. WOLIN:  He didn't say he didn't
5  understand it
6      (Question read.)
7      A.  No.
8      Q.  Did you say anything supervisor Cano
9  on July 25, 2011 to indicate that you would
10  occupy the booth he was directing you to
11  report to in any set of circumstances?
12         MR. WOLIN:  Objection.
13         Answer it.
14     A.  It is not my duty to furnish
15  supervisor Cano a solution to this problem.
16  He is a supervisor, he is being paid extra
17  money to solve these problems himself.
18         He is telling me to occupy a booth
19  that's already occupied.  I tell him I don't
20  see how I can occupy a booth that is already
21  occupied by someone else, it is up supervisor
22  Cano to provide a solution.  It is not my job
23  or position as a CBP officer to furnish a
24  solution to a supervisory issue to a
25  supervisor.

Page 407

R. Figueroa
1
2      Q.  I understand that, Mr. Figueroa.
3         MR. WOLIN:  All this is argument.
4  This is a simple interaction between him and
5  the supervisor and we keep going back and
6  forth over it 25 different times.
7         MR. LYNCH:  Can you read the question
8  back?
9         I just need you to answer only my
10  question, sir, that's all.
11         Can you just read my question back?
12  Thank you.
13         (Question read.)
14         MR. WOLIN:  Objection.
15     Q.  So my question is did you say
16  anything to supervisor Cano on July 25, 2011
17  that you would occupy the booth that he was
18  directing you to report to under any set of
19  circumstances, okay?  That's my question to
20  you, whether it was that somebody else get the
21  other officer's belongings out of the booth,
22  he was directing you to report to.
23         So just my question is did you say
24  anything to supervisor Cano on July 25, 2011
25  to indicate that you would occupy the booth he

Page 408

R. Figueroa
1
2  was directing you to under any set of
3  circumstances?  That's all I'm asking you.
4         MR. WOLIN:  I objected to the
5  question.
6         Just answer it.
7      A.  You are asking me to provide an
8  answer for something that did not occur.
9  Supervisor Cano gave me no options whatsoever.
10  So I am not there to provide supervisor Cano
11  with an option.  Supervisor Cano is obligated
12  to provide me with one.
13         Nor did I refuse to occupy that booth
14  if he give me a solution.
15     Q.  Okay, but that's my question.
16         Did you, I'm not asking about Cano at
17  this point, I'm not asking about him, I'm just
18  concerned about your actions, what you did,
19  anything you said.
20         Did you say anything to supervisor
21  Cano to indicate that you would occupy the
22  booth that he was directing you to report to
23  under any set of circumstances?  Just you I'm
24  focused on, Mr. Figueroa, that's it.
25         MR. WOLIN:  Objection.



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
409–412

Page 409

R. Figueroa

1      A. I never got that far, because that
2  option was never provided to me.
3      MR. WOLIN: Just answer it yes or no,
4  if you can.
5      MR. LYNCH: Answer my question.
6      Can you read my question back.
7      MR. WOLIN: No, we have already read
8  it back four times, we don't have to read it
9  back again.
10     Q. Hold it, stop. I want to make sure
11  the record it clear.
12     Did you say anything to supervisor
13  Cano to indicate that you would occupy the
14  booth he was directing you to report to under
15  any set of circumstances? That's my question.
16     MR. WOLIN: Objection.
17     If you can just answer it yes or no
18  so we can move on.
19     A. No. Nor did I refuse.
20     MR. WOLIN: Okay. You have your
21  answer. Can we move on?
22     MR. LYNCH: Can you just read that
23  back for me, please?
24     MR. WOLIN: For the fifth time.

Page 410

R. Figueroa

1      Q. Okay. All right. So still focused
2  on this charge number one, failure to follow
3  supervisory instructions that's listed on
4  Defendant's Exhibit 11, and the second ground
5  under the first charge of failure to follow
6  supervisory instructions.
7      According to the second ground, on
8  July 25, 2011, you left before the end of your
9  tour because you were sick, but before doing
10  so your supervisor, Mr. Cano, had instructed
11  you to submit a request for leave or approved
12  absence, this OPM form 71, before you departed
13  that day.
14     So according to this second ground in
15  support of the first charge, at a certain
16  point in time on July 25, 2011, Mr. Cano had
17  instructed you to submit this OPM form 71,
18  okay.
19     MR. WOLIN: Is that a question.
20     MR. LYNCH: Let me finish.
21     MR. WOLIN: Okay.
22     MR. LYNCH: All right.
23     Q. And is it your testimony today that
24  on July 25, 2011 at no time did supervisor

Page 411

R. Figueroa

1      Cano instruct you to submit this OPM form 71?
2      MR. WOLIN: Objection.
3      Answer it again.
4      A. Yes, he never told me to submit the
5  form.
6      Q. So just directing your attention to
7  the second charge that's listed on Defendant's
8  Exhibit 11 under absence without leave, that
9  being the charge I'm referring to, and it
10  indicates that under this second charge that
11  on July 25, 2011 after he had been scheduled
12  to work the 4:00 p.m. to 12:00 a.m. shift and
13  had left early that day, you did not submit a
14  request for leave or approved absence, this
15  OPM form 71, we have been discussing, and as a
16  result of that you had been charged with
17  7.25 hours of absence without leave?
18     And just to make sure we are clear,
19  at no point after this, July 25, 2011, did you
20  submit this OPM form 71?
21     MR. WOLIN: Objection.
22     Answer it again.
23     A. Just so we are clear, I was never
24  instructed to.

Page 412

R. Figueroa

1      Q. Okay. So --
2      A. So I did not.
3      Q. Okay. So then I want to direct your
4  attention to the third charge that's listed on
5  Defendant's Exhibit 11, this third charge of
6  unprofessional conduct.
7      And in support of this charge under
8  the first ground it indicates that on July 25,
9  2011 after your supervisor Mr. Cano had
10  instructed you to move to your assigned booth,
11  you had responded in sum and substance that
12  someone else's bag was in your assigned booth
13  and that it was not your job to insure that
14  your booth was ready.
15     Did you in sum and substance tell Mr.
16  Cano on July 25, 2011, after he had instructed
17  you to move to an assigned booth, that not
18  only was someone else's bag in the assigned
19  booth, but that it wasn't your job to insure
20  that the booth should be ready for you?
21     MR. WOLIN: Objection.
22     Answer it again.
23     A. It's not my job to see to it that the
24  booth is available for me. This is his



Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
417–420

Page 417

1        R. Figueroa
2        MR. WOLIN:  Objection.
3    A.  That is totally false.  I was never
4  instructed to fill out the form.
5        MR. LYNCH:  Okay.  That's all I'm
6  asking.  Thank you.  All right.  So why don't
7  we take -- it's 1:00, let's reconvene at 2:00;
8  all right?
9        MR. WOLIN:  Fine.
10       MR. LYNCH:  Thank you.
11       (Whereupon, a luncheon recess was
12   taken at 1:00 p.m.)
13       A F T E R N O O N   S E S S I O N :
14       (Whereupon, the proceedings resumed
15   at 2:00 p.m.)
16       (Defendant's Exhibit 15, Letter dated
17   May 23, 2012 from CBP acting port director
18   Wayne Biondi was so marked for
19   identification.)
20  BY MR. LYNCH:
21   Q.  So I'm handing you, Mr. Figueroa,
22  what's been marked as Defendant's Exhibit 15.
23       Just take a moment to review it, sir,
24  and just let me know when you are finished?
25   A.  Okay.

Page 418

1        R. Figueroa
2    Q.  Do you recognize this document,
3  Defendant's Exhibit 15, sir?
4    A.  Yes.
5    Q.  Can you tell me what it is, sir?
6    A.  It is a final decision to suspend me
7  for two days.
8    Q.  Okay.  Defendant's Exhibit 15 is also
9  a letter that's been -- do you recognize this
10  document as a letter dated May 23, 2012, from
11  CBP acting port director Wayne Biondi to you
12  regarding a decision to suspend you?
13   A.  Yes.
14   Q.  And according to Defendant's
15  Exhibit 15, CBP's acting port director Wayne
16  Biondi had upheld the proposed two-day
17  suspension that had been issued on
18  November 29th of 2011; that November 29, 2011
19  notice of proposal to suspend that we have
20  been discussing.
21       And according to Defendant's
22  Exhibit 15, CBP's acting port director Wayne
23  Biondi had determined that your two-day
24  suspension would be effective June 27, 2012,
25  and that you would return to duty on June 29th

Page 419

1        R. Figueroa
2  of 2012.
3       Did you, in fact, carry out your
4  suspension on June 27th of 2012?
5    A.  Yes, I did serve a two-day suspension
6  for that time period.
7    Q.  And did you return to duty on
8  June 29, 2012?
9    A.  Yes.
10       MR. LYNCH:  Mark this.
11       (Defendant's Exhibit 16, Letter dated
12   February 22, 2012 was so marked for
13   identification.)
14   Q.  And you've been handed what's been
15  marked as Defendant's Exhibit 16, a copy has
16  been handed to your counsel.
17       If you can just take a moment to
18  review it and just let me know when you are
19  finished?
20   A.  Okay.
21   Q.  Okay.  Do you recognize this
22  document, Defendant's Exhibit 16, Mr.
23  Figueroa?
24   A.  Yes.
25   Q.  Can you tell me what it is, sir?

Page 420

1        R. Figueroa
2    A.  It's a suspension proposal for
3  14 days.
4    Q.  And specifically, Defendant's
5  Exhibit 16 is a letter dated February 22, 2012
6  to you regarding a CBP's notice of proposal to
7  suspend you for 14 calendar days.
8       Do you recall receiving Defendant's
9  Exhibit 16 on or around February 22nd of 2012,
10  sir?
11   A.  Yes.
12   Q.  And on occasion I'll refer to
13  Defendant's Exhibit 16 as this February 22
14  2012 notice of proposal to suspend; okay?
15   A.  Okay.
16   Q.  And according to the February 22,
17  2012 notice of proposal to suspend, CBP's
18  assistant port director John Mirondona had
19  proposed to suspend you for 14 days in
20  connection with an incident that occurred when
21  you were assigned to work overtime on
22  November 25th of 2011.
23       And Defendant's Exhibit 16 sets forth
24  the following charge upon which CBP had
25  proposed to suspend you which was "willful and



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
421–424

Page 421

1          R. Figueroa
2  intentional refusal to obey a proper order of
3  a superior."
4        Before going into the charge I want
5  to ask you a few questions, first talking
6  about where you were assigned back in November
7  of 2011, how the overtime assignment process
8  worked, and then what happened on
9  November 25th of 2011; okay?
10     A.  Okay.
11     Q.  So just focusing in November of 2011,
12  which branch were you generally assigned to
13  work during that time period, sir?
14     A.  The firearms division.
15     Q.  And generally, what time did you
16  report for duty back in November of 2011?
17     A.  Well, we had two shifts, an 8:00 to
18  4:00 shift and a 12:00 to 8:00, 12:00 p.m. to
19  8:00 a.m.
20     Q.  And did you generally work both
21  shifts back in November of 2011?
22     A.  We started out working both shifts,
23  and then it kind of morphed into certain
24  people would rather do the days, certain other
25  people would rather do the p.m. shifts.  So it

Page 422

1          R. Figueroa
2  eventually became a steady shift operation.
3        So I was either working both shifts
4  during this time period, or maybe working in
5  one a little bit more than the other.
6     Q.  And when we got to the actual day of
7  November 25th of 2011, what shift did you work
8  on that day?
9     A.  The 12:00 to 8:00.
10     Q.  And that's the 12:00 p.m. to
11  8:00 a.m. shift?
12     A.  No, no, no, 12:00 p.m. to 8:00 p.m.
13  shift.
14     Q.  To 8:00 p.m. shift, I'm sorry.
15        Okay.  And who were your supervisors
16  back in November of 2011?
17     A.  Supervisor Deborah Pisciotta.
18     Q.  To the best you can, how do you spell
19  her last name?
20     A.  P-I-S-C-I-O-T-T-A.
21     Q.  And besides Ms. Deborah Pisciotta?
22     A.  Frank Siniscalchi.
23     Q.  Anyone else?
24     A.  No.
25     Q.  And with respect to Ms. Deborah

Page 423

1          R. Figueroa
2  Pisciotta, she was female; correct?
3     A.  Yes.
4     Q.  And what's Ms. Pisciotta's race?
5     A.  She is a white female.
6     Q.  Do you know Ms. Pisciotta's national
7  origin?
8     A.  No.
9     Q.  I believe you had mentioned Frank
10  Siniscalchi before.  He is male; correct?
11     A.  Yes.
12     Q.  And his race is white; correct?
13     A.  Yes.
14     Q.  And in terms of national origin, do
15  you know?
16     A.  I don't know.
17     Q.  Can you tell me, back in November of
18  2011, how did the overtime assignment process
19  work, in general?
20     A.  Well, the way it's supposed to work
21  is if an officer wants to volunteer for
22  overtime, you'll call in and get your name
23  placed on the list.
24        And then if you are one of the people
25  with the least amount of overtime earnings to

Page 424

1          R. Figueroa
2  date, you'll get the assignment.
3     Q.  Okay.  So back in November of 2011,
4  it wasn't as if overtime assignments were
5  mandatory?
6     A.  No, there could have been two.  If
7  you didn't want to work overtime and they
8  needed people and your overtime earnings were
9  low, then you can get drafted as well.
10     Q.  Now, just focusing on November 25th
11  of 2011, did you request at all to work an
12  overtime assignment?
13     A.  Yes, I did.
14     Q.  Can you tell me what was the nature
15  of your request to work this overtime
16  assignment?
17     A.  I don't understand.
18     Q.  Prior to November 25th of 2011, did
19  you put in to request overtime -- to work an
20  overtime assignment that day?
21     A.  No, you put it in on a daily basis.
22     Q.  Okay.
23     A.  So I -- on November 25th, I phoned
24  and I volunteered to work overtime that day.
25     Q.  So how did it work?  So on

 Tankoos Reporting

RICHARD FIGUEROA Volume II                                    May 20, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                         425–428

Page 425

1              R. Figueroa
2   November 25, 2011 you were working the
3   12:00 p.m. to 8:00 p.m. shift; right?
4       A. I'm sorry, say that again?
5       Q. So how did it work?  So on
6   November 25, 2011, you were assigned to work
7   your regular shift at 12:00 p.m. to 8:00 p.m.;
8   right?
9       A. Yes.
10      Q. And so is it that when you reported
11  to work that day at a certain point in time
12  that day you had decided to request overtime?
13      A. No, you generally request it at the
14  start of your shift.
15      Q. Okay.  So what time did you report to
16  work on November 25, 2011?
17      A. 12:00.
18      Q. Okay.  And tell me what happened once
19  you reported to work from where you
20  specifically went once you arrived to the JFK
21  facility?
22      A. Okay.  Well, there are firearms
23  sessions that have to be given to qualify the
24  officers in the use of their firearms.  And
25  you would participate in these sessions,

Page 426

1              R. Figueroa
2   either giving the lecture for that day or
3   assisting when the officers actually shoot on
4   the range to oversee the shooters to make sure
5   there aren't any mistakes or any injuries that
6   may occur.
7       Q. So when you reported to work on
8   November 25th of 2011 at 12:00 p.m., did you
9   report somewhere to sign-in for work?
10      A. Yes.
11      Q. Okay.  Where did you report?
12      A. At the firearms officer's office.
13      Q. Where is the firearms officer's
14  office back in that time on November 25th of
15  2011?
16      A. It's on the mezzanine level of
17  Building 77.
18      Q. So when you reported to the mezzanine
19  level of Building 77 where the firearms
20  officer's office was, what was the first thing
21  you did when you got there on November 25,
22  2011?
23      A. I signed in.
24      Q. And at the point that you signed in,
25  did you then request an overtime assignment at

Page 427

1              R. Figueroa
2   that point?
3       A. I made a notation on the sign-in
4   sheet that I was volunteering for overtime,
5   and then someone else calls over the
6   volunteers sometime shortly thereafter.
7       Q. And what made you decide to volunteer
8   to work an overtime assignment on that day?
9       A. Well, it's something that we have to
10  do.  So on days that it is more convenient
11  than others, that is to say, you know, there
12  are no babysitting issues for people or they
13  don't have to go somewhere very early the next
14  morning, if you don't have anything that's
15  pending, you'll decide to work overtime so
16  that you can maintain your numbers and not
17  become one of these people that may get
18  drafted at a moment's notice.
19      Q. And what exactly was the overtime
20  assignment that you had volunteered for on
21  November 25, 2011?
22      A. Well, you volunteer for overtime,
23  they will instruct you as to what your
24  assignment is going to be when they notify you
25  as to whether or not you have been selected

Page 428

1              R. Figueroa
2   for an overtime assignment.
3       Q. And in terms of overtime back in
4   November of 2011, is it an overtime assignment
5   constitutes a full additional shift?  What
6   exactly is the overtime in terms of hours?
7       A. No, it can include that, but
8   generally speaking at JFK, it depends on the
9   shift that you are coming from.
10          Now, if I'm coming from a 12:00 to
11  8:00 shift, my overtime would generally be
12  from 8 to midnight.
13      Q. So back on November 25th of 2011 when
14  you volunteered for this overtime assignment,
15  was that going to run from 8:00 p.m. to 12
16  midnight that day?
17      A. Yes.
18      Q. And after you had volunteered to work
19  an overtime assignment that day, how soon
20  after did you find out whether or not your
21  assignment had been accepted?
22      A. Sometime around 5:00 in the evening.
23      Q. So how did you learn that your
24  request to work an overtime assignment around
25  5:00 p.m. on the evening of November 25, 2011



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
429–432

Page 429

R. Figueroa

1  had been accepted?
2
3      A.  Someone will tell you.  They will
4  make a phone call to the office and that phone
5  call will consist of a listing of people who
6  are working overtime and where they will be
7  working.  And someone will take the message
8  and then pass it on to those who have been
9  selected for that night.
10     Q.  So who did you learn from that your
11  request to work this overtime assignment had
12  been accepted?
13     A.  I don't remember, I think it was
14  another officer.
15     Q.  Well, do you recall what was said to
16  you when you learned that your request to work
17  an overtime assignment had been accepted for
18  November 25, 2011?
19     A.  Well, they told me that I had to call
20  the overtime desk for some special instructions.
21     Q.  Okay.  By "they," you are referring
22  to?
23     A.  Whoever gave me the message that I
24  was selected for overtime that day.
25     Q.  And so did there come a point in time

Page 430

R. Figueroa

1
2  which you called the overtime desk to find out
3  about your overtime assignment?
4      A.  Yes.
5      Q.  And around what time was that on
6  November 25, 2011?
7      A.  Shortly after I got the notification
8  to call them and that I had been selected.  So
9  I would say between 5:00 and 6:00 p.m. that
10  evening.
11     Q.  And what happened when you called to
12  find out what the overtime assignment was?
13     A.  I was given instructions that stated
14  that I had to appear over at the international
15  arrivals terminal at the supervisor's office
16  no later than 7:00 p.m. where -- I'm just
17  taking time out for you to write.
18     Q.  No, that's fine.
19     A.  Okay.  (Continuing) -- where I will
20  be driven to the medical van facility.
21     Q.  Now, when you called to find out what
22  your overtime assignment was on November 25th
23  of 2011, who did you speak to?
24     A.  I don't remember.
25     Q.  And how long was the telephone

Page 431

R. Figueroa

1
2  conversation with the individual that you
3  found out what your overtime assignment was?
4      A.  Oh, a couple of minutes.
5      Q.  What did you do next?
6      A.  Well, I questioned it, because we are
7  over at Building 77, and the medical van
8  facility is over at Building 75, practically
9  right next door.
10         Now, they wanted me to travel all the
11  way into the terminals, which is quite a
12  distance, just so that I can be driven back to
13  Building 75, it didn't make any sense.
14         Normally you would just hop on over
15  to building number 75, but these were the
16  instructions and those are the instructions I
17  followed.
18     Q.  So what happened next?
19     A.  Well, when I walked into the
20  supervisor's office at terminal 4, I was met
21  by Deputy Chief Chance Young.
22     Q.  Now, prior to November 25, 2011, had
23  you been supervised by Deputy Chief Chance
24  Young before?
25     A.  On occasion I have been.

Page 432

R. Figueroa

1
2      Q.  And approximately how many occasions
3  prior to November 25, 2011 had you been
4  supervised by Deputy Chief Chance Young?
5      A.  I cannot answer that question, only
6  because you see the deputy chiefs are assigned
7  to an area, and they are only assigned to that
8  area for a certain amount of time before they
9  get uprooted and assigned to other areas.
10         Now, you'll be working in an area
11  where the deputy chief in charge may be a
12  particular person, but you may not even see
13  them that night so you may not know that they
14  were there.
15         So I couldn't tell you how many times
16  I may have been supervised by Deputy Young.
17     Q.  So when you went to the supervisor's
18  office on November 25, 2011, Mr. Chance Young
19  was in that office?
20     A.  Yes.
21     Q.  Was anyone else in the office besides
22  Mr. Young?
23     A.  Yes.
24     Q.  Who else was there?
25     A.  Another supervisor, I'm trying to



Page 433

1           R. Figueroa
2   think of her name.  Her first name is Corin.
3   I can't think of her last name.
4       Q.  Around what time specifically did you
5   report to the supervisor's office on November
6   25, 2011?
7       A.  7:00 p.m.
8       Q.  So when you reported to the
9   supervisor's office at approximately 7:00 p.m.
10  on November 25, 2011, in that office was
11  supervisor Young and supervisor Corin?
12      A.  Yes.
13      Q.  Was anyone else present?
14      A.  I didn't see anyone else.  Someone
15  else may have been, I don't recall seeing
16  anyone else.
17      Q.  So what happened when you reported to
18  the supervisor's office at 7:00 p.m.?
19      A.  Well, Deputy Young instructed me that
20  I was going to take an automobile that's
21  parked on the tarmac, that is where the planes
22  are located, and where they transport from one
23  location to another.  And that I was going to
24  drive over to the medical van to watch
25  prisoners while I'm there.  And I instructed

Page 434

1           R. Figueroa
2   him that I couldn't do that.
3       Q.  What did Mr. Young say in response?
4       A.  I'm taking your overtime away for
5   refusing to obey an order.
6       Q.  And what happened next?
7       A.  Well, I was leaving because he is
8   telling me that my overtime has now been
9   canceled for refusing an order.
10          And he says, "I'll tell you what, I'm
11  going to send you over to the immigration side
12  to stamp passports."
13          I told him "Well, my assignment was
14  that I was going to the medical van.  So I'm
15  prepared for that.  I'm not prepared to go
16  stamp passports over at the immigration side,
17  but they have assignments over there that
18  don't require any stamping, so that I'll head
19  on over there and advise them of the
20  circumstances."
21          Well, he tells me, "Well, then you
22  can't do that.  So then refusing to do both
23  assignments, I'm taking your overtime away and
24  you can leave."
25      Q.  Did Mr. Young ask you to get your

Page 435

1           R. Figueroa
2   admission stamp?
3       A.  Yes.  He said well, where is your
4   stamp?  Now these stamps are national security
5   items, they have to be secured.
6           Now, if I'm going to watch a prisoner
7   at the medical van facility, I'm not taking my
8   stamp with me, it may get lost.
9           So it was secured.
10      Q.  So where was your admission stamp on
11  November 25, 2011?
12      A.  It was secured in a locker with a
13  padlock in a room that's locked and alarmed.
14      Q.  So where on the JFK facility was your
15  locker where you had stored your admission
16  stamp?
17      A.  In the shooting range.
18      Q.  And where was the shooting range at
19  the JFK facility back in November 25, 2011?
20      A.  It's in Building 77, on the basement
21  level.
22      Q.  In which building was the
23  supervisor's office that you were in when you
24  had the conversation with Mr. Young?
25      A.  At terminal 4 over by the airline

Page 436

1           R. Figueroa
2   terminals.
3       Q.  And where is that in relation to
4   Building 77 where you had stored your
5   admission stamp?
6       A.  It's quite a distance away, at least
7   a 20-minute drive on airport grounds.
8       Q.  So from where you are in terminal 4
9   where your supervisor's office was when you
10  were having a conversation with supervisor
11  Young, as far as your overtime assignment,
12  your admission stamp was approximately a
13  20-minute drive away at Building 77?
14      A.  Yes.
15      Q.  Let me ask you prior to November 25,
16  2011, in the other instances in which
17  supervisor Young supervised you, had you had
18  any issues at all with him?
19      A.  Yes.
20      MR. WOLIN:  Objection.
21          I mean, we just discussed one.  So I
22  don't know if you are including that or not
23  including that.
24      Q.  Well, why don't we go back and tell
25  me about the first issue that you had with Mr.



RICHARD FIGUEROA Volume II                                    May 20, 2013
RICHARD FIGUEROA vs. JANET NAPOLITANO                          441–444

Page 441

1                R. Figueroa
2      Q.  So tell me about the conversation
3   that you had with Mr. Young on either
4   July 27th or 28th of 2011 when he was asking
5   you about this July 25, 2011 incident.
6        Where did it take place specifically?
7      A.  Once again, it was done in
8   conversation.  It was an interrogation that
9   took place by my booth where supervisor Young
10  was not asking me questions, he was demanding
11  answers to specific questions.
12     Q.  And how was supervisor Young
13  demanding answers to specific questions?
14     A.  He was asking me that he wanted to
15  know the conditions that occurred that night,
16  asking me specific questions regarding going
17  sick.
18       And when I then stipulated, "you
19  know, you are interrogating me without giving
20  me my rights," supervisor Young then shut up,
21  stopped interrogating me and told me he was
22  going to send me an e-mail with those very
23  same questions.
24     Q.  And the e-mail you are referring to
25  is this e-mail that we discussed that Mr.

Page 442

1                R. Figueroa
2   Young sent to you in July of 2011?
3      A.  Yes.
4      Q.  All right.  So that was the first
5   incident that you had with Mr. Young prior to
6   November 25, 2011, this one that took place on
7   either July 27th or the July 28th of 2011; is
8   that correct?
9      A.  Well, when you say "contact with Mr.
10  Young," we have had contact along the way
11  before that.
12       MR. WOLIN:  I think he said
13  "incidents."
14       THE WITNESS:  Oh "incidents," I
15  didn't hear that.
16       MR. LYNCH:  Can you read the question
17  back, please.
18       That's the importance of it, Alan.
19       MR. WOLIN:  In this particular
20  situation I agree with you.
21       (Question read.)
22     A.  Yes.
23     Q.  And after July 27th or 28th of 2011,
24  when was the next incident, if at all, prior
25  to November 25, 2011 concerning Mr. Young?

Page 443

1                R. Figueroa
2      A.  The next incident was on November 25,
3   2011.
4      Q.  Okay.  So when on November 25, 2011,
5   when you are having this conversation with Mr.
6   Young as far as your overtime assignment, was
7   there a specific point in time when he
8   requested that you get your admission stamp?
9      A.  No.  He said "I want you to go out
10  and get your admission stamp."
11       And I said "Well, it's going take me
12  some time to do that."
13       You know, these admission stamps have
14  to be secured by the individual officer.  They
15  give you no direction as to how to do that.
16  They tell you it has to be secured.
17       They provide no assistance, no
18  facilities to secure these admission stamps.
19  And if you lose them, you are losing a
20  national security item that you will be in a
21  lot of trouble for.  So you have to secure
22  them the best way.
23       I secured mine in a building, in a
24  metal locker with a strong lock on it, that
25  the room is alarmed and there is also a video

Page 444

1                R. Figueroa
2   camera taping all day long so that it can be
3   properly secured.
4      Q.  Okay.
5      A.  Mr. Young must have been assuming
6   that I drove my car to the terminal that day
7   and that my stamp had been in my glove
8   compartment or the trunk of my car, which it
9   wasn't.
10     Q.  So then from what I'm understanding
11  from what you are saying was that Mr. Young
12  did tell you to get your admission stamp?
13     A.  Yes, he did.  He said "I want you to
14  go and get your admission stamp and I want you
15  to go over there and stamp."
16       I said, "Fine.  I'll do that, but
17  it's going to take me some time, I don't have
18  my admission stamp with me."
19     Q.  And when you said it was going to
20  take me some time, because I don't have my
21  admission stamp with me what, if anything, did
22  Mr. Young say in response to that?
23     A.  He said, "I'm cancelling your
24  overtime.  I want you to leave."
25     Q.  Did you say anything in response?

 Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
445–448

Page 445

1         R. Figueroa
2   A. No.
3   Q. What did you do?
4   A. I turned around to leave.
5   Q. And did anything else happen that day
6 before you left the JFK facility on July 25,
7 2011?
8   A. I don't understand.
9   Q. Well, you turned around and left.
10    Did anything then happen once you
11 turned around and left?
12   A. I went home.
13   Q. So after this incident involving Mr.
14 Young on November 25, 2011, did there come a
15 time that you were asked to provide a written
16 statement by CBP management to address certain
17 aspects of the incident?
18   A. Yes, CBP had been asking me for a
19 number of statements that always led to a
20 suspension.
21   MR. LYNCH: Mark this, please.
22    (Defendant's Exhibit 17, E-mail dated
23 December 2, 2011 was so marked for
24 identification.)
25   Q. I'm going to show you a document

Page 446

1         R. Figueroa
2 marked Defendant's Exhibit 17, a copy has also
3 been handed to counsel. Just take a moment to
4 review it.
5   A. Okay.
6   Q. Defendant's Exhibit 17 is a copy of
7 an e-mail from Mr. Frank Siniscalchi to you
8 that was sent on Friday, December 2, 2011.
9    Do you recall receiving an e-mail
10 from Mr. Siniscalchi back in December of 2011?
11   A. Yes.
12   Q. And now, according to Defendant's
13 Exhibit 17, in this December 2, 2011 e-mail
14 from Mr. Siniscalchi, you were asked by him to
15 provide a written statement addressing four
16 aspects of the November 25, 2011 incident.
17 And those aspects being 1, why you refused
18 your medical facility overtime assignment
19 knowing prior to the assignment that you
20 cannot drive on the field.
21    2, why you were unable to drive on
22 the field.
23    3, why you were unprepared and did
24 not have your stamp.
25    And 4, why you refused to retrieve

Page 447

1         R. Figueroa
2 your admission stamp as structured.
3    Now, in response to Defendant's
4 Exhibit 17, this e-mail from Mr. Siniscalchi
5 to you, did you, in fact, provide a written
6 explanation?
7   A. This e-mail was forwarded by Mr.
8 Siniscalchi over to me. I asked Mr.
9 Siniscalchi, "who instructed you to send me
10 this e-mail?"
11    He told me, "It was Chance Young."
12    This e-mail was directly directed
13 towards me by Chance Young through my
14 supervisor so that Chance Young's name
15 wouldn't appear anywhere on the memo.
16    And I sent Mr. Siniscalchi a return
17 e-mail asking specifically "who is requesting
18 this information?"
19    And he responded back that it was
20 Deputy Chief Chance Young.
21   Q. All right, but just my question was
22 did you provide a written explanation in
23 response to the request from Mr. Siniscalchi
24 regarding you to address these four aspects of
25 the November 25, 2011 incident that he had

Page 448

1         R. Figueroa
2 referenced?
3   A. Yes.
4   MR. LYNCH: Mark this, please?
5    (Defendant's Exhibit 18, Written
6 response, was so marked for identification.)
7   Q. You've been handed what's been marked
8 as Defendant's Exhibit 18. If you can just
9 take a moment to review it, Mr. Figueroa, and
10 then I'm just going to ask you a couple of
11 questions about it.
12   A. Okay.
13   Q. Do you recognize this document,
14 Defendant's Exhibit 18?
15   A. Yes.
16   Q. Can you tell me what it is?
17   A. It is my written response.
18   Q. When you say your "written response,"
19 this is the written response to Mr.
20 Siniscalchi's e-mail to you in December of
21 2011 regarding addressing certain aspects of
22 the overtime assignment issue on November 25,
23 2011?
24   A. Yes, the December 2nd, 2011 e-mail.
25   Q. Okay. And I want to direct your

 Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
461–464

Page 461

1           R. Figueroa
2 of command, lower ranking officers are
3 supposed to obey proper orders of a superior
4 ranking officer in general; correct?
5     A. Proper orders, yes.
6     Q. And is it your testimony, sir, that
7 at no time on November 25, 2011, did you
8 refuse to go get your admission stamp when Mr.
9 Young had directed you to do so?
10       MR. WOLIN:  Objection.
11     Asked and answered three times.
12   A. No, I didn't refuse.
13       MR. LYNCH:  Mark this, please.
14       (Defendant's Exhibit 19, Letter dated
15   March 26, 2012 was so marked for
16   identification.)
17     Q. Mr. Figueroa, I'm showing you what's
18 been marked as Defendant's Exhibit 19, also a
19 copy has been handed to your counsel.
20       Just take a moment to review it and
21 let me know when you are finished, sir.
22     A. Okay, I'm done.
23     Q. Okay.  Do you recognize this
24 document, Defendant's Exhibit 19?
25     A. Yes.

Page 462

1           R. Figueroa
2     Q. Can you tell me what it is, Mr.
3 Figueroa?
4     A. It's a letter stipulating that I will
5 be suspended for 10 days.
6     Q. Okay.  And Defendant's Exhibit 19
7 specifically is a letter dated March 26, 2012,
8 to you from CBP port director Brian Humphrey
9 sustaining the February 22, 2012 notice of
10 proposal to suspend.  And as you indicate,
11 according to Defendant's Exhibit 19, CBP had
12 decided to mitigate this proposed 14-day
13 suspension to a 10-day suspension.
14       Now, according to Defendant's
15 Exhibit 19, your suspension was to take affect
16 on Monday, May 14, 2012.
17       Did you, in fact, carry out your
18 suspension on Monday, May 14, 2012?
19     A. I don't remember what the exact start
20 date was, but I did serve a 10-day suspension.
21     Q. Okay.  So following the issuance of
22 the March 26, 2012 letter that's been marked
23 Defendant's Exhibit 19 sustaining the charge
24 set forth in the February 22, 2012 notice of
25 proposal to suspend, you served a 10-day

Page 463

1           R. Figueroa
2 suspension?
3     A. Yes.
4     Q. All right.  So I want to talk a
5 little bit about CBP's bid assignment process;
6 okay?
7     A. Yes.
8     Q. Are you familiar with CBP's bid
9 rotation placement process?
10     A. Yes.
11     Q. Can you tell me what exactly is your
12 knowledge regarding this bid rotation
13 placement process?
14       And I'll refer to it by its acronym
15 the BRP process, bid rotation placement
16 process?
17     A. Okay, we had engaged in an agreement,
18 a national agreement that officers are to be
19 assigned as per a bid process.  If you wish an
20 assignment, you have sufficient seniority and
21 no one outbids you for a particular
22 assignment, then you can be granted that
23 assignment provided that you were not facing
24 disciplinary action, because if you were, you
25 were not allowed to bid.

Page 464

1           R. Figueroa
2       MR. LYNCH:  Can you just read that
3 back?
4       (Record read.)
5     Q. And which agreement are you referring
6 to?
7     A. It's an agreement between the
8 National Treasurer Employees Union and Customs
9 and Border Protection.
10     Q. And can you tell me how exactly do
11 the CBP officers put in bid for assignments?
12     A. Well, you are given the listing of
13 assignments and the parameters that those
14 assignments entail, and if you find an
15 assignment to your liking, you would bid for
16 that assignment on a first priority, second
17 priority, third priority and so forth listing.
18       Your choices are looked at as well as
19 everyone else's, and they combine the common
20 requests.
21       That is, if 10 officers want a
22 particular assignment they will combine those
23 requests and determine which officer has the
24 most seniority.  And the officer that does,
25 gets the assignment.



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
465–468

Page 465

1         R. Figueroa
2      Q.  Okay, and but how exactly would you
3   submit your bids for these assignments?
4      A.  Well, you fill out some bid sheets
5   and then you submit it to the assignment desk.
6   And they will probably -- properly process it
7   and file it.
8      Q.  All right.  So when you submit your
9   bid, you do it on a bid assignment sheet and
10  you submit it to a bid assignment desk?
11     A.  You submit it on an assignment desk.
12  They are a collection point.
13     Q.  Okay?
14     A.  They will take it from you, send you
15  an e-mail as a receipt, that you submitted
16  your bid sheet on a certain date with your bid
17  choices.  And you will then receive an e-mail
18  at some point later stipulating what you've
19  been granted.
20     Q.  Okay.
21     A.  Once again, provided you are not
22  facing disciplinary action.
23     Q.  All right.  Did there come a time
24  between December of 2008 and January of 2009
25  in which CBP had requested that you submit a

Page 466

1         R. Figueroa
2   bid assignment sheet indicating your
3   assignment preference for that upcoming year?
4      A.  Yes.
5      Q.  And in response to that request, did
6   you submit a bid assignment sheet?
7      A.  Well, not immediately.  I called my
8   union to stipulate that, hey, I'm facing
9   disciplinary action, I shouldn't be bidding.
10        There are other officers who are
11  facing disciplinary action, they are not
12  submitting bids.
13     Q.  Okay, but my question was just, did
14  you, in fact, submit a bid in response to a
15  request from CBP sometime between
16  December 2008 and January of 2009?
17     A.  I submitted a bid -- I did submit a
18  bid on demand of CBP --
19     Q.  Okay.
20     A.  -- between that time period.
21        MR. LYNCH:  Mark this, please.
22        (Defendant's Exhibit 20, Bid rotation
23  and placement preference sheet was so
24  marked for identification.)
25     Q.  I'm going to show you a document

Page 467

1         R. Figueroa
2   marked Defendant's Exhibit 20.  I just want
3   you to take a brief moment to review it, Mr.
4   Figueroa, and let me know when you are
5   finished, sir?
6      A.  Okay.
7      Q.  Do you recognize Defendant's
8   Exhibit 20?
9      A.  Yes.
10     Q.  Okay.  Can you tell me what it is,
11  sir?
12     A.  It is a bid rotation and placement
13  preference sheet.
14     Q.  Do you recognize Defendant's
15  Exhibit 20 as the bid rotation and placement
16  sheet you submitted for fiscal year 2009?
17     A.  Yes, except for the notation on the
18  front page that says, "Hispanic male."
19        I didn't put that in.
20     Q.  All right.  So utilizing Defendant's
21  Exhibit 20, can you tell me when did you
22  submit your bid assignment sheet?
23     A.  According to the date here, it was
24  January 2, 2009.
25     Q.  Okay.  So when you submitted this

Page 468

1         R. Figueroa
2   2009 bid assignment sheet that's been marked
3   Defendant's Exhibit 20, can you explain to me
4   how many assignments did you specifically bid
5   for?
6      A.  It looks like I put in a bid for six
7   assignments.
8      Q.  So can you explain to me for the six
9   assignments you put in a bid for that are
10  listed on the front page of Defendant's
11  Exhibit 20, just explain to me each assignment
12  you bid for and why, starting I guess with the
13  first bid?
14     A.  Well, I bid for cargo processing,
15  because I was in the cargo unit at the time
16  and liked what I was doing.  And your first
17  bid is usually considered your strongest
18  choice.
19        Then I put in for firearms, because I
20  have a skill in that area both for
21  demonstrating and for teaching.
22        And then the other assignments,
23  scheduling, advanced targeting unit, chase,
24  and advanced passenger information systems, I
25  didn't know very much about those assignments,



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
473–476

Page 473

1           R. Figueroa
2   officer you can get it.
3        I said, I can get it, the bid
4   assignments were completed and lo and behold
5   every officer got assigned, but when it came
6   to my name, I was the most senior officer at
7   JFK who didn't qualify for anything.
8        Q.  Okay.
9        A.  And then a couple of months later, I
10  received a memo, lo and behold, that I can now
11  quality for APIS.
12        Q.  Okay.  So to make sure then I
13  understand, after you had submitted this 2009
14  bid assignment sheet and this has been marked
15  Defendant's Exhibit 20, you didn't get any of
16  the six bids that you had put in for?
17        A.  Correct.
18        Q.  You had been put into passenger
19  processing?
20        A.  Correct.
21        Q.  And then a few months later in 2009
22  you received notice that you were going to be
23  placed into this advanced passenger
24  information systems assignment?
25        A.  Yes.

Page 474

1           R. Figueroa
2        Q.  Okay.  All right.  Now, when you
3   found out that you had been placed into
4   passenger processing, how did you feel at that
5   point when you learned that?
6        A.  Well, I felt that there was something
7   definitely amiss.  I'm in the top third tier
8   of seniority at the airport and everyone at
9   the airport gets an assignment that they bid
10  for except when it came to me.
11        There were no other officers above me
12  that didn't get the assignment that they put
13  in for.
14        Q.  How do you know you were in the top
15  third of seniority at the time you submitted
16  the 2009 bid assignment sheet?
17        A.  Because there is a seniority list
18  that comes out with this and you get to
19  clearly see where you lie on the seniority
20  list.
21        Q.  And from that you deduced that you
22  were in the top third?
23        A.  Yes.
24        Q.  All right.  So did there come a time,
25  Mr. Figueroa, that you had filed a complaint

Page 475

1           R. Figueroa
2   in the district court alleging discrimination
3   against the secretary of Homeland Security?
4        A.  I alleged discrimination towards me
5   by the people in the U.S. Customs Service.
6        MR. LYNCH:  Mark this, please.
7        (Defendant's Exhibit 22, Complaint,
8        was so marked for identification.)
9        Q.  I'm handing you what's been marked as
10  Defendant's Exhibit 22.  Just take a moment to
11  review it, sir.
12        Do you recognize Defendant's
13  Exhibit 22?
14        A.  Yes.
15        Q.  Can you tell me what it is?
16        A.  It's a complaint of discrimination.
17        Q.  Do you recognize Defendant's
18  Exhibit 22 as the complaint that you had filed
19  in the district court with regard to your
20  allegations of discrimination against the
21  Secretary of the Department of Homeland
22  Security?
23        A.  Yes.
24        Q.  Okay.  And do you recognize your
25  signature on the last page of Defendant's

Page 476

1           R. Figueroa
2   Exhibit 22?
3        A.  Yes.
4        Q.  Did there come a time in which you
5   filed an amended complaint in the district
6   court concerning allegations of discrimination
7   against the Secretary for Homeland Security?
8        A.  Yes.
9        MR. LYNCH:  Can we have that marked
10  as the next exhibit?
11        (Defendant's Exhibit 23, Amended
12  complaint was so marked for identification.)
13        Q.  And do you recognize what's been
14  marked as Defendant's Exhibit 23?
15        A.  Yes.
16        Q.  Can you tell me what Defendant's
17  Exhibit 23 is, sir?
18        A.  It looks like the amended complaint
19  that was filed.
20        Q.  Okay.  When you say Defendant's
21  Exhibit 23 looks like the amended complaint
22  that was filed, are you referring to an
23  amended complaint that was filed in the
24  district court?
25        A.  Yes.



RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
477–480

Page 477

R. Figueroa

1
2    Q.  And do you recognize your signature
3  on the second to last page of Defendant's
4  Exhibit 23, sir?
5    A.  Yes.
6    Q.  Okay.  And I want to focus on the
7  allegations and the claims that you raised in
8  this amended complaint that's been marked
9  Defendant's Exhibit 23.
10      I'm going to ask you some questions
11  about them; okay?
12    A.  All right.
13    Q.  All right.  So I'm going to start by
14  focusing on the issue related to the bid
15  rotation placement process, which you had
16  highlighted on page 11 of Defendant's
17  Exhibit 23.
18      All right.  Now, in your amended
19  complaint you allege that the reason you did
20  not receive your choice assignment after
21  submitting this 2009 bid assignment sheet was
22  because of discrimination on account of your
23  national origin and gender.
24      And in paragraph 84 of the amended
25  complaint, which begins on page 12, you allege

Page 478

R. Figueroa

1
2  that you believe you were "forced to
3  participate in the bid assignment."
4      Can you explain to me how were you
5  forced to participate in the bid assignment
6  process?
7    A.  As I explained earlier, if an officer
8  is facing discipline, he or she cannot bid.
9      I was facing discipline at the time,
10  my issue wasn't resolved.  I should not have
11  bid, and I was told, by e-mail, that I had to
12  bid.
13    Q.  Okay.  So you believe it was to your
14  detriment to have been allowed to submit the
15  2009 bid assignment sheet?
16    A.  Yes.
17    Q.  Why do you believe it was to your
18  detriment?  Because when you look at the 2009
19  bid assignment sheet, you got to indicate
20  which assignment you wanted.
21      So why did you believe it was to your
22  detriment to have to submit this 2009 bid
23  assignment sheet?
24    A.  Because I was facing discipline, I
25  should not have had to bid.  I should have

Page 479

R. Figueroa

1
2  been frozen in my assignment the same as a
3  Caucasian officer who was facing discipline,
4  he didn't have to bid, and he was frozen in
5  his assignment.
6      Why is it that we are both facing the
7  similar circumstances, yet I am forced to bid
8  and he isn't?
9    Q.  Okay, but I guess what I'm just
10  focused on is just why you believed it was to
11  your detriment to submit the 2009 bid
12  assignment sheet?
13      Because had you been selected for
14  cargo, which was your first choice assignment
15  that you listed when you submitted the bid,
16  you wouldn't have had an issue, right?  That
17  was your first choice?
18    A.  My issue was bidding to begin with.
19  Because -- are you going to let me answer?
20    Q.  Go ahead, sir.
21    A.  I didn't wish to bid in the first
22  place.  I believe that this bid process was
23  eventually going to somehow be detrimental to
24  me in that when I put my choices down I wasn't
25  going to get any of them.

Page 480

R. Figueroa

1
2      And lo and behold, when I put my
3  choices down and every officer with more
4  seniority than me was able to get what they
5  wanted, when it came to my name, they couldn't
6  fit me into any of my choice assignments, just
7  as I was afraid of.
8      The officers who were under me had a
9  great deal of less seniority time than I did.
10  There wasn't an officer underneath me who had
11  close seniority to mine who also didn't get
12  his assignment.  The officers underneath me
13  had severely less time than I did,
14  substantially less time.
15      When it came to this bid process, it
16  wasn't fairly done when it came to me.  And I
17  knew that that was going to take place, and I
18  stipulated that I wouldn't have to worry about
19  this issue because another officer who is in
20  the same circumstance as I did not have to
21  bid, but I was forced to bid.
22      And lo and behold, out of a thousand
23  officers and all the other officers that got
24  their assignment, once that list came to my
25  name, they couldn't fit me anywhere.

 Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
481–484

Page 481

1        R. Figueroa
2      It's exactly the result I thought I
3   would face, and it turned out that way,
4   because when it came to me I wasn't going to
5   get what I wanted.
6      There was a campaign of hostility at
7   the airport, and these results prove it.
8      Q.  Okay.  Now, in paragraph 85 on page
9   13 of your amended complaint, you allege that,
10  "Only a handful of officers did not receive
11  their choice of assignment."
12     What's your basis for that
13  allegation, there was only a handful of
14  officers that did not receive their choice of
15  assignments?
16     A.  As a member of the union, you are
17  allowed to look at all the documents that
18  pertain to anything regarding the union and
19  its membership.
20     I was allowed to look at all the bid
21  requests, see the officers' seniority and see
22  who was able to get what assignment.
23     And according to this, I was number
24  367 out of 1,033 officers.  When it came to my
25  name, I got nothing.

Page 482

1        R. Figueroa
2      The other seven officers underneath
3   me with substantially less seniority, they too
4   got nothing, but they had substantially less
5   seniority.  There wasn't one officer who was
6   denied an assignment that had close anywhere
7   to my seniority.
8      MR. LYNCH:  Can you just read his
9   answer back, please?  Thank you.
10     (Question read.)
11     Q.  Okay.  Well, can you tell me who are
12  the CBP officials that you believe
13  discriminated against you because of your
14  national origin and gender with respect to the
15  bid rotation placement process for fiscal year
16  2009?
17     A.  I have no idea who was involved in
18  the bid rotation process of 2009.
19     Q.  So then tell me, what's your basis
20  for -- listen to the question, what's your
21  basis for believing that it was because of
22  your national origin that you did not receive
23  your preferred bid assignment in 2009?
24     A.  My complaint was national origin,
25  retaliation and a hostile work environment.

Page 483

1        R. Figueroa
2      Q.  Okay.  I'm focused on -- that's why I
3   said just listen to the question, some may
4   seem all the same, but what's your basis for
5   believing it was because of your national
6   origin that did you not receive your preferred
7   bid assignment back in 2009?
8      A.  Because of the fact that I put in a
9   complaint already regarding Ms. Sachdeva, that
10  I am a Hispanic officer, not a Caucasian
11  officer, who had the nerve to complain about a
12  supervisor and as a result had a campaign, a
13  retaliation campaign leveled against me with
14  everything I did with regard to my job at this
15  airport, including a process that's supposed
16  to be legitimate that turned out not to be.
17     Q.  But why do you believe that anything
18  that occurred with Ms. Sachdeva has anything
19  to do with you not being selected to receive
20  your preferred bid assignment on the basis of
21  your national origin?
22     A.  I was facing discipline.  A Caucasian
23  officer was facing discipline, I wasn't
24  supposed to bid.  He didn't have to bid.  They
25  forced me to bid.  They didn't force him to

Page 484

1        R. Figueroa
2   bid.
3      Q.  Okay.  Who is the Caucasian officer
4   that you are referring to?
5      A.  Officer R████████  ████████ Redacted
6      Q.  And you believe that the same way
7   that Officer R████████ R████████ was not allowed
8   to bid that you should not have been permitted
9   to submit a bid back in 2009?
10     A.  Well, the rule is clear, if an
11  officer is facing disciplinary matters, he is
12  not permitted to bid.  I didn't invent that.
13  The rule is clear.  It's listed, it's
14  documented.  Officer R████████ was facing
15  disciplinary matters the same time I was.
16  Officer R████████ didn't have to bid.
17     Q.  How do you know that Officer R████████
18  was facing the same disciplinary issues around
19  the same time that you were?
20     MR. WOLIN:  Objection.
21     You can answer it.
22     A.  He wasn't facing the same
23  disciplinary issues that I was, he was facing
24  disciplinary issues.  That's the criteria.
25     If you are facing disciplinary


Tankoos Reporting

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
485–488

Page 485

R. Figueroa

1   issues, you cannot bid.  They are forcing me
2
3   to bid against the rule.
4       Officer R Redacted kept his position in
5   cargo.  I was in cargo at this time.
6       Officer R Redacted did not have to bid,
7   was facing disciplinary matters and retained
8   his position in cargo.
9       Q.  And how do you know that Officer
10  R Redacted did not have to bid?
11      A.  Because I saw the bid sheets, and I
12  asked Officer R Redacted and I was told by the
13  union no, he doesn't have to bid, he is facing
14  issues.
15      I was facing issues.  They made it a
16  point to reach out in an e-mail to tell me I
17  had to bid.  And then when I do bid, I don't
18  get any of my choices.  Officer R Redacted got to
19  stay in cargo.
20      There was an officer Redacted Redacted,
21  an African-American officer, he bid, he was
22  facing discipline, he shouldn't have had to
23  bid.  He won his bid assignment, they refused
24  to give it to him.  There is clearly two sets
25  of rules, one for the Caucasian officers at

Page 486

R. Figueroa

1
2   JFK and definitely one for officers of color,
3   especially those who speak up and file
4   harassment -- sexual harassment complaints
5   against their supervisors.
6       Q.  Okay.  Well, you identify as an
7   officer of color?
8       A.  Pardon me?
9       Q.  You identify as an officer of color?
10      A.  I identify as a Hispanic officer.
11      Q.  Okay.  And that's national origin?
12      A.  Yes.
13      Q.  Okay.
14      A.  And once again, I point out in
15  evidence sheet number 20, there is a notation
16  here stipulating I'm a Hispanic male.
17      I didn't write that.  Somebody did.
18      Q.  Okay.
19      A.  That's not my handwriting.  Why do
20  they feel a need to stipulate what my
21  ethnicity is?
22      Q.  Okay.
23      A.  Furthermore, Officer Redacted
24  F Redacted, he was the least senator officer
25  who got the holidays off, he lost his bid to

Page 487

R. Figueroa

1
2   the mail branch that year, he was retained in
3   the mail branch.
4       He was supposed to go to passenger
5   processing.  He was retained by Ms. Sachdeva
6   at the mail branch.
7       Q.  All right.  Well, why don't you tell
8   me, did you ever hear anyone in CDP state that
9   the reason you didn't receive your preferred
10  bid assignment back in 2009 was due to you
11  being Hispanic?
12      A.  No, sir.  No one was going to walk
13  around with a sign saying you were
14  discriminated against because of your
15  ethnicity.
16      No one is going to tell me or send me
17  an e-mail saying ha, ha, this happened to you
18  because of what you did to Sachdeva.
19      No, sir.  I learned of what's
20  happening to me by the circumstances and the
21  results of what exactly did happen to me.
22      Q.  Well, did you ever come across any
23  document in which a CBP official indicated
24  that the reason you didn't receive your
25  preferred bid assignment was on account of you

Page 488

R. Figueroa

1
2   being Hispanic?
3       A.  No, I've never seen any admission to
4   anything or like that until today when you
5   handed me this sheet with my ethnicity clearly
6   stated on it.
7       Q.  Well, this was produced, sir, in
8   connection with this case where you had raised
9   issues and so that's why there is a notation,
10  sir.
11      A.  Well, who put that notation there?
12  If you don't know, then how can you certify
13  that that is the reason?
14      MR. LYNCH:  Okay.  Let's just take a
15  minute, okay.
16      (Recess taken.)
17      Q.  Why don't you tell me, Mr. Figueroa,
18  what's your basis for believing that it was
19  because of your gender that you did not
20  receive your choice assignment in 2009?
21      A.  It all stems back from the Sachdeva
22  incident.
23      Q.  Okay, but what's your basis for
24  believing that it all stems from your
25  interactions with Ms. Sachdeva that you base

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
489–492

Page 489

```
1              R. Figueroa
2  not receiving this choice assignment in 2009
3  on the basis of your gender?
4      A. No, that's a leap.
5      MR. WOLIN: I'm sorry, I didn't hear
6  that last portion?
7      THE WITNESS: I said that's a leap
8  that's being made. And I'm not saying that
9  you are doing that intentionally.
10      With my problems with supervisor
11 Sachdeva, it was because I was a male. If I
12 was a female, I don't believe he would have
13 been interested.
14     Q. Right. So then --
15     A. Okay. And this all stems from my
16 incident with her.
17         I did put in a complaint against her,
18 all right, and because I did put in a
19 complaint against her, now begins a campaign
20 of retaliation against me based on my
21 ethnicity and retaliation in that I submitted
22 a sexual harassment complaint in violation of
23 my EEO rights.
24     Q. But my questions are not focused on
25 retaliation right now, okay. So that's why
```

Page 490

```
1              R. Figueroa
2  it's really important just to listen to each
3  question. And my question was just what's
4  your basis for believing it was because of
5  your gender that you didn't receive your
6  choice assignment back in 2009?
7         You said it all stems from your
8  interaction with Ms. Sachdeva and the
9  incidents with her. What's your basis for
10 believing that any of the incidents you had
11 with Ms. Sachdeva were the reason that you
12 didn't receive your choice assignment in 2009
13 on the basis of your gender?
14     A. I believe it's all one and the same.
15 It began because of my gender with Sachdeva
16 and it turns into a campaign of retaliation.
17     Q. Okay. And I'm just not asking about
18 retaliation, I'm just focused on why you
19 believe that it was because of your gender,
20 okay. That because you were a man that you
21 did not receive your choice assignment in
22 2009.
23         You are saying it all stems from the
24 interactions with Ms. Sachdeva, but what's
25 your basis for believing that because of these
```

Page 491

```
1              R. Figueroa
2  issues with Ms. Sachdeva that it was on
3  account of your gender you didn't receive the
4  choice assignment? That's just my question.
5      MR. WOLIN: Objection.
6      Answer it.
7      A. My response is the same.
8      Q. Well, was Ms. Sachdeva in charge of
9  the bid assignment process in 2009?
10     A. No, Ms. Sachdeva is a member of
11 management.
12     Q. But as far as you know, she wasn't
13 involved in making the selections for bid
14 assignments in 2009; correct?
15     A. I don't know what input she had in it
16 at this stage of the game. As I had just
17 explained, the bid rotation process was
18 less -- the integrity was definitely less than
19 what it should have been. And I don't know
20 who had a hand in that.
21         These problems all began with Ms.
22 Sachdeva and got carried on continually with
23 the rest of management at JFK.
24     Q. Okay, but just focusing on the bid
25 issue then, what's your basis for believing
```

Page 492

```
1              R. Figueroa
2  that this all stems from Ms. Sachdeva with
3  regard to your choice -- your bid assignment
4  request in 2009?
5      A. If I hadn't had been a male, Ms.
6  Sachdeva wouldn't have been interested in me
7  and when I rebuffed her, I would not have had
8  these problems.
9      Q. And my follow-up question then though
10 is what's the basis for believing the linkage
11 between your interactions with Ms. Sachdeva
12 and those incidents and you making this bid in
13 2009 and not being selected, what's your
14 linkage? How do you connect that? That's all
15 I'm asking, sir.
16     A. It's a lot more than my not being
17 selected. My being forced to bid was
18 included. You are skipping over that as well,
19 okay.
20         My right to not have bid was already
21 circumvented, as I stipulated by the
22 comparison with a Caucasian officer. Officer
23 F[Redacted] a junior officer who lost his bid
24 couldn't stay in the mail branch, was able to
25 stay because of Ms. Sachdeva.
```

RICHARD FIGUEROA Volume II
RICHARD FIGUEROA vs. JANET NAPOLITANO

May 20, 2013
509–512

Page 509

1              R. Figueroa
2   Rios, Charles Mattina, Pedro Cano, Chance
3   Young, Deborah Tricarico and Terry Abramsky.
4   That's her first name, Terry.
5       Q.  What was the other one, Deborah?
6       A.  Tricarico, T-R-I-C-A-R-I-C-O.  As
7   well as Ms. Polimeni, Mr. Biondi, Mr.
8   Humphries and Mr. Mirondona.
9       MR. LYNCH:  Can you read his answer
10  back?
11      (Answer read.)
12      Q.  Okay.  Well, I understand with regard
13  to Ms. Sachdeva why you may refer to her as
14  one of the CBP officials you believe are
15  responsible for retaliating against you for
16  filing the April 18, 2008 e-mail response
17  result that you believe resulted in this
18  June 2009 suspension.
19      I'm not clear with regard to Tim
20  Jernigan, why is he one of the CBP officials
21  that you believe was responsible for
22  retaliating against you in connection with
23  this June 2009 suspension?
24      A.  Because he was the supervisor that
25  held a meeting with me and another supervisor

Page 510

1              R. Figueroa
2   and stipulated that I was getting thrown out
3   of the mail branch because of my EEO reports.
4   I had to leave the mail branch, I was getting
5   thrown out physically.
6       Q.  When you say your EEO reports, you
7   are referring to this April 18, 2008 e-mail
8   response?
9       A.  Yes, he specifically stated and was
10  commenting, ridiculing me on my EEO reports.
11      Q.  And with regard to Laura Rios, why do
12  you indicate that she is also one of the CBP
13  officials you believe are responsible for
14  retaliating against you in connection with you
15  receiving this June 2009 suspension?
16      A.  Because they all have to endorse the
17  paperwork and make it go further up and put
18  their own comments on the paperwork or give
19  their input as part of the impartial
20  investigative process.
21      Q.  But why specifically do you believe
22  Laura Rios was one of the responsible CBP
23  officials?
24      A.  Because of her actions towards me.
25  The snaring, the speaking to me like I was

Page 511

1              R. Figueroa
2   some kind of a third class citizen, trying to
3   humiliate me in public.
4       I have no doubt that she had a great
5   deal of input into the end result, which was
6   my suspension.
7       Q.  And when you say you have no doubt
8   that she was responsible in connection with
9   this June 2009 suspension, what do you base
10  that statement on when you say you have no
11  doubt?
12      A.  Well, an incident like this requires
13  many memos to go back and forth, and I'm sure
14  they wrote memos regarding this incident
15  putting their personal feelings into it.
16      Q.  Okay.  Well, how are you sure that
17  chief Laura Rios had put in a memo indicating
18  her personal feelings regarding the -- with
19  regard to you being suspended in June of 2009?
20      A.  I don't know.  Well, if she didn't
21  and nobody else did, then they just suspended
22  me based on Sachdeva's complaint.  It doesn't
23  make sense.
24      Q.  Okay.  Well, you are saying that you
25  were sure that she had put her own personal

Page 512

1              R. Figueroa
2   feelings, Laura Rios?
3       A.  Yes, I am sure she did.
4       Q.  What's your basis for making that
5   statement, though?
6       A.  Because whenever things like this
7   happens, at every level someone has to issue a
8   memo regarding their findings, and further it
9   up the chain of command.
10      Q.  What makes you believe it was chief
11  Laura Rios's personal feelings toward you that
12  played a role in connection with you receiving
13  this suspension in June of 2009?
14      A.  Because the way she was treating me
15  physically, I had no doubt that she
16  transferred those emotions onto paper when she
17  had to make out her memo.
18      Q.  Tell me, what's your basis for
19  believing that it was Charles Mattina that was
20  one of the responsible CBP officials you
21  believe had retaliated against you for filing
22  this April 18, 2008 e-mail response?
23      A.  As I mentioned prior, I needed to get
24  some keys out of the detention room in order
25  to do my job, Charles Mattina was standing in



Page 513

1          R. Figueroa
2   front of the detention room, had access to the
3   detention room and stipulated that he wasn't
4   going to let me in and I would have to wait
5   for somebody else to come in and allow me
6   access in there so that I can obtain what I
7   needed to get my job done.
8       Q.  But how did Charles Mattina have any
9   role with this June 2009 suspension?  I
10  understand your issue with regard to him not
11  letting you into the detention room, but how
12  did that connect with him having any
13  involvement with this June 2009 suspension?
14      A.  Charles Mattina was one of the
15  witnesses when I got served with my suspension
16  proposals.
17      Q.  Okay, but I'm not following you.
18          How is it that you believe that he
19  had any responsibility with regard to you
20  being issued the suspension in June of 2009?
21      A.  Because all the supervisors, they get
22  together, they discuss matters and they
23  further up their feelings.  Whenever they are
24  asked for a memo regarding anything that might
25  have occurred, any incidents, they have to

Page 514

1          R. Figueroa
2   write memos, be it a cc mail or an incident
3   report, they have to write memos.
4       Q.  Why don't you tell me with regard to
5   Pedro Cano, how is it you believe he is one of
6   the CBP officials that was responsible for
7   retaliating against you for filing this
8   April 18, 2008 e-mail response?
9       A.  Because it had already been known
10  that I made out a complaint report, an EEO
11  report, I've been shifted around from one unit
12  to another.
13          Now I'm in a situation where I have
14  to work in a specific area that no one ever
15  told me about.  And when he did mention it to
16  me, the area was already occupied by somebody.
17      MR. WOLIN:  He is asking you
18  specifically with reference to the first
19  suspension.
20      MR. LYNCH:  That's why I said it's
21  really important to listen here, because I'm
22  focused on just this June 2009 suspension,
23  sir.
24      A.  Oh, you mean on that date?
25      Q.  Yes, that's what I'm focused on.

Page 515

1          R. Figueroa
2       A.  No, no, no, no, those are from
3   Officer Cano on, those officers had nothing to
4   do with the 2009 suspension date.
5       Q.  So why don't we start this from the
6   top, okay, with June of 2009.
7           Who are the CBP officials that you
8   believe were responsible for retaliating
9   against you for filing the April 18, 2008
10  e-mail response?  I just want to focus on
11  them.
12      A.  Okay.
13      MR. WOLIN:  When he was suspended --
14      MR. LYNCH:  This is in connection
15  with the June 2009 suspension only.
16      A.  Fine.
17      Q.  Who are those CBP officials?
18      A.  Supervisor Sachdeva, Charles
19  Jernigan, Charles Mattina -- Tim Jernigan.
20  I'm sorry, Tim Jernigan, Charles Mattina,
21  Laura Rios, Camille Polimeni.
22      MR. LYNCH:  Let's take a break.
23      (Recess taken.)
24      Q.  And do you know if Tim Jernigan was
25  aware that you had filed this April 18, 2008

Page 516

1          R. Figueroa
2   e-mail response that you believe you were
3   retaliated against for?
4       A.  Yes.
5       Q.  What's your basis for that statement?
6       A.  He told me too.
7       Q.  When did Mr. Jernigan tell you that
8   he was aware that you had filed this April 18,
9   2008 e-mail response?
10      A.  The day he had me in his office to
11  tell me that I was being thrown out of the
12  mail branch and going over to cargo.
13      Q.  Okay.  And when was that?
14      A.  I believe that date was a Friday, so
15  it would be the following Monday.
16      Q.  So that was in -- still in April of
17  2008?
18      A.  Yes.
19      Q.  Okay.  With regard to Charles
20  Mattina, do you know if he was aware that you
21  had filed this April 18, 2008 e-mail response?
22      A.  Yes, he was.
23      Q.  How do you know that?
24      A.  He once again told me, and he also
25  told my union representative that was there



Exhibit C

Page 1

COPY

1

2　UNITED STATES DISTRICT COURT

　　EASTERN DISTRICT OF NEW YORK

3　- - - - - - - - - - - - - - - - x

　　RICHARD FIGUEROA,

4

　　　　　　　　　　Plaintiff,

5

　　　　- against -

6

　　JANET NAPOLITANO, Secretary, U.S.

7　Department of Homeland Security,

8　　　　　　　　　　Defendant.

　　- - - - - - - - - - - - - - - - X

9

　　　　　　　　　271 Cadman Plaza East

10　　　　　　　　Brooklyn, New York

11　　　　　　　　October 30, 2013

　　　　　　　　　10:05 A.M.

12

13

14

15

16

17

18　　　　DEPOSITION of KOMPEL VERDI, a witness

19　herein, taken by the Plaintiff herein,

20　pursuant to the Federal Rules of Civil

21　Procedure, held at the above-mentioned

22　time and place, before Raymond Stalker,

23　RPR, a Notary Public of the State of New

24　York.

25

Page 2

1
2 A P P E A R A N C E S :
3 WOLIN & WOLIN, P.C.
   Attorneys for Plaintiff
4    420 Jericho Turnpike
     Jericho, New York 11753
5
   BY: ALAN E. WOLIN, ESQ.
6
7 LORETTA E. LYNCH
     United States Attorney
8    Eastern District of New York,
     271 Cadman Plaza East
9    Brooklyn , New York 11201
10 BY: TIMOTHY D. LYNCH, ESQ.
     and
11    RAFIK ALIDINA, ESQ.
12
13 A L S O   P R E S E N T :
14    RICHARD FIGUEROA
15    JILL MERENDA
      Paralegal
16
17
18
19
20
21
22
23
24
25

Page 3

1              KOMPEL VERDI
2 K O M P E L   V E R D I, a witness herein, having
3 first been duly sworn by a Notary Public of the
4 State of New York, was examined and testified as
5 follows:
6           MR. WOLIN:  Good morning, Ms.
7           Verdi.  My name is Alan Wolin.
8           I am an attorney and I
9           represent Mr. Figueroa in this
10          lawsuit.  I will be asking you
11          a series of questions
12          concerning some of the facts
13          and circumstances of the case.
14          If at any time I ask you a
15          question that you don't
16          understand, ask me to rephrase
17          it and I will attempt to do the
18          best I can.
19 EXAMINATION BY
20 MR. WOLIN:
21    Q.   Please state your full name for
22 the record.
23    A.   Kompel Verdi.
24    Q.   What is your present assignment?
25    A.   JFK Airport, Terminal 4,

Page 4

1              KOMPEL VERDI
2 Jamaica, New York 11430.
3    Q.   Have you ever been known by any
4 other name, other than Verdi?
5    A.   Yes.
6    Q.   What other name or names have
7 you been known by?
8    A.   My last name has been Sachdeva,
9 which is my maiden name, S-A-C-H-D-E-V-A.
10 And I was also married previously with
11 Gifford.  Gifford was my previous married
12 name.
13    Q.   During what period of time have
14 you been known as Kompel Sachdeva?
15    A.   From birth until age
16 twenty-three and then again from age
17 twenty-six until 2011.
18    Q.   What happened in 2011 to result
19 in a change of your last name?
20    A.   I was married.
21    Q.   What is the name of the person
22 to whom you were married?
23    A.   Michael Verdi.
24    Q.   And is Mr. Verdi employed by
25 CBP?

Page 5

1              KOMPEL VERDI
2    A.   Yes.
3    Q.   What is his job title at CBP?
4    A.   Supervisory CBP officer.
5    Q.   Where is he assigned?
6    A.   Newark Airport.
7    Q.   Has Mr. Verdi every been
8 assigned to J.F.K?
9    A.   Yes, he has.
10    Q.   When was he assigned to JFK?
11    A.   1996 to 2001.
12    Q.   And has he been assigned to
13 Newark continuously since 2001?
14    A.   Yes.
15    Q.   Now, you indicated that you were
16 previously married to someone named Gifford,
17 you said?
18    A.   Yes.
19    Q.   Was Mr. Gifford an employee of
20 customs?
21    A.   No.
22    Q.   Ms. Verdi, have you taken any
23 medication within the past twenty-four
24 hours?
25    A.   No.

2 (Pages 2 - 5)

Page 6

KOMPEL VERDI

1          KOMPEL VERDI
2     Q.    Have consumed any alcoholic
3  beverages within the past twenty-four hours?
4     A.    No.
5     Q.    Is there any reason that you
6  know of, whatsoever, why you cannot answer
7  my questions today truthfully, accurately
8  and to the best of your ability?
9     A.    No.
10    Q.    What, if anything, did you do to
11 prepare for the deposition today?
12    A.    I spoke with my attorney.
13    Q.    Other than speaking to your
14 attorney, did you speak to anyone else to
15 prepare for this deposition?
16    A.    No.
17    Q.    Did you review any documents to
18 prepare for this disposition?
19       MR. LYNCH:  Ms. Verdi did
20       review documents with me in
21       preparation for the deposition.
22       As long as you agree it is not
23       a waiver of attorney work
24       product, I will allow her to
25       answer.

Page 7

1          KOMPEL VERDI
2       MR. WOLIN:  Of course.
3     Q.    What documents did you review to
4  prepare for the deposition?
5     A.    Documents I had written.
6     Q.    Can you identify what those
7  documents are?
8     A.    Sure.  An E-mail and a memo.
9     Q.    What was the purpose of the
10 E-mail?
11    A.    The purpose of the E-mail was to
12 notify my managers of an incident.
13    Q.    And was that Laura Rios?
14    A.    Yes.
15       MR. WOLIN:  Why don't we
16       marked this?
17       (Whereupon, at this time, the
18       above-mentioned E-mail was
19       marked by the reporter as
20       Plaintiff's Exhibit 1, for
21       identification, as of this
22       date.)
23    Q.    Ms. Verdi, I show you what we
24 have just marked as Exhibit 1, which seems
25 to be an E-mail from you to various

Page 8

1          KOMPEL VERDI
2  individuals, including Laura Rios, dated
3  September 29th, 2007; do you have that
4  document before you?
5     A.    Yes.
6     Q.    Is that the e-mail that you have
7  referred to as having reviewed?
8     A.    Yes.
9     Q.    Now, you also indicate that you
10 reviewed a memo; is that correct?
11    A.    Yes.
12    Q.    Was that memo a memo to Chief
13 Rios?
14    A.    Yes.
15       MR. WOLIN:  Why don't we mark
16       this as Exhibit 2?
17       (Whereupon, at this time, the
18       above-mentioned memo was marked
19       by the reporter as Plaintiff's
20       Exhibit 2, for identification,
21       as of this date.)
22    Q.    Ms. Verdi, I show you what we
23 have just marked as Exhibit 2, which appears
24 to be a memo from you to Chief Rios, dated
25 December 31st, 2007; is that the memo that

Page 9

1          KOMPEL VERDI
2  you have referred to as having reviewed?
3     A.    Yes.
4     Q.    When did you review these two
5  documents; was it this morning or sometime
6  other than this morning?
7     A.    Yesterday.
8     Q.    And other than these two
9  documents, did you review any other
10 documents to prepare for this deposition
11 today?
12    A.    No.
13    Q.    Are you aware of the fact that
14 Mr. Figueroa has given a deposition in this
15 action?
16    A.    Yes.
17    Q.    And did you review any portion
18 of Mr. Figueroa's deposition transcript?
19    A.    No.
20    Q.    Besides counsel, did you speak
21 to anyone to prepare for this deposition
22 today?
23    A.    No.
24    Q.    Have you ever before given a
25 deposition like you are doing today?

3 (Pages 6 - 9)

Page 10

KOMPEL VERDI

1
2    A.    No.
3    Q.    Have you ever testified under
4  oath before today?
5    A.    Yes.
6    Q.    How many times?
7    A.    Twice.
8    Q.    Can you recount the
9  circumstances?
10   A.    Yes.  Narcotic seizures.
11   Q.    Both times?
12   A.    Yes.
13   Q.    And in what type of setting did
14  you testify under oath?
15   A.    Courtroom.
16   Q.    Both times courtroom?
17   A.    Yes, sir.
18   Q.    And on each occasion you
19  testified in a courtroom?
20   A.    Yes.
21   Q.    Do you remember what court or
22  courts you testified in?
23   A.    I do not.
24   Q.    Was it the United States
25  District Court?

Page 11

KOMPEL VERDI

1
2    A.    Yes.
3    Q.    And do you remember what borough
4  it was in?
5    A.    It was here.
6    Q.    Her in Brooklyn?
7    A.    Brooklyn.
8    Q.    Across the street?
9    A.    Yes.
10   Q.    How long ago did you testify in
11  each case?
12   A.    I can't recall.
13   Q.    Was it within the past five
14  years?
15   A.    No.
16   Q.    Past ten years?
17   A.    Yes.
18   Q.    Have you ever sued anyone
19  before?
20   A.    No.
21   Q.    Have you ever been sued?
22   A.    No.
23   Q.    Have you ever been convicted of
24  a crime?
25   A.    No.

Page 12

KOMPEL VERDI

1
2    Q.    Has anyone, besides what may be
3  the circumstances in this case, has anyone
4  claimed that you discriminated against him
5  or her in the work place?
6    A.    No.
7    Q.    Has anyone, besides what may be
8  the circumstances in this case, ever claimed
9  that you sexually harassed him?
10   A.    No.
11   Q.    Have ever claimed that you were
12  the victim of discrimination?
13   A.    No.
14   Q.    Have you ever claimed that you
15  were the victim of sexual harassment?
16   A.    No, sir.
17   Q.    By whom are you currently
18  employed.
19   A.    Customs & Boarder Protection.
20   Q.    How long have been employed by
21  CBP?
22   A.    Twenty-one years.
23   Q.    So that obviously would include
24  the time prior to the merger; is that
25  correct?

Page 13

KOMPEL VERDI

1
2    A.    Correct.
3    Q.    What is your current job title?
4    A.    Deputy chief officer.
5    Q.    How long have you been a deputy
6  chief?
7    A.    Since January?
8    Q.    Of 2013?
9    A.    Correct.
10   Q.    And what is your current
11  assignment?
12   A.    I'm a watch commander as of
13  yesterday.
14   Q.    As of yesterday?
15   A.    Yes.
16   Q.    What does a watch commander do?
17   A.    I take all of the
18  responsibilities of the entire airport and
19  it filters through the watch commander and
20  goes up the chain of command, so that
21  there's one central location for all
22  incidents to come through.
23   Q.    What did you do prior to
24  becoming a watch commander?
25   A.    I've been a deputy chief since

4 (Pages 10 - 13)

Page 14

KOMPEL VERDI

1
2    January.
3        Q.    Were you a deputy chief in a
4    particular branch?
5        A.    Yes. Terminal 4.
6        Q.    Were you a deputy chief in
7    Terminal 4 continuously from time you became
8    a chief in January until yesterday?
9        A.    No. I was on maternity leave
10   for three months.
11       Q.    Other than that --
12       A.    Other than that, yes.
13       Q.    During what months were you on
14   the maternity leave?
15       A.    From July through October.
16   Actually, the end of September.
17       Q.    Now, during the time that you
18   had served as deputy chief, have you had any
19   interaction with Mr. Figueroa?
20       A.    No.
21       Q.    Since you became a deputy chief,
22   has Mr. Figueroa served under your chain of
23   command?
24       A.    No.
25       Q.    During the time that you served

Page 15

KOMPEL VERDI

1
2    as a deputy chief in Terminal 4, do you know
3    if Mr. Figueroa has been assigned overtime
4    responsibilities in Terminal 4?
5        A.    I do not.
6        Q.    But even if he had been, you had
7    no interaction with him during those times;
8    is that correct?
9        A.    Correct.
10       Q.    How did it come about that you
11   became a deputy chief in January of 2013?
12       A.    I applied for the position.
13       Q.    And can you describe the
14   application process?
15       A.    Sure. I -- it's a computer
16   application process. You file the
17   application on-line. You have to take a
18   test prior and you can take the test at any
19   point. Your score goes toward the
20   application and then you go through an
21   interview.
22       Q.    And who interviewed you?
23       A.    Chief Nasauer.
24       Q.    And do you know who selected you
25   as assistant chief?

Page 16

KOMPEL VERDI

1
2        A.    I do not. As a chief.
3        Q.    I'm sorry.
4        A.    A deputy chief.
5        Q.    Deputy chief. I'm sorry.
6            Prior to becoming a deputy chief
7    in January of 2013, what was your job title?
8        A.    Supervisory Customs and Boarder
9    Protection Officer.
10       Q.    How long did you serve as an
11   SCBPO?
12       A.    From 2006 to 2013.
13       Q.    When in 2006?
14       A.    August of 2006.
15       Q.    And what were your duties and
16   responsibilities as a supervisory officer?
17       A.    From August of 2006 through,
18   till about September of 2011 I was assigned
19   to the mail branch and I was in charge of
20   overseeing the duties and responsibilities
21   of the officers, including their assignments
22   on the work floor.
23       Q.    Were you considered the direct
24   supervisor of the CBPOs?
25       A.    Some of them.

Page 17

KOMPEL VERDI

1
2        Q.    Some of them?
3        A.    Correct.
4        Q.    And you indicated that you
5    served in the mail branch until sometime in
6    2011?
7        A.    Correct.
8        Q.    What happened then?
9        A.    They reassigned me to the AT-CET
10   team.
11       Q.    And what is the CET team?
12       A.    It's the Anti-Terrorism
13   Contraband Enforcement Team. It's a team
14   where they focus on terrorism and narcotics.
15       Q.    Now, during the time you were
16   assigned to the CET team as a supervisor,
17   did you have any interaction with Mr.
18   Figueroa?
19       A.    No.
20       Q.    Now, as a supervisor on the CET
21   team, did you actually work in a particular
22   location?
23       A.    Yes.
24       Q.    What location was that?
25       A.    Building 77.

KOMPEL VERDI — Page 18

1        KOMPEL VERDI
2    Q.  Have you ever served as a
3 supervisor in passenger processing?
4    A.  No.
5    Q.  So is it fair to say that while
6 you were a supervisory officer, your two
7 assignments were to the mail branch and then
8 to the CET team?
9    A.  Correct.
10    Q.  Do you know if during the time
11 that you were supervisor over the CET team,
12 if Mr. Figueroa ever worked that assignment?
13    A.  No, he did not.  With the CET
14 team, you said?
15    Q.  Yes.
16    A.  Yes.
17    Q.  How did it come about that you
18 original became a supervisory officer?
19    A.  Same as the process of deputy
20 chief.
21    Q.  Can you describe that?
22    A.  Sure.  It's a application
23 process where you apply on-line.
24    Q.  Are you interviewed?
25    A.  No.

KOMPEL VERDI — Page 19

1        KOMPEL VERDI
2    Q.  And do you know who selected you
3 as a supervisory customs & Broader
4 Protection Officer?
5    A.  Usually it's the port director,
6 but there are several people before that, so
7 I don't know -- other than port director I
8 don't know.
9    Q.  Are you saying that there were
10 recommending officials and selecting
11 official?
12    A.  Correct.
13    Q.  Do you know who the selecting
14 official is?
15    A.  Selecting is usually the port
16 director and the DFO?
17    Q.  And do know who that was in your
18 situation?
19    A.  The port director was Camille
20 Polomini and the DFO at the time was Susan
21 Mitchell.
22    Q.  And do you know who recommended
23 your appointment as a supervisory officer?
24    A.  No.
25    Q.  Now, prior to becoming the

KOMPEL VERDI — Page 20

1        KOMPEL VERDI
2 Supervisory Customs and Broader Protection
3 Officer, do I take it that you were a CBPO?
4    A.  Yes.
5    Q.  And how long had you served as a
6 CBPO?
7    A.  The Legacy Agency from 1998
8 until the merger in 2001 and then a regular
9 CBP officer from 2001 through 2006.
10    Q.  And immediately prior to
11 becoming a supervisor, where were you
12 assigned?
13    A.  Several locations.  I worked in
14 the mail branch, I worked in AT-CET, I
15 worked in Terminal 4 and the other terminals
16 as well, the whole passenger processing
17 division.
18    Q.  Was that all at JFK?
19    A.  Yes.
20    Q.  Have you ever been assigned to a
21 location, other than JFK?
22    A.  Yes.
23    Q.  When was that?
24    A.  Several times.  August of 2007
25 through January of 2008.

KOMPEL VERDI — Page 21

1        KOMPEL VERDI
2    Q.  Was that a temporary detail?
3    A.  Yes.
4    Q.  To where?
5    A.  Penn Plaza, our field office.
6 Again, in April of 2009 I believe through
7 August of 2009 and then again in December of
8 2009 through January of 2010.
9    Q.  Were all those temporary
10 details?
11    A.  Yes.
12    Q.  But even during those times, did
13 your permit duty station remain JFK?
14    A.  Yes.
15    Q.  So has JFK been your permanent
16 duty station the entire time that you were
17 either a customs inspector or CBPO?
18    A.  Yes.
19    Q.  This may be a dumb question, but
20 I have to get it on the record, what do you
21 consider your gender to be?
22    A.  Female.
23    Q.  What do you consider your race
24 to be?
25    A.  Asian.

6 (Pages 18 - 21)

KOMPEL VERDI

1
2    Q.    And what you consider your
3  national origin to be?
4    A.    Indian.
5    Q.    Have you have ever engaged in EO
6  activity?
7    A.    No.
8    Q.    During your employment with the
9  either customs or CBP, have you ever been
10 written up for disciplinary action?
11   A.    No.
12   Q.    Have you ever been reprimanded?
13   A.    No.  Other than this incident,
14 no.
15   Q.    Counseled?
16   A.    No.
17   Q.    Suspended?
18   A.    No.
19   Q.    So other than what we have been
20 the situation with this incident, as far as
21 you're concerned, you have never been
22 disciplined; is that correct?
23   A.    Correct.
24   Q.    Now, we have referred to Mr.
25 Figueroa a few times.  When did you first

KOMPEL VERDI

1
2  meet Mr. Figueroa?
3    A.    Whatever year he became an
4  officer or inspector, either one.
5    Q.    And prior to you becoming a
6  supervisor, were you and he and coworkers?
7    A.    Yes.
8    Q.    And were you assigned to the
9  same branch together?
10   A.    I don't recall.  I don't know
11 where he was assigned.
12   Q.    Now, were you ever assigned to
13 passenger processing as a CBPO?
14   A.    Yes, sir.
15   Q.    And do you know if you were
16 assigned to passenger processing at the same
17 time Mr. Figueroa was assigned to passenger
18 processing?
19   A.    Yes.
20   Q.    And were you?
21   A.    Yes.
22   Q.    Now, do you know for what period
23 of time both you and he were assigned to
24 passenger processing at the same time?
25   A.    I could tell when I was

KOMPEL VERDI

1
2  assigned, but I don't know when he was
3  assigned.
4    Q.    Now, during the time that you
5  both worked in passenger processing, did you
6  ever work with Mr. Figueroa?
7    A.    Yes.
8    Q.    On what type of circumstances?
9    A.    Both officers on the work floor.
10   Q.    Describe the nature of the
11 interaction you had with Mr. Figueroa during
12 the time that you both served in mail
13 branch?
14   A.    In the mail branch?
15   Q.    I mean passenger processing.
16 I'm sorry.
17   A.    Either I was assigned to the
18 work floor, the control point or we have
19 various assignments.  Both of us had similar
20 assignments.  So either he would run the
21 work floor and I would be a belt or on
22 control or vise versa, because it was all on
23 the custom side at the time.
24   Q.    So do I take it that there were
25 times when both you and he worked on the

KOMPEL VERDI

1
2  same team together, the same assignment?
3    A.    Well, passenger is not one of
4  the specialized teams, we just call it a
5  branch, but yes.
6    Q.    But you and he had to work
7  together; is that correct?
8    A.    Correct.
9    Q.    And how did the two of you get
10 along while you worked together in the
11 passenger processing?
12   A.    Fine.  Just cordial.
13   Q.    Did you ever have any
14 disagreements with Mr. Figueroa at the time
15 that you both worked in passenger
16 processing?
17   A.    No.  Not that I can recall.
18   Q.    During the time that you both
19 worked in passenger processing, did you and
20 he ever socialize outside of the office?
21   A.    Never no.
22   Q.    Did you and he ever, under
23 whatever circumstances, see each other
24 outside of the work place?
25   A.    No.

7 (Pages 22 - 25)

KOMPEL VERDI                                    Page 26

1          KOMPEL VERDI
2          MR. LYNCH: Objection. You
3     can answer.
4     A. No.
5     Q. Did you ever go to any agency
6 functions outside the work place together or
7 at the same time?
8          MR. LYNCH: Objection. You
9     can answer.
10     A. No.
11     Q. Now, sitting here today, did you
12 and Mr. Figueroa have any disputes or issues
13 while you both worked in passenger
14 processing?
15     A. No.
16     Q. Now, at some point in time you
17 became a supervisor; is that correct?
18     A. Yes.
19     Q. Now, at the time you became a
20 supervisor, were you still working in
21 passenger processing?
22     A. No.
23     Q. Where were you working?
24     A. The mail branch.
25     Q. Immediately before you became a

KOMPEL VERDI                                    Page 27

1 supervisor?
2     A. AT-CET.
3     Q. And your first assignment as a
4 supervisor was in the mail branch; is that
5 correct?
6     A. Yes.
7     Q. And at the time you became a
8 supervisor in the mail branch, was Mr.
9 Figueroa assigned to the mail branch?
10     A. I don't recall when he started
11 the mail branch.
12     Q. At some point in time was he
13 assigned to the mail branch?
14     A. Yes.
15     Q. During the time that Mr.
16 Figueroa or at some point in time while he
17 was assigned to the mail branch, were you
18 his immediate supervisor?
19     A. No.
20     Q. Were you ever his immediate
21 supervisor?
22     A. No.
23     Q. Did you ever have any
24 interaction with Mr. Figueroa while he and

KOMPEL VERDI                                    Page 28

1 you were assigned to the mail branch?
2     A. Yes.
3     Q. Describe the nature of that
4 interaction.
5     A. I was the floor supervisor or
6 the duty supervisor. Everybody rotates
7 shifts and at that time I would either be
8 what we call in the block house to accept
9 signatures for -- everyone signs in, so
10 either for that, I would accept leave slips,
11 I made assignments. If there were
12 incidents, I was in charge of the incident,
13 if I was the duty supervisor.
14     Q. And that was the nature of you
15 as supervisor, he as an officer, the
16 interaction that you had, the general
17 nature; is that correct?
18     A. Yes, sir.
19     Q. Now, during what period of time
20 was that?
21     A. From whenever he started the
22 mail branch, whether before me or after,
23 until April of 2000 -- I believe it was
24 2008.

KOMPEL VERDI                                    Page 29

1     Q. What happened then?
2     A. One moment. Let me just see.
3 It's either April of 2008 or April of 2007.
4 I can't recall the exact date.
5     Q. But in any case, what happened
6 then?
7     A. Mr. Figueroa switched
8 assignments.
9     Q. Do you know where he switched
10 to?
11     A. I believe cargo.
12     Q. How do you know that he switched
13 assignments?
14     A. Because I was told.
15     Q. Who told you?
16     A. Ms. Rios.
17     Q. Now, from that time forward, did
18 you perform any supervisory duties with
19 reference Mr. Figueroa?
20     A. Between which time frame?
21     Q. From April or --
22     A. Whatever the time he left?
23     Q. Whatever that time was going
24 forward?

8 (Pages 26 - 29)

Page 30

KOMPEL VERDI

1   KOMPEL VERDI
2   A.   No, sir.
3   Q.   From whatever that time was,
4 April '07 or April '08 --
5   A.   Right.
6   Q.   -- have you since had any
7 interaction, whatsoever, with Mr. Figueroa?
8   A.   No.
9   Q.   Between that date, whatever it
10 was and today, have you seen Mr. Figueroa?
11       MR. LYNCH:  Objection.  You
12     can answer.
13   A.   Yes.
14   Q.   Under what circumstances?
15   A.   Just passing in the parking lot,
16 in the hallway, whichever.
17   Q.   Other than just casually passing
18 each other, have you had any interaction
19 with him since the time he left the mail
20 branch?
21   A.   No.
22   Q.   And during those casual
23 occurrences that you have just described,
24 have you and he spoken?
25   A.   No.

Page 31

1   KOMPEL VERDI
2   Q.   Since the time that Mr. Figueroa
3 left the mail branch, whether April '07 or
4 April of '08, have you spoken to Mr.
5 Figueroa at all?
6   A.   No, sir.
7   Q.   Now, during the time that you
8 had some type of supervisory role with
9 reference to Mr. Figueroa, as you have just
10 described while in the mail branch, how did
11 you and he get along?
12   A.   Fine.
13   Q.   Did you and he have any
14 disagreements during the time that you
15 served as a supervisor in the mail branch?
16   A.   Other than this incident?  No.
17   Q.   During the time that you served
18 as a supervisor and he an officer in the
19 mail branch, did you have the occasion to
20 observe his job performance?
21   A.   Yes.
22   Q.   And how would describe his job
23 performance?
24   A.   Average.
25   Q.   What do you mean by average?

Page 32

1   KOMPEL VERDI
2   A.   He did exactly what he was told
3 to do.  I wouldn't say above and beyond.  I
4 wouldn't say he did less than anybody else.
5 He did exactly what he was told and didn't
6 dispute it at that point.
7   Q.   Now, sitting here today, is
8 there anything that stands out in your mind
9 that you believe was critical of Mr.
10 Figueroa's job performance and I'm not
11 talking about this incident, but critical of
12 his job performance.
13       MR. LYNCH:  Objection.  You
14     can answer.
15   A.   What do you mean specifically?
16   Q.   Let me withdraw the question.
17       Is there anything that you
18 perceived that was critical of his job
19 performance?
20       MR. LYNCH:  Objection.  You
21     can answer.
22   A.   Critical as in -- the entire job
23 is a law enforcement job.  The job is
24 critical.
25   Q.   I don't mean critical in that

Page 33

1   KOMPEL VERDI
2 way.  Let me withdraw the question.
3       Did you have any criticisms of
4 his job performance at the time?
5       MR. LYNCH:  Objection.  You
6     can answer.
7   A.   Not positive or negative.
8   Q.   How was it determined which
9 officer would work on Thanksgiving and
10 Christmas in 2007?
11   A.   In 2007 I had a -- the
12 assignment of giving out holidays and it was
13 a very lengthy process, in which I laid out
14 several different aspects and then once I
15 finished I had three managers review what I
16 had done to make sure that it was fairly
17 done.
18   Q.   So what, if any, role did you
19 have with reference to the determination of
20 which officers would have which holidays off
21 in 2007?
22   A.   At first I handed out the
23 sheets.  It was called a preference sheet.
24 We allowed the officers to put a 1 through
25 10 on what they prefer to work and what they

9 (Pages 30 - 33)

Page 34

KOMPEL VERDI

1
2 not prefer to work. Then I put them in
3 seniority order by officer.
4          At the time there was probably,
5 I would like to say forty, forty-five
6 officers assigned to the branch. Then we
7 broke it down into groups of the ten
8 holidays and officer safety and the needs of
9 the service.
10     Q.   And did you, in fact, have the
11 responsibility of determining which officers
12 worked which holidays in 2007?
13     A.   Yes, I did.
14     Q.   Who delegated that
15 responsibility to you?
16     A.   Chief Rios.
17     Q.   When did Chief Rios delegate
18 that responsibility to you?
19     A.   Whenever the assignment was
20 given to me. It was probably August or
21 September of that year.
22     Q.   Of '07?
23     A.   Yes.
24     Q.   Did your determination of the
25 holidays include Thanksgiving in 2007?

Page 35

KOMPEL VERDI

1
2     A.   Yes.
3     Q.   And did it include Christmas in
4 2007?
5     A.   Yes.
6     Q.   And what factors determined your
7 decision making process with reference to
8 which officers would work which holidays?
9          MR. LYNCH: Objection. You
10 can answer.
11     A.   Sure. It would be based on
12 their preference of what they would like to
13 work, not work, based on their seniority,
14 based on how many officers we needed for
15 officer safety, based on how many officers
16 were needed to carry out the mission of CBP
17 at that time.
18     Q.   And were you aware of any
19 written rule, regulation or contractual
20 provision that governed holiday assignment?
21     A.   Yes. Actually -- well, there
22 was no contractual. Every other branch went
23 through a computer system where every
24 officer was assigned every holiday. The
25 mail branch did it a different way and that

Page 36

KOMPEL VERDI

1
2 wasn't something I decided. That was the
3 way the mail branch did it, to be a little
4 more fair to the officers.
5     Q.   Were you aware of any provision
6 in a union contract that concerned the
7 assignment of holidays?
8     A.   There was no union contract at
9 that time for holidays.
10     Q.   Has there been one since?
11     A.   Yes.
12     Q.   And when did a union contract
13 come into effect that provided for holiday
14 assignments?
15     A.   I can't recall.
16     Q.   Do you know what it provided
17 for?
18     A.   The way it is now is every -- if
19 you're assigned to work a regular workday
20 and a holiday falls on that day, you're
21 assigned that holiday.
22     Q.   Now, what, if any, importance
23 did seniority have in your determination as
24 to who would work what holidays?
25     A.   Middle of the road.

Page 37

KOMPEL VERDI

1
2     Q.   What do you mean middle of the
3 road?
4     A.   Officer safety comes first,
5 needs of the service and how many slats we
6 had to fill.
7     Q.   Were those the other factors
8 that you considered?
9     A.   Yes.
10     Q.   So is it your testimony that
11 seniority was not the only factor that you
12 considered?
13          MR. LYNCH: Objection. Asked
14          and answered. You can answer
15          again.
16     A.   Yes.
17     Q.   Now, with reference to seniority
18 at the time, were there officers who were
19 less senior than Mr. Figueroa?
20     A.   Yes.
21     Q.   And do you remember the names of
22 any of them?
23     A.   I can't recall.
24     Q.   Was Mr. F[Redacted] one of them,
25 Officer [Redacted]?

10 (Pages 34 - 37)

KOMPEL VERDI — Page 38

1          KOMPEL VERDI
2     A.   I would have to look at
3 seniority list to tell you.
4     Q.   You aware of an Officer [Redacted]
5 do you know if he was less senior than Mr.
6 Figueroa?
7          MR. LYNCH:  Objection.
8          MR. WOLIN:  On what grounds?
9          MR. LYNCH:  You can answer.
10         She just answered she does not
11         recall the names of the
12         officers.
13         MR. WOLIN:  Then I have a
14         right to give a specific name
15         to refresh her recollection?
16    Q.   Do you remember an Officer
17 V[Redacted]?
18    A.   I remember an Officer V[Redacted],
19 yes.
20    Q.   Do you know if Officer V[Redacted]
21 was less senior than Mr. Figueroa?
22    A.   I would have to look at the
23 seniority list.
24    Q.   Now, did Mr. Figueroa request to
25 work Thanksgiving in 2007?

KOMPEL VERDI — Page 39

1          KOMPEL VERDI
2     A.   I'd have look at his bid sheet,
3 but with this incident I would have to say
4 no.
5     Q.   And did you, in fact, assign
6 Officer Figueroa to work Thanksgiving in
7 2007?
8     A.   Apparently.
9     Q.   And what do you mean apparently?
10    A.   Apparently, because that's where
11 this incident started.
12    Q.   And why did you assign him to
13 work Thanksgiving in 2007?
14    A.   Once again, based on all the
15 factors I gave you.
16    Q.   Well, what factors particularly
17 influenced you to assign Mr. Figueroa
18 working Thanksgiving?
19         MR. LYNCH:  Objection.  Asked
20         and answered.  You can answer
21         again.
22    A.   The same thing.  How many
23 officers we needed, how many officers were
24 necessary for officer safety and to carry
25 out the mission.  Those were the primary

KOMPEL VERDI — Page 40

1          KOMPEL VERDI
2 reasons.
3     Q.   How did you apply those factors
4 with reference to Thanksgiving in 2007?
5     A.   First there was slots listed per
6 holiday, per the chief of the branch, the
7 number of slots were listed and then I was
8 assigned to fill in the slots.  I wasn't in
9 charge of how many slots were designated for
10 officer safety.
11    Q.   Now, with reference to the
12 slots, the number of slots and the needs of
13 the service, so you had to designate a
14 certain amount of people to work on
15 Thanksgiving with reference to those needs
16 and the manpower that was required; is that
17 correct?
18    A.   Yes.
19    Q.   So in determining who actually
20 would work, taking into consideration the
21 needs of the service, how did you actually
22 determine who would work Thanksgiving of
23 2007?
24    A.   Sure.  I took the sheets, trying
25 to put it in some sort of order.  I put them

KOMPEL VERDI — Page 41

1          KOMPEL VERDI
2 in seniority order.  I took person number
3 one and filled in their name on their
4 preference to work because, they had the
5 most seniority, so that slot would be
6 filled.  I went all the way down the line to
7 forty officers with ten holidays.
8     Q.   Is it fair to say that with
9 reference to Thanksgiving, you primarily
10 consider preferences and seniority?
11    A.   Yes.
12         MR. LYNCH:  Objection.  You
13         can answer.
14    A.   Yes.
15    Q.   Is it fair to say that with
16 receive for Thanksgiving you primary
17 considered preferences and seniority?
18    A.   Yes.
19    Q.   Would the same process have
20 applied with reference to Christmas of 2007?
21    A.   Yes.
22    Q.   And did you assign Officer
23 Figueroa with working Christmas in 2007?
24    A.   No.
25    Q.   What other holidays, besides

11 (Pages 38 - 41)

KOMPEL VERDI

Page 42

1           KOMPEL VERDI
2 Thanksgiving, did you assigned Officer
3 Figueroa with the task of working, I guess
4 in 2007 and 2008?
5     A.   I can't recall.
6     Q.   Is thanksgiving the only one you
7 recall --
8     A.   Yes.
9     Q.   Is Thanksgiving the only one
10 recall sitting here today?
11     A.   Yes.
12     Q.   Now, if less senior officers
13 than Mr. Figueroa were not assigned
14 Thanksgiving, why would that have been the
15 case?
16     A.   Excuse me?  Can you repeat the
17 question?
18     Q.   Sure.  If less senior officers
19 than Mr. Figueroa were not assigned to work
20 Thanksgiving and Mr. Figueroa was assigned
21 to work Thanksgiving, how would that have
22 happened?
23          MR. LYNCH:  Objection.  You
24          can answer.
25     A.   Two ways.  Number 1, it depends

Page 43

1           KOMPEL VERDI
2 on the tour of duty.  We were trying to be
3 fair to the officers and not move them out
4 of their regular tour of duty to accommodate
5 the slots.  The second way is if they -- the
6 way we decided to do at the mail branch, the
7 most junior person normally in a normal
8 branch, the way before the bid and rotation
9 came through, every junior officer would
10 work all the major holidays.  The way the
11 mail branch did it, we assigned however many
12 junior people to fill the slots to work one
13 major holiday.
14     Q.   Now, do you consider whether
15 that officer worked the major holidays the
16 previous year?
17     A.   No.
18     Q.   Prior to December 29th, 2007,
19 did you have any conversation with Mr.
20 Figueroa about him working on Thanksgiving?
21     A.   No.
22     Q.   Is it your testimony that the
23 incident on December 29th, 2007, was the
24 first time you and he spoke about him
25 working Thanksgiving?

Page 44

1           KOMPEL VERDI
2          MR. LYNCH:  Objection.  You
3          can answer.
4     A.   Yes.
5     Q.   Now, with particular reference
6 to Mr. Figueroa, I mean you stated in
7 general the methodology you applied, but
8 with specific reference to Mr. Figueroa
9 working Thanksgiving in 2007, what factors
10 did you consider which resulted in you
11 having him work Thanksgiving in 2007?
12          MR. LYNCH:  Objection.  You
13          can answer.
14     A.   It's the same factors and I
15 never looked at names on a sheet.  Just
16 numbers and preferences.  So it wasn't a
17 matter of picking an officer by name.  Same
18 thing, it's the officers, how many slots we
19 had, officer safety and how many we needed
20 to carry out the mission?
21     Q.   Now, you indicated that
22 preferences and seniority were the primary
23 considerations?
24     A.   That's not what I said.
25     Q.   Well, all right.  I believe the

Page 45

1           KOMPEL VERDI
2 record will reflect what you said.
3          MR. LYNCH:  Objection?  She
4          did state, she gave the three
5          factors.  Needs of the service.
6          Seniority and the other factor.
7          THE WITNESS:  Officer safety.
8          MR. LYNCH:  Officer safety.
9     Q.   What was there about officer
10 safety that dictated Mr. Figueroa work
11 Thanksgiving.
12     A.   His seniority helped determine
13 that, because he didn't have enough
14 seniority not to work a major holiday.
15     Q.   So is it your testimony that his
16 seniority with reference to Thanksgiving
17 worked against him?
18          MR. LYNCH:  Objection.  You
19          can answer.
20     A.   Sure.  If he's junior, he's
21 going to work a major holiday.
22     Q.   Even if less junior officers do
23 not have to work that major holiday?
24          MR. LYNCH:  Objection.  You
25          can answer.

12 (Pages 42 - 45)

KOMPEL VERDI

1  
2    A.   Junior officers did work major  
3  holidays.  They were assigned to other  
4  branches.  
5    Q.   What do you mean they were  
6  assigned other branches?  
7    A.   We had gotten told that all  
8  junior officers would work a major holiday,  
9  whether it was the mail branch or if the  
10  need was in the terminals.  So junior  
11  officers were assigned major holidays.  
12    Q.   Did you assign Officer Figueroa  
13  to work any other major holiday?  
14    A.   I can't recall.  If you consider  
15  the major Holidays Christmas and New Years,  
16  no, I did not.  
17    Q.   What did you consider the major  
18  holidays --  
19    A.   Those were the three major  
20  holidays.  
21    Q.   With reference to those three  
22  major holidays, were there more senior  
23  officers than Officer Figueroa who worked  
24  any of those three holidays?  
25    A.   Once again, you would have to

KOMPEL VERDI

1  
2  give me the seniority list and the sleets to  
3  look at what I did.  
4    Q.   Sitting here today, do you  
5  remember?  
6    A.   No.  
7    Q.   Now, did you become aware that  
8  Officer Figueroa complained to higher  
9  management about your assignment of him to  
10  work Thanksgiving?  
11    A.   No.  
12    Q.   Did you ever speak to Chief  
13  Jernigan about the issue of Mr. Figueroa  
14  working Thanksgiving?  
15    A.   No.  
16    Q.   Did you ever speak to deputy  
17  Chief Rios?  
18    A.   Yes.  
19    Q.   When for the first time?  
20    A.   Not specifically about him, but  
21  about everybody's assignments.  
22    Q.   When did you have that  
23  conversation with her?  
24    A.   Before I submitted the  
25  assignments.

KOMPEL VERDI

1  
2    Q.   What did she say?  
3    A.   She looked at the assignments.  
4  She said they were done fairly.  I went  
5  through it with her and two other managers  
6  and they were fine with it, signed off on it  
7  and it moved on.  
8    Q.   Who were the other two managers?  
9    A.   Ben Sciacca and Charlie Mattina.  
10    Q.   Did you ever speak to any of  
11  them specifically about Mr. Figueroa working  
12  Thanksgiving?  
13    A.   No.  
14    Q.   Did you speak to anybody  
15  specifically about Mr. Figueroa working  
16  Thanksgiving?  
17    A.   No.  
18    Q.   Did you communicate in any  
19  fashion, whatsoever, including E-mail, about  
20  Mr. Figueroa working Thanksgiving?  
21    A.   No.  
22    Q.   Do you have knowledge that Mr.  
23  Figueroa did complain about your assignment  
24  of him on Thanksgiving?  
25    MR. LYNCH:  Objection.  You

KOMPEL VERDI

1  
2  can answer.  
3    A.   It's the same thing you asked me  
4  a few minutes ago and I said, "No."  
5    Q.   Sitting here today, do you know  
6  now have knowledge that he complained about  
7  your assignment of him?  
8    MR. LYNCH:  Objection.  You  
9  can answer.  
10    A.   No.  
11    MR. WOLIN:  I have a few  
12  calls to make.  Let's take a  
13  few second break.  
14    (Whereupon, at this time a  
15  brief recess was taken.)  
16    Q.   Do you know what major holiday  
17  Officer F[Redacted] worked in 2007?  
18    A.   I do not.  
19    Q.   Do you know if he worked  
20  Christmas?  
21    A.   I don't know.  
22    Q.   Do you remember his originally  
23  being assigned to work on Christmas, then  
24  you giving him the day off?  
25    A.   I don't recall.

13 (Pages 46 - 49)

Page 50

KOMPEL VERDI

1
2    Q.   Now, I want to direct your
3    attention to December 20, 2007.  On that day
4    were you and Mr. Figueroa both assigned to
5    the mail branch?
6    A.   Yes.
7    Q.   And on that day some kind of
8    interaction occur between you and Mr.
9    Figueroa?
10   A.   Correct.
11   Q.   What shift were you working on
12   that day?
13   A.   I believe four to midnight.
14   Q.   Do you know what shift he was
15   working?
16   A.   He was usually four to midnight.
17   Q.   Approximately, what time of day
18   did this interaction occur?
19   A.   The actual incident?  The actual
20   incident started about 9:30.
21   Q.   9:30 p.m., right?
22   A.   Correct.
23   Q.   What happened?
24       MR. LYNCH:  Objection.  You
25       can answer.

Page 51

KOMPEL VERDI

1
2       MR. WOLIN:  Objection to
3       what.  Asking her what
4       happened?
5    Q.   What happened?
6       MR. LYNCH:  It's vague.
7    A.   Well, there were -- I will start
8    from the beginning to give you an idea.
9    Q.   Yes.
10   A.   The postal service has several
11   express segregation machines and they -- we
12   assign officers to run the machines, they're
13   x-ray machines.  You can assign up to six
14   people.  Postal management called me and
15   asked me, because of the flow of the mail,
16   they only needed one person.  So I took -- I
17   personally walked over and took Mr.
18   Figueroa, as well as other officers, off the
19   assignment to reassign them, because they
20   were no longer needed at this assignment.
21       so I notified Mr. Figueroa he
22   didn't need to work there anymore.  That he
23   can come down, follow me down, he can work
24   in the enforcement cage to write up
25   seizures.  On the way down to his new

Page 52

KOMPEL VERDI

1
2    assignment I noticed he was upset or
3    agitated.  I could tell from his facial
4    express.  Nothing was said, just from his
5    facial expression.  I asked him if
6    everything was okay.
7    Q.   And where were you when you
8    asked him if everything was okay?
9    A.   Walking down to the second
10   assignment.
11   Q.   Did he respond to you?
12   A.   Yes.
13   Q.   What did he say?
14   A.   He said he wanted to talk, he
15   was not happy, he wanted to talk, but not in
16   front of everyone.
17   Q.   Now, in your estimation, who
18   sought to initiate the conversation, you an
19   Mr. Figueroa?
20       MR. LYNCH:  Objection.
21   A.   I did.
22       MR. LYNCH:  You can answer.
23   Q.   Answer it.
24   A.   I did.
25   Q.   And did Mr. Figueroa ever tell

Page 53

KOMPEL VERDI

1
2    you that he didn't want to talk to you?
3    A.   No.
4    Q.   Did he ever tell you to leave
5    him alone, that there was nothing to
6    discuss?
7    A.   No.
8    Q.   Now, Mr. Figueroa has testified
9    that you sought to speak to him on
10   approximately three occasions before you met
11   in the detention room; is that --
12       MR. LYNCH:  Objection.
13   Q.   That is what happened?
14   A.   On that day?
15   Q.   Yes.
16   A.   No.
17   Q.   So continue testifying to what
18   happened.
19   A.   So we walked down and he asked
20   to speak privately.  So I walked with him
21   into what's call the detention room.  It's a
22   private room that's monitored by video and
23   it's only accessed by certain people
24   assigned to that room or managers.  So I
25   took him into the detention room so that we

14 (Pages 50 - 53)

KOMPEL VERDI

1   can speak.
2       Q.   Now, where is the detention room
3   with reference to where you first asked him
4   to talk?
5       A.   Maybe about 200 feet.
6       Q.   And did you and Mr. Figueroa
7   both walk to that detention room together?
8       A.   Yes.
9       Q.   Was there any conversation as
10  you were walking to the detention room?
11      A.   Not once he told me he wanted to
12  speak privately.
13      Q.   Now, other than what you have
14  testified to, was there any other
15  conversation between you and Mr. Figueroa,
16  prior to entering the detention room?
17          MR. LYNCH:  Objection.  You
18          can answer.
19      A.   As far as just giving him his
20  assignment for the day.  That's about it.
21      Q.   Once you asked to speak to him,
22  was there any other conversation, other than
23  what you have already testified to, prior to
24  going into the detention room?
25

KOMPEL VERDI

1
2       A.   Just that I asked him if he was
3   okay and he said he would like to talk
4   privately.
5       Q.   Was there any other
6   conversation?
7       A.   Not that I can recall.
8       Q.   Did you tell him that you
9   thought there was a problem between the two
10  of us?
11      A.   No.
12      Q.   And why did you want to speak
13  with him on that occasion?
14          MR. LYNCH:  Objection.  She
15          didn't testify she wanted to
16          speak with him.
17      Q.   You requested to speak to him;
18  am I correct.
19      A.   I asked him what was wrong.  He
20  requested to have a conversation.
21      Q.   And did you have any idea as to
22  what was wrong at the time you asked him
23  that?
24      A.   No.
25      Q.   So it's your testimony that he

KOMPEL VERDI

1
2   is the one that wanted to have the
3   conversation?
4       A.   Yes.
5       Q.   As you were walking to the
6   detention room, did he tell you why he
7   wanted to have the conversation?
8       A.   He had mentioned that it was
9   about the holidays, but that was the end of
10  it, that he had talked about that, that he
11  wanted to speak about the holidays.
12      Q.   And he said that as you and he
13  were walking toward the detention room?
14      A.   We were just about there, yes.
15      Q.   And did you say anything in
16  response to his telling you that it was
17  about the holidays?
18      A.   No.  He wanted to talk
19  privately.
20      Q.   And did both you and he enter
21  the detention room?
22      A.   Yes.
23      Q.   Now, you indicated that there
24  was video capability in the detention room?
25      A.   Yes, sir.

KOMPEL VERDI

1
2       Q.   Was the encounter between you
3   and he tape-recorded?
4       A.   It was, however it rerecords
5   ever forty-eight hours, so by the time it's
6   been asked for it rerecord, unless you pull
7   it.
8       Q.   Did you ever review the
9   videotape?
10      A.   Never.
11      Q.   So is it your testimony the
12  video recording of the encounter between you
13  and Mr. Figueroa ceased to exist forty-eight
14  hours after it happened?
15      A.   Correct.
16      Q.   And between the time you had the
17  encounter in the detention room and
18  forty-eight hours thereafter, did you make
19  any effort to preserve the recording?
20      A.   We don't have access to that.
21  We didn't have access to touching the
22  equipment?
23      Q.   But could you have made a
24  request that it be preserved?
25      A.   Not on the weekend.

15 (Pages 54 - 57)

KOMPEL VERDI

1
2    Q.   What do you mean not on the
3   weekend?
4       A.   On the weekend. You would have
5   to wait until Monday morning, which does
6   fall in that forty-eight-hour period in case
7   it did happen, but I did not.
8       Q.   Was there any particular reason
9   why you did not?
10      A.   Because I didn't -- I wasn't
11  looking to pursue any incident at that
12  point.
13      Q.   But you did ultimately furnish a
14  report, right?
15      A.   Yes.
16      Q.   When did you furnish the report?
17      A.   A few days later.
18      Q.   On the 31st, right?
19      A.   Yes.
20      Q.   So that was still within the
21  forty-eight hours?
22      A.   No.
23      Q.   So when did you decide to
24  furnish the report?
25      A.   That day.

KOMPEL VERDI

1
2    Q.   The 31st?
3    A.   Yes, sir.
4    Q.   What time of day?
5    A.   I couldn't tell you.
6    Q.   So now the 29th was what day of
7   the week?
8    A.   Saturday.
9    Q.   And the 31st was a Monday?
10   A.   Right.
11   Q.   When did you decide to furnish
12  this report to Chief Rios?
13   A.   On the 31st.
14       MR. LYNCH: Objection.
15   Q.   Why did you decide to furnish
16  the report to Chief Rios?
17   A.   She asked for it.
18   Q.   When did she ask for it?
19   A.   On the 31st.
20   Q.   Would you have furnished the
21  report to her had she not asked for it?
22   A.   Maybe. I couldn't tell. She
23  got to me and she asked for it, so I gave it
24  to her.
25   Q.   Do you know how she learned of

KOMPEL VERDI

1
2   this incident?
3    A.   Yes.
4    Q.   How?
5    A.   By my E-mail to her and as well
6   as several officers.
7    Q.   Now, is that the E-mail that you
8   previously identified?
9    A.   Yes.
10   Q.   When did you send that E-mail to
11  her?
12   A.   On the 29th.
13   Q.   Why did you send this E-mail to
14  Chief Rios and others on the 29th?
15   A.   As to document the file.
16   Q.   Why did you want to document the
17  file?
18   A.   We document -- as managers we
19  document every incident.
20   Q.   And what was there about this
21  incident that you believed deserved to be
22  documented?
23   A.   I felt that I was threatened. I
24  was cursed at. I was demeaned. I wasn't
25  happy with the way I was treated.

KOMPEL VERDI

1
2    Q.   So under those circumstances,
3   why didn't you try to preserve the tape?
4    A.   I didn't think of the tape until
5   two days later. I'm not looking to take
6   somebody into that room just for a recorded
7   conversation. I looked for a private area,
8   that was my priority.
9    Q.   And even though you sent this
10  E-mail on the 29th to Chief Rios and others,
11  you didn't think it necessary to try to
12  preserve the tape?
13   A.   No.
14   Q.   Did you ever make any effort to
15  find out if the tape was still there?
16   A.   After not requesting for it
17  there was nothing else. I didn't request
18  it, end of story.
19   Q.   Now, would there have been a
20  procedure or protocol by which you could
21  have requested that the tape be preserved?
22   A.   Yes. I would ask Chief Rios and
23  she would go further.
24   Q.   That was not done; is that
25  correct?

16 (Pages 58 - 61)

Page 62

KOMPEL VERDI

1
2     A.   Yes.
3     Q.   Now, do you know if Chief Rios,
4  after you sent her this E-mail on the 29th,
5  made any effort to preserve the tape?
6     A.   I didn't ask her.
7     Q.   Did she ever discuss the tape
8  with you?
9     A.   No.
10    Q.   Do you know for a fact that that
11 tape no longer existed forty-eight hours
12 after the interaction?
13    A.   Yes.
14    Q.   How do you know that is a fact?
15    A.   Because that room is watched and
16 monitored for a reason by a security
17 company.
18    Q.   What's the security company?
19    A.   I couldn't tell you. I haven't
20 worked there in years.
21    Q.   So when you got into the
22 detention room, what happened?
23    A.   I let Mr. Figueroa talk and I
24 was thinking that he was going to vent and
25 he stood in front of me and in a defensive

Page 63

KOMPEL VERDI

1
2  stance pointed his finger at my face, cursed
3  at me repeatedly and told me that I screwed
4  him, that I fucked him with the holiday and
5  that I knew I was wrong. He didn't think I
6  was like that.
7     Q.   Now, how long did this encounter
8  in the detention room take?
9     A.   About fifteen, twenty minutes?
10    Q.   Were you standing, were you
11 sitting or a combination?
12    A.   Standing.
13    Q.   You were standing the whole
14 time?
15    A.   Yes.
16    Q.   How about Mr. Figueroa?
17    A.   Standing.
18    Q.   So you were both standing?
19    A.   Yes.
20    Q.   None of you sat during the
21 entire event?
22    A.   That's what standing is, yes.
23    Q.   Were there chairs in the room?
24    A.   Yes.
25    Q.   And how far were you and Mr.

Page 64

KOMPEL VERDI

1
2  Figueroa from each other?
3     A.   When we walked in the room,
4  probably a couple of feet. By the time
5  Mr. Figueroa started yelling at me, probably
6  a few inches.
7     Q.   And how large is the detention
8  room?
9     A.   Probably the size of this room.
10 Maybe a slight bit bigger.
11    Q.   Well, the record is not going to
12 be able visualize the size of this room, so
13 can you approximate it?
14    A.   It's a large room.
15    Q.   Now, can you approximate it in
16 terms of feet?
17       MR. LYNCH: Objection.
18    A.   No.
19    Q.   Now, you indicated that Mr.
20 Figueroa assumed the defensive posture, you
21 said?
22    A.   Yes.
23    Q.   Can you describe what you meant
24 by that?
25    A.   Sure. When you work for CBP you

Page 65

KOMPEL VERDI

1
2  are trained on being defensive against a
3  passenger or some threatening situations, so
4  his body was bladed with his -- his gun side
5  away from me, but his body bladed and he was
6  talking at me with his hands.
7     Q.   What do you mean he was talking
8  at you with his hands?
9     A.   I don't know how to clarify that
10 anymore.
11    Q.   Were his hands were talking?
12    A.   He was talking to me with his
13 hands pointed at my face.
14    Q.   So he was gesturing with his
15 hands as he was speaking to you?
16    A.   Yes.
17    Q.   Can you describe the hand
18 gestures that he was making?
19    A.   Yes. He was point his finger at
20 my face, cursing at me, telling me I was
21 wrong.
22    Q.   What finger did he point at you?
23    A.   I couldn't tell you.
24    Q.   Which hand was it?
25    A.   I couldn't tell you.

17 (Pages 62 - 65)

KOMPEL VERDI

2    Q.    And how far did the finger come
3 from you?
4    A.    Probably between one and two
5 inches.
6    Q.    And did you retreat at any time
7 during the encounter?
8    A.    Yes, I did.
9    Q.    How did you retreat?
10    A.    I moved back.
11    Q.    And how far did you move back?
12    A.    About two feet.
13    Q.    Did Mr. Figueroa move closer to
14 you as you moved back?
15    A.    Yes.
16    Q.    And how far was he from you?
17    A.    A few inches at each time.
18    Q.    Now, once you got into the
19 detention room, what was the first thing
20 that you remember was said?
21    A.    The whole conversation was the
22 same thing.  It was just, "You fucked me
23 with the holiday.  I didn't think you were
24 like that.  I thought we were friends.  I
25 thought, you know, why -- management is out

KOMPEL VERDI

2 to get me.  Why are you -- uh --" he just
3 kept on screaming at me and I felt
4 threatened.
5    Q.    Who spoke first?
6    A.    I let Mr. Figueroa speak so he
7 could tell me what the issue was.
8    Q.    And what did he tell you the
9 issue was?
10    A.    The holiday schedule.
11    Q.    Tell me everything you remember
12 him saying in order?
13        MR. LYNCH:  Objection.
14    Q.    In order, tell me everything you
15 remember him saying?
16        MR. LYNCH:  You can answer
17        again.
18    A.    Same thing.  We walked into the
19 room.  He said, "You fucked me with the
20 schedule.  I didn't think --" the order I
21 remember is, "I didn't think you were like
22 that.  Why -- you know, I shouldn't have to
23 work these holidays," and at that point I
24 tried to, which I did not have to do, I
25 tried to explain the process of what I did,

KOMPEL VERDI

2 which is what I explained to you earlier.
3    Q.    What did you say to him then?
4    A.    Same thing, that I took all the
5 sheets, I put them in seniority order I
6 filled in the sheets and he would not let me
7 speak.  So I let him continue.  I didn't
8 think it was worth arguing with him.  I let
9 him continue to vent.
10    Q.    Why didn't you walk out?
11    A.    Twenty minutes of it going
12 nowhere, the same conversation and starting
13 to feel threatened, I didn't want to be
14 alone in that room anymore.
15    Q.    So why did it take you twenty
16 minutes to walk out?
17    A.    Because I was trying to give the
18 person the benefit of the doubt to vent.
19    Q.    So --
20    A.    Hoping that it would make him
21 feel better to be able to talk about it.
22    Q.    So were you permitting him to go
23 on and on because you believed that he was
24 venting and would feel better about things,
25 right?

KOMPEL VERDI

2        MR. LYNCH:  Objection.  You
3        can answer.
4    A.    Yes.
5    Q.    And other than what you have
6 testified Mr. Figueroa said, what, if
7 anything else, did he say?
8    A.    That was the same conversation
9 over and over again that I can recall.
10    Q.    And what, if anything, did you
11 say, other than what you have testified to?
12    A.    I tried to defuse the situation
13 just by telling him, "Okay, well, there's
14 not much you can do based on all the factors
15 of the holidays."  And I said, "Well, you
16 screwed me over and over again."  And I said
17 to him, "I'm sorry you feel that way," and
18 we -- I told him the conversation was over
19 and I opened the door for him.
20    Q.    Now, you indicated to him that
21 you had placed everyone in seniority order?
22    A.    That was one of the factors, not
23 the only factor.
24    Q.    And did you tell him what other
25 factors were utilized?

18 (Pages 66 - 69)

Page 70

KOMPEL VERDI

1
2    A.   Yes.  I explained the same
3 process to him that I explained to you, that
4 it was based on officer safety, needs of the
5 service.  Seniority was a factor, but it was
6 not the only factor.
7    Q.   Now, I'm still a little unclear
8 on this.  What was there about the needs of
9 service, which dictated that Mr. Figueroa
10 work the Thanksgiving holiday?
11       MR. LYNCH:  Objection.  She
12 answered this few times.
13    Q.   Can you answer it again?
14       MR. LYNCH:  Answer it again.
15    A.   You're talking about a law
16 enforcement agency that deals with
17 terrorism.  The threat goes up every single
18 day.  The more officers assigned, the better
19 it is for the agency.  Every year more
20 officers were, at that point, assigned to a
21 branch.  When you have more officers you are
22 able to utilize more officers.
23    Q.   What was there about Mr.
24 Figueroa that he had to be one of the people
25 chosen?

Page 71

KOMPEL VERDI

1
2    A.   He was not picked out because it
3 was him.  It went based on the papers I had
4 in front of me.  You could put a piece of
5 tape over every persons' name and the
6 results would have been the same.
7    Q.   And those papers were the
8 seniority list; is that correct?
9    A.   It's not a seniority list.  It
10 was preference sheets.
11    Q.   And you also had this seniority
12 list; am I correct?
13    A.   Yes.  I had seniority list at
14 the time, but not with that group of papers,
15 yes.
16    Q.   Other than the seniority list
17 and the preference list, did you work off
18 any other documents in making the
19 assignments?
20    A.   Just the spreadsheet that I
21 created.
22    Q.   But that was the document you
23 created?
24    A.   Yes.
25    Q.   But the two documents you

Page 72

KOMPEL VERDI

1
2 utilized to create the spreadsheet were the
3 preference sheets and seniority sheets,
4 right?
5    A.   Yes.
6    Q.   Did you say to Mr. Figueroa
7 words to effect, "Well, you got to
8 understand, I did not mean it to turn out
9 that way"; did you say words to that effect?
10    A.   I'm sorry, no.
11    Q.   Was the COSS system discussed at
12 all during this encounter?
13    A.   No.
14    Q.   Now, is Mr. F[Redacted]'s name
15 mentioned during this encounter?
16    A.   Not that I can recall.
17    Q.   Did you say to him words to the
18 effect that, "Well, if you thought you
19 assignment process is so easy, then maybe
20 you should have done it yourself"; did you
21 say anything to that effect?
22    A.   No.
23    Q.   How did the encounter end?
24    A.   I opened the door and let Mr.
25 Figueroa out of the detention room.

Page 73

KOMPEL VERDI

1
2    Q.   Did you perceive him to calmer
3 at the end?
4    A.   No.
5    Q.   Was he still according to your
6 testimony, shouting when he left the
7 detention room?
8    A.   No.
9    Q.   Did you raise your voice at all
10 in the detention room?
11    A.   No.
12    Q.   Did Mr. Figueroa raise his
13 voice?
14    A.   Several times.
15    Q.   And you believe that was part of
16 the venting process; is that correct?
17    A.   Yes.
18    Q.   Did you use any profanity during
19 the encounter?
20    A.   No, I did not.
21    Q.   Did you use the "F" word?
22    A.   No.
23    Q.   Did you say words to the effect,
24 "I didn't fuck you out of the holiday"?
25    A.   No.

19 (Pages 70 - 73)

Page 74

```
                KOMPEL VERDI
 1
 2      Q.   Now, after this meeting or
 3  encounter took place, did Mr. Figueroa ask
 4  to leave early?
 5      A.   Yes.
 6      Q.   Did he say he felt ill?
 7      A.   Yes.
 8      Q.   And did he tell you that he felt
 9  ill?
10      A.   He said he was going home sick.
11  Those were his exact words.
12      Q.   Did he say that to you?
13      A.   Yes.
14      Q.   What, if anything, did you say
15  in response?
16      A.   I didn't say anything in
17  response.
18      Q.   Did you authorize him to leave?
19      A.   I had no choice.  He threw a
20  piece of my paper in my face and walked out.
21      Q.   Now, you say you threw a piece
22  of paper in your face.  Did you document
23  that in my of your reports?
24      A.   No.
25      Q.   Why not?
```

Page 75

```
                KOMPEL VERDI
 1
 2      A.   I didn't.
 3      Q.   Now, on the following day, which
 4  was Sunday, did you and Mr. Figueroa again
 5  speak?
 6      A.   Yes.
 7      Q.   And was that during your shift?
 8      A.   Yes.
 9      Q.   Was it the same shift?
10      A.   Yes.
11      Q.   Approximately, what time did you
12  and he speak?
13      A.   Sometime between 3:30 and 4:00.
14      Q.   And how did that conversation
15  come about?
16      A.   Mr. Figueroa walked in to sign
17  in.  Other officers were waiting to leave,
18  noticing he wanted to speak.
19      Q.   By the way, with reference the
20  encounter on the 29th --
21      A.   Correct.
22      Q.   -- were there any officers who
23  witnessed that encounter?
24      A.   Yes.
25      Q.   Who?
```

Page 76

```
                KOMPEL VERDI
 1
 2      A.   One was Officer Fasano.  The
 3  rest of the officers, they never came over
 4  to tell me who they were, but I was told
 5  there were several witnesses that went to
 6  Chief Rios.
 7      Q.   Do you know who they are?
 8      A.   No.
 9      Q.   Do you know if they ever gave
10  statements?
11      A.   I don't know.
12      Q.   Getting back to the following
13  day.
14          MR. LYNCH:  Just to clarify
15          for the record, though, when
16          you're referring to, because
17          there were two, when Mr.
18          Figueroa -- when she testified
19          he threw the leave slip at her
20          but then also the incident
21          involving the detention room,
22          so I think for record you want
23          to clarify in terms of which
24          incident.
25      Q.   Well, the throwing of the leave
```

Page 77

```
                KOMPEL VERDI
 1
 2  slip, you never reported that, right?
 3      A.   Correct.
 4      Q.   How about the incident in the
 5  detention room, were there any witnesses?
 6      A.   Yes.  Mr. Fasano and several
 7  other officers who I don't know who they
 8  are.
 9      Q.   Have you seen anyone give a
10  statement alleging that Mr. Figueroa threw a
11  piece of paper at you?
12      A.   When you're involved in an
13  incident, you only give a statement to the
14  person requesting it.  So I don't know if
15  there were any requested or given.
16      Q.   You didn't see anything after
17  the fact, did you?
18      A.   No.
19      Q.   Now, on the following day I
20  think you indicated that you and Mr.
21  Figueroa spoke at this sign-in area?
22      A.   Yes.
23      Q.   And who spoke first?
24      A.   He did.
25      Q.   What did he say?
```

20 (Pages 74 - 77)

KOMPEL VERDI

1
2    A.   Mr. Figueroa said that he wanted
3 to take a minute to apologize, that he knew
4 he had spoken to me in an incorrect manner,
5 that he wanted to forget the incident and
6 move on.
7    Q.   And what, if anything, did you
8 say?
9    A.   I didn't respond.  I said -- I
10 did.  I apologize.  I did respond.  I said
11 to him, I agreed that he was wrong and I
12 didn't go any further.
13    Q.   Did you use the word apology?
14    A.   No.
15    Q.   Did you tell him essentially,
16 well, you know, let's just forget about it?
17    A.   No, I did not.
18    Q.   Did Mr. Figueroa use the word
19 apology?
20    A.   Yes.  He apologized.
21    Q.   Apologized?
22    A.   Yes.
23    Q.   Did he say words to the effect,
24 "We are both adults.  Let's just forget
25 about it.  We can agree to disagree and

KOMPEL VERDI

1
2 let's just get on with our lives?"
3    A.   I don't remember that statement.
4    Q.   Did you believe that
5 Mr. Figueroa was being sincere?
6    A.   It didn't matter if he was or
7 not.  I didn't even think about it.
8    Q.   And why didn't you even think
9 about it?
10    A.   I didn't think about, because as
11 far as I was concerned, I felt threatened by
12 him and I just wanted him to walk out.
13    Q.   When you said you felt
14 threatened by him, you testified that you
15 were letting him vent and you never walked
16 out of the room, right?
17    A.   Correct.
18    Q.   Now, when you and he spoke the
19 day after on December 30th, did you believe
20 that Mr. Figueroa should receive
21 disciplinary action for what happened?
22    A.   I didn't think either way, but I
23 knew I should document it.
24    Q.   And why did you believe it was
25 necessary to document it after he, according

KOMPEL VERDI

1
2 to you, had apologized?
3    A.   Because he was in subordinate.
4 The entire incident on 29th was
5 insubordination.
6    Q.   How was he being insubordinate?
7    A.   By screaming at a supervisor, by
8 threatening with his hands a supervisor.
9    Q.   But you just testified that you
10 were letting him vent.
11    A.   I was letting him vent, however,
12 that doesn't mean his action have to be
13 threatening.
14    Q.   Now, did you believe that Mr.
15 Figueroa should be disciplined as a result
16 of this incident?
17    A.   Yes.
18       MR. WOLIN:  Please mark this.
19       (Whereupon, at this time, the
20       above-mentioned letter, dated
21       1/3/08, was marked by the
22       reporter as Plaintiff's Exhibit
23       3, for identification, as of
24       this date.)
25    Q.   I show you what has just been

KOMPEL VERDI

1
2 marked as Plaintiff's Exhibit 3; have you
3 ever seen that document before?
4    A.   No.
5    Q.   I haven't shown it to you yet.
6    A.   I looked at this one right
7 there.
8    Q.   Look at the one I'm showing you;
9 have you ever seen is that document before?
10    A.   No.  May I read it for a moment?
11    Q.   Sure.  Absolutely.
12    A.   Thank you.
13       (Short pause in proceedings.)
14    A.   Okay.
15    Q.   Who was Supervisor Mitnick at
16 the time?
17    A.   Supervisor at the mail branch.
18    Q.   Was he considered Mr. Figueroa's
19 immediate supervisor?
20    A.   I don't know.
21    Q.   And I want to direct your
22 specific attention to the second paragraph
23 of this document.
24    A.   Sure.
25    Q.   I'm quoting now, "I was assigned

21 (Pages 78 - 81)

KOMPEL VERDI

1        KOMPEL VERDI
2 four to twelve at the mail facility on
3 Saturday, 12/29/07. During my tour of duty
4 SCBPO Sachdeva repeatedly requested that she
5 and I have a personal discussion," and I
6 will stop right there; do you agree with
7 that statement?
8    A.   No.
9    Q.   I'm going on. "I acquiesced and
10 she and I spoke in the detention room for a
11 brief period. At the end of the
12 conversation I felt ill and told SCBPO
13 Sachdeva that I was sick. I was released
14 and went home."
15    What, if anything, do you
16 disagree with in reference to what I just
17 read?
18    A.   Sure. We did speak in the
19 detention room. He did tell me he felt sick
20 and he was -- he wasn't released. He on his
21 own took it upon himself and walked out.
22    Q.   I'm sorry, he took it upon
23 himself and walked out?
24    A.   Yes.
25    Q.   So you would have let him vent

1        KOMPEL VERDI
2 more if he didn't walk out?
3    A.   No. I would have responded to
4 his request of sick leave, but it wasn't a
5 request. The leave slip was thrown at my
6 face and he walked out, which is another act
7 of insubordination.
8    Q.   Which you never reported?
9    A.   Correct.
10    Q.   As a supervisor, wasn't it your
11 obligation to report what you viewed to be
12 acts of insubordination?
13    A.   Right. Maybe I will go back and
14 amend my statement.
15    Q.   Six years later?
16    MR. LYNCH: Objection.
17    Argumentative. Let's move on.
18    Q.   Anyway, when Mr. Figueroa
19 indicated he was sick, was that still in the
20 detention room?
21    A.   No.
22    Q.   Where were you and he when he
23 indicated that he was sick?
24    A.   It was in what we called the
25 11's office.

1        KOMPEL VERDI
2    Q.   Where is that in relation to the
3 detention room?
4    A.   It's down the hallway. It's
5 actually on the floor where the supervisor's
6 office is.
7    Q.   Now, the following paragraph
8 recounts what happened the following day.
9 "The following day as I was signing in I
10 spoke to SCBPO Sachdeva regarding the
11 previous evening's conversation. SCBPO
12 Sachdeva and I apologized to one another
13 over our erroneous misunderstanding and
14 unresolved issue. We both agreed to openly
15 discuss any issues that may arise in the
16 future to prevent any further
17 misunderstandings." Now, tell me what you
18 disagree with, if anything, with reference
19 to that paragraph?
20    A.   It sounds great, but it's -- it
21 was all one-sided. The conversation was
22 one-sided on Mr. Figueroa's behalf.
23    Q.   So when he says here that you
24 and he apologized to one another, you agree
25 with that statement?

1        KOMPEL VERDI
2    A.   I do not.
3    Q.   And when he talks about an
4 erroneous misunderstanding and unresolved
5 issue, were those terms ever used during
6 this conversation?
7    A.   No.
8    Q.   Then it says here, "We both
9 agreed to openly discuss any issues that may
10 arise in the future"; is that what happened
11 according to you?
12    A.   No.
13    Q.   Now, the following paragraph,
14 the last paragraph, he says that on January
15 3rd he was ordered by Supervisor Mitnick to
16 prepare a memo. Do you how that came about
17 that he was ordered to prepare a memo?
18    A.   No, I don't.
19    Q.   Other than the two documents
20 that you have identified, Exhibits 1 and
21 two, did you furnish any other written
22 reports concerning your interaction with Mr.
23 Figueroa?
24    A.   Yes, I did.
25    Q.   And was that to a Mr. Parisi.

22 (Pages 82 - 85)

Page 86

KOMPEL VERDI

1
2     A.   No.  I am talking about a
3 document of -- it was just a memo regarding
4 Mr. Figueroa changing his assignment without
5 management's approval.
6     Q.   When did that happen?
7     A.   January.
8     Q.   Did that directly involve the
9 encounter that we have been discussing?
10    A.   No.
11    Q.   It was a different issue?
12    A.   Yes.
13    Q.   Did you furnish any other
14 written statements concerning the issue that
15 we're discussing today?
16    A.   Mr. Parisi wrote a statement and
17 I signed it.
18    Q.   We'll get to that a second.
19        Other than that, was there
20 anything?
21    A.   Not that I can recall.
22    Q.   The statement that you gave to
23 Mr. Parisi, eventually, was written by him?
24    A.   Yes.
25    Q.   And did you make any changes to

Page 87

KOMPEL VERDI

1
2 it?
3     A.   If I did, I would have initialed
4 it.  If I didn't, then you wouldn't see my
5 initials on the pages.
6     Q.   And the report that we have, is
7 that the only version of the report that
8 exist or were there prior drafts?
9        MR. LYNCH:  Objection.  You
10        can answer.
11    A.   You would have to ask
12 Mr. Parisi.  That's the only version that I
13 have seen.
14    Q.   Well, of course, you can only
15 testify to what you know.  You haven't seen
16 any other drafts?
17    A.   No.
18    Q.   It's your testimony that if any
19 changes would have made on that statement
20 would have been initialed by you?
21    A.   Correct.
22    Q.   Now, was Mr. Figueroa ultimately
23 served with a notice a proposed suspension
24 arising from the encounter that you have
25 testified to?

Page 88

KOMPEL VERDI

1
2     A.   That's what I understand.
3     Q.   Have you ever seen that notice
4 of proposed suspension?
5     A.   Yes.
6        MR. WOLIN:  Please mark this.
7        (Whereupon, at this time, the
8        above-mentioned letter, dated
9        3/17/08, was marked by the
10       reporter as Plaintiff's Exhibit
11       4, for identification, as of
12       this date.)
13    Q.   I show you what we have just
14 marked as Exhibit 4; have you ever seen that
15 document before?
16    A.   Yes.
17    Q.   And is that what you take to be
18 the notice of proposed suspension?
19    A.   Yes.
20    Q.   Now, the proposing official was
21 Robert Meekins; is that correct?
22    A.   Yes.
23    Q.   Did you ever speak to
24 Mr. Meekins at the time about the incident
25 that occurred in December of 2007?

Page 89

KOMPEL VERDI

1
2     A.   Not that I can recall.  He was
3 my chain of my command and I spoke with Ms.
4 Rios.
5     Q.   And so the chain of command, Ms.
6 Rios was your immediate supervisory?
7     A.   Yes.
8     Q.   And Mr. Meekins was second in
9 line?
10    A.   Yes.
11    Q.   When did you speak to Ms. Rios?
12 I know obviously we have seen a couple of
13 documents that you sent to her; did you
14 otherwise speak to her about the encounter
15 with Mr. Figueroa?
16    A.   Not -- not about suspension or
17 anything like that.  That was between her
18 and upper management.  That had nothing to
19 do with me.
20    Q.   Did you speak to her about what
21 had happened?
22    A.   What had happened?  No, just in
23 the memos.
24    Q.   Other than what is in the memos,
25 you had no other communication with her; is

23 (Pages 86 - 89)

Page 90

KOMPEL VERDI

1
2 that your testimony?
3     A.   Yes.  I wasn't asked to furnish
4 anything, so it wasn't a topic of
5 conversation every day at lunch.
6     Q.   Well, I'm not saying it was.
7 I'm asking you if you spoke to her?
8     A.   No.  We didn't need to discuss
9 it.
10     Q.   Other than these two documents
11 that you have furnished, did you have any
12 other communications with her, weather
13 E-mail or otherwise --
14     A.   Every day.
15     Q.   -- concerning the events that
16 you are testifying to today?
17     A.   No.  She had told me that he was
18 going to be served a notice of suspension.
19 She didn't tell me when, she didn't tell if
20 it was served and I didn't ask for it.
21 That's for the upper management to deal
22 with, not me.
23     Q.   Did she ask your opinion as to
24 whether or not you believed Officer Figueroa
25 should be served with a notice of

Page 91

KOMPEL VERDI

1
2 suspension?
3     A.   No.
4     Q.   After December 29th, 2007, did
5 you speak to anyone about what had happened
6 on December 29th, 2007?
7     A.   Just my immediate managers via
8 the E-mail and via the memo.
9     Q.   Who are they?
10     A.   Ben Sciacca, Tim Jernigan,
11 Charlie Mattina and Armand Mitnick.
12     Q.   That's the E-mail?
13     A.   Yes.
14     Q.   Did you communicate with anyone
15 in any other fashion, after December 29,
16 2007, concerning your encounter with Mr.
17 Figueroa?
18     A.   I don't recall.
19         MR. WOLIN:  Please mark this.
20         MR. LYNCH:  Before he marks
21     that, let's take a minute.
22         (Whereupon, at this time a
23     brief recess was taken.)
24         (Whereupon, at this time, the
25     above-mentioned Letter dated

Page 92

KOMPEL VERDI

1
2     4/18/08 was were marked by the
3     reporter as Plaintiff's Exhibit
4     s 5, for identification, as of
5     this date.)
6     Q.   Before I ask you about this
7 exhibit, let me ask you a couple of other
8 questions.
9     A.   Sure.
10     Q.   Now, you testified previously
11 that on the 29th you started speaking with
12 Mr. Figueroa because he looked angry, words
13 to that effect or upset?
14     A.   Yes.
15     Q.   And he didn't say anything, but
16 it was by his expressions that you saw that?
17     A.   Yes.
18     Q.   What did you observe?
19     A.   His facial expressions.
20     Q.   Can you tell me what you those
21 facial expressions were or describe them?
22     A.   The opposite of happy.
23     Q.   I'm sorry?
24     A.   Not cheerful, down.
25     Q.   Well, can you describe what

Page 93

KOMPEL VERDI

1
2 facial expressions led you to believe that
3 he was down or not happy?
4     A.   He wasn't smiling.
5     Q.   Okay.  So if somebody doesn't
6 smile that means --
7     A.   No.  It's not even -- you know,
8 it was just not cheerful.  You could see
9 that there was something bothering him.  We
10 are in the business of noticing facial
11 expressions and he looked like something was
12 bothering him.  So as a manager I decided to
13 see.  I didn't know if it was something at
14 home, something at work, but I decided to
15 ask him, in case he wanted to talk.
16     Q.   And at that time, did you have
17 any idea that it concerned the holiday
18 assignment?
19     A.   No.
20     Q.   Now, you also indicated
21 previously that you had written a memo in
22 January of 2008 concerning Mrs. Simon?
23     A.   Yes.
24     Q.   Can you describe what that was
25 all about?

24 (Pages 90 - 93)

Page 94

KOMPEL VERDI

1
2     A.    Sure.  About a month later,
3  obviously a little less than month later,
4  apparently Mr. Figueroa did not want to work
5  with some new officers and made it clear to
6  other officers that he was not willing to
7  work with new officers and he on his own
8  decided, with another officer, to switch
9  assignments.  All assignment changes usually
10  go through a manager.
11          So the other officer came to me
12  and said this is what happened and to avoid
13  any conflict I will go take his assignment.
14     Q.    And who is that officer that
15  came to you?
16     A.    Barbara Sole (sic).
17     Q.    And who are the officers that
18  you claim he didn't want to work with?
19     A.    I don't know which officers it
20  was at this time, but that's what she told
21  me.  He doesn't want to work with new
22  officers.
23     Q.    And did you speak to Officer
24  Figueroa about that?
25     A.    No.

Page 95

KOMPEL VERDI

1
2     Q.    Do you know of any supervisors
3  spoke to him about that?
4     A.    No.
5     Q.    Did you issue any written
6  communication to Officer Figueroa about
7  that?
8     A.    No.
9     Q.    Do you know, did any supervisor?
10     A.    No.
11     Q.    Why didn't you issue a written
12  document to Officer Figueroa about what you
13  were told?
14     A.    I documented it for my file.  I
15  did not discuss it with him, because we had
16  already had an argument.  I didn't want to
17  make it worse.  I was trying to avoid any
18  sort of contact, if possible, with Mr.
19  Figueroa.
20     Q.    Why didn't you have another
21  supervisor talk to him about it?
22     A.    I don't remember if there was
23  another supervisor on duty or not.
24          MR. WOLIN:  Do you know if
25          have been provided with that

Page 96

KOMPEL VERDI

1
2  memo?
3          MR. LYNCH:  You were provided
4  with it, yes.
5     Q.    Who did you issue that memo to?
6     A.    I believe Ms. Rios.
7     Q.    And --
8     A.    Actually, it's a memo to file.
9  So it just gets typed.  It was probably an
10  E-mail to Ms. Rios and then goes in the
11  employee file.
12     Q.    Now, if it went in the
13  employee's file, doesn't the employee have
14  to be given a copy of if?
15     A.    No.
16     Q.    And was Mr. Figueroa ever given
17  a copy of it?
18     A.    I don't know.
19     Q.    Did you ever give him a copy of
20  it?
21     A.    No.
22     Q.    To your knowledge, was he given
23  a copy of it?
24     A.    I don't know.
25     Q.    Do you have any reason to

Page 97

KOMPEL VERDI

1
2  believe he was given a copy of it?
3     A.    I don't know if he was or not.
4     Q.    I want to get back to Exhibit 5;
5  Have ever seen that document before?
6     A.    No.
7     Q.    Now, I want to direct your
8  attention to the third paragraph of this
9  document and I'm quoting now.  "Since her
10  arrival to the mail branch, Ms. Sachdeva has
11  made numerous unwanted overtures toward me
12  that can only be classified as improper.
13  When Ms. Sachdeva was rebuffed, I started
14  experience negative actions on the work
15  front at her request"; do you see that?
16     A.    Yes, I do.
17     Q.    Did you ever make any type of
18  romantic overtures to Officer Figueroa?
19     A.    No.
20     Q.    Now, Officer Figueroa has stated
21  that on occasion you would bat your
22  eyelashes in his direction; did you ever do
23  that?
24     A.    No.
25     Q.    He also has stated that you

25 (Pages 94 - 97)

Page 98

KOMPEL VERDI

1
2  constantly smiled at him; did you ever do
3  that?
4      A.   No.
5      Q.   Did you ever sit down in close
6  proximity to him while he was having lunch
7  in the lunch room?
8      A.   I can't recall sitting next to
9  him, no.
10     Q.   Did you ever make comments to
11 about what he was having for lunch?
12     A.   No.
13     Q.   Now, Officer Figueroa has stated
14 on one occasion in the lunch room you placed
15 your hand on his thigh; did you ever do
16 that?
17     A.   No.
18     Q.   Now, he has also stated that you
19 looked him up and down in a seductive
20 manner; did you ever do that?
21     A.   No.
22     Q.   Did you ever want to date
23 Officer Figueroa?
24     A.   No.
25     Q.   Did you have any dating

Page 99

KOMPEL VERDI

1
2  interests in him whatsoever?
3      A.   No, sir.
4      Q.   I'm sorry?
5      A.   No.
6      Q.   Now, Officer Figueroa has
7  testified to one occasion in 2006 when he
8  had requested access to the detention room
9  and at that time you smiled and batted your
10 eyes at him; do you ever remember such an
11 incident?
12     A.   No.
13     Q.   Now, Mr. Figueroa has stated
14 that during 2006 and/or into 2007 you would
15 light up when he came into your presence;
16 did you ever do that?
17     A.   No.
18     Q.   Now, Officer Figueroa has
19 testified to another occasion in or about
20 October, November of '06 when he went into
21 your office to tell you that the another
22 supervisor wanted to see you and on that
23 occasion you smiled at him and looked at him
24 up and down; did you ever do that?
25     A.   No.  Can you repeat that?

Page 100

KOMPEL VERDI

1
2      Q.   I said on that occasion he
3  testified that you smiled at him --
4      A.   No.  Can you go back for a
5  moment?
6      Q.   Sure.  He's saying that in or
7  about October or November of 2006 he went to
8  you to tell you that another officer wanted
9  to see you.
10     A.   Because you just said another
11 supervisor.
12     Q.   I believe it was a supervisor.
13     A.   So if I'm clear, I'm in the
14 supervisor's office, but a supervisor sent
15 an officer to come get me to speak to me?
16     Q.   I don't know what the exact
17 details were, but he went into your officer
18 saying that at another location the
19 supervisor wanted to see you.
20     A.   No.
21     Q.   Now, while in the lunchroom, did
22 you ever sit next to him to the point where
23 there was no distance between the two of
24 you?
25     A.   No.

Page 101

KOMPEL VERDI

1
2      MR. LYNCH:  Objection.
3      THE WITNESS:  I'm sorry?
4      MR. LYNCH:  It's okay.
5      Q.   Did you ever press the side of
6  your body up against the side of his body --
7      MR. LYNCH:  Objection.
8      Q.   -- in the lunchroom?
9      MR. LYNCH:  You can answer.
10     A.   No.
11     Q.   At any point did you ever ask
12 where he got his lunch from?
13     MR. LYNCH:  Objection.  You
14     can answer.
15     A.   No.
16     Q.   Did Officer Figueroa ever ask
17 you out on a date?
18     A.   No.
19     Q.   Did you ever ask him out on a
20 date?
21     A.   No.
22     Q.   Now, during 2006, 2007, you were
23 the not married; am I correct?
24     A.   Correct.
25     Q.   Were you dating anyone during

26 (Pages 98 - 101)

Page 102

KOMPEL VERDI

1
2 that time?
3     A.   Probably.  I couldn't tell you
4 right now.
5     Q.   Do you remember the names of
6 anyone that you were dating during 2006,
7 2007?
8     A.   No.
9     Q.   Other than your current husband,
10 have you ever dated any employee of CBP?
11     A.   Yes.
12     Q.   How many?
13     A.   One.
14     Q.   Who?
15     A.   His name is Carlos Ortiz.  At
16 the time he was not with CBP.
17     Q.   And who was he with at the time?
18     A.   INS, immigration.
19     Q.   When was that?
20     A.   2000, 2004.
21     Q.   Do you date him during that
22 entire time?
23     A.   Yes.
24     Q.   Do you know an individual named
25 S█dact G        Redacted        ）

Page 103

KOMPEL VERDI

1
2     A.   I do.
3     Q.   Who is that?
4     A.   He was -- as far as I know, I
5 don't know if he's still works there, he's a
6 security contractor worker for the U.S.
7 Postal Service.
8     Q.   He worked at JFK?
9     A.   Yes.
10     Q.   Did you ever date him?
11     A.   No.
12     Q.   Other than the individuals that
13 you have discussed, have you ever dated any
14 other government employee?
15     A.   No.
16     Q.   During 2006, 2007, do you
17 remember the occupations of anyone else who
18 you dated?
19     A.   No.  It wasn't anybody from CBP,
20 but no.
21     Q.   How about any federal government
22 employee?
23     A.   No.
24     Q.   How about any contractor?
25     A.   No.

Page 104

KOMPEL VERDI

1
2     MR. LYNCH:  Objection.
3     A.   No.
4     MR. WOLIN:  On what basis?
5     MR. LYNCH:  Overly broad.
6     Any contractor?
7     Q.   Now, at some point in 2006,
8 2007, did you leave the mail branch for a
9 period of time?
10     A.   Except for public affairs.
11     Q.   I'm sorry?
12     A.   I was -- public affairs was in
13 2007.
14     Q.   And was that a temporary detail?
15     A.   Yes.
16     Q.   Where did you go?
17     A.   To Penn Plaza.
18     Q.   And how long were you at Penn
19 Plaza for at that time?
20     A.   August of '07 through -- I'm
21 sorry -- yeah, August of '07 through January
22 of '08.
23     Q.   Were you at the mail branch from
24 the time you became a supervisor in '06 for
25 the remainder '06, were you assigned to the

Page 105

KOMPEL VERDI

1
2 mail branch the entire time?
3     A.   Yes.
4     Q.   And until you were assigned to
5 Penn Plaza in August of '07, during '07 were
6 you at JFK the entire time?
7     A.   Yes.
8     Q.   Now, do you know supervisor
9 Chance Youngs?
10     A.   The watch commander, yes.
11     Q.   Did you ever speak to Mr. Youngs
12 about any anything to do with Mr. Figueroa?
13     A.   No.
14     Q.   Did you communicate with
15 Mr. Youngs in any way, shape or form about
16 anything having to do with Mr. Figueroa?
17     A.   No.
18     Q.   Do you know a supervisor named
19 Cano, C-A-N-O?
20     A.   Yes.
21     Q.   Did you ever speak to Supervisor
22 Cano about anything having to do with Mr.
23 Figueroa?
24     A.   No.
25     Q.   Did you communicate with

27 (Pages 102 - 105)

Page 106

KOMPEL VERDI

1   KOMPEL VERDI
2   Supervisor Cano in any way, shape or form
3   about anything having to do with Officer
4   Figueroa?
5       A.   No.
6       Q.   Now, was there an administrative
7   inquiry into Mr. Figueroa's allegations that
8   you made numerous unwanted overtures toward
9   him?
10      A.   Yes.
11      Q.   And how did you find out there
12  was an administrative inquiry?
13      A.   Mr. Parisi interviewed me.
14      Q.   Who is Mr. Parisi?
15      A.   He is a fact finder.
16      Q.   When did he interview you?
17      A.   Sometime in 2008.  The end of
18  2008.
19      Q.   And was that the first time you
20  learned that Officer Figueroa claimed that
21  he had rebuffed your overtures?
22      A.   No.
23      Q.   When was the first time you
24  learned that?
25      A.   I believe it was April of 2008.

Page 107

1   KOMPEL VERDI
2       Q.   How did you learn about it then?
3       A.   Because I have served with a
4   cease and desist letter.
5       Q.   By whom?
6       A.   By Ms. Rios.
7       Q.   And what did that cease and
8   desist letter say?
9       A.   Basically, these were the
10  charges against me and as a manager I should
11  be aware of my actions at all times and that
12  I am being investigated.
13      Q.   And what did she tell you were
14  the charges against you?
15      A.   She didn't tell me.  I read it
16  in the letter.
17      Q.   And what did the letter say were
18  the charges against you?
19      A.   Exactly what you're saying,
20  numerous overtures, unwanted overtures,
21  anything you pretty much asked me, it was in
22  the letter.
23      Q.   Tell me everyone you spoke to
24  concerning Mr. Figueroa's allegations that
25  he had rebuffed your overtures?

Page 108

1   KOMPEL VERDI
2       A.   The other manager's, because
3   everybody in the mail branch, the other
4   managers in the mail branch, because they
5   were being interviewed, so they came to me.
6       Q.   Who were they?
7       A.   Ben Sciacca, Charlie Mattina,
8   Armand Mitnick, Tim Jernigan and Laura Rios.
9
10      Q.   They were all interviewed by
11  Mr. Parisi As well?
12      A.   I don't know if they were
13  directly interviewed by Mr. Parisi, but
14  Mr. Rios spoke with them as well.  But
15  Mr. Parisi was supposed to speak with them,
16  because he asked me for their names.
17      Q.   So they approached you after
18  they learned that there was an investigation
19  ongoing.
20      A.   Yes.
21      Q.   Generally, what did each say to
22  you?
23      A.   I can't recall.
24      Q.   Can you recall generally?
25      A.   Just that they are sorry I'm

Page 109

1   KOMPEL VERDI
2   going through this.
3       Q.   Did any of them ask you what
4   happened?
5       A.   No.
6       Q.   Did anyone ask you to recount
7   any facts as to what had happened?
8       A.   No.
9       Q.   Now, who would had given their
10  names to Mr. Parisi as possible witnesses.
11      A.   Mr. Parisi asked for all the
12  managers, so I gave him a list of all the
13  managers there.
14      Q.   So did they all approach you,
15  all of these people that you have
16  identified, did they approach you after you
17  gave Mr. Parisi their names?
18      A.   They probably approached me one
19  other time and that was because my computer
20  was confiscated to check for E-mails, if I
21  had sented any E-mails to Mr. Figueroa.
22      Q.   Who confiscated your computer?
23      A.   Our own IT department.
24      Q.   And were there any E-mails?
25      A.   They never told me if there

28 (Pages 106 - 109)

Page 110

KOMPEL VERDI

1
2  were.
3     Q.    Should there have been any
4  E-mails?
5     A.    No.
6     Q.    You indicated that in April of
7  2008 you received this cease and desist
8  order from Chief Rios; am I correct?
9     A.    Correct.
10    Q.    Other than receiving that
11 writing, did you speak to Mr. Rios about the
12 allegations that Officer Figueroa had
13 rebuffed your overtures?
14    A.    No.
15    Q.    Did you speak to anyone, other
16 than the people that you have identified,
17 did you speak to anyone in management about
18 the allegation that you had made overtures
19 to Officer Figueroa?
20    A.    No.
21        MR. WOLIN:  You want to mark
22        this.
23        (Whereupon, at this time, the
24        above-mentioned letter, dated
25        9/8/08, was marked by the

Page 111

KOMPEL VERDI

1
2        reporter as Plaintiff's Exhibit
3        6, for identification, as of
4        this date.)
5     Q.    After you received the cease and
6  a desist letter from Chief Rios, did you
7  duty status change at all?
8     A.    Status change?
9     Q.    Yes.  Did you continue to
10 perform your duties as before?
11    A.    My duties as a supervisor?
12    Q.    Yes.
13    A.    Yes.
14    Q.    What did the letter say to cease
15 and desist from?
16    A.    Any action towards Mr. Figueroa,
17 any unwanted action toward Mr. Figueroa.
18    Q.    And in April of 2007, were you
19 both working in the mail branch?  I'm sorry,
20 April of 2008?
21    A.    Yes.  For a short period of time
22 at that point.
23    Q.    And at some point immediately
24 thereafter Mr. Figueroa was transferred to
25 cargo; is that correct?

Page 112

KOMPEL VERDI

1
2     A.    Yes.
3     Q.    And you continued acting as
4  supervisor in the mail branch; is that
5  correct?
6     A.    Yes.
7     Q.    Until the time that you were
8  transferred to the CET program; is that
9  correct?
10    A.    Correct.
11    Q.    I want direct your attention to
12 Exhibit 6; have you ever seen this document
13 before?  I have it here.  I'm sorry.
14    A.    No, I have not.
15    Q.    Did you ever speak to Helen
16 Ashton; do you know who Helen Ashton is.
17    A.    I know who she is.
18    Q.    Who is she.
19    A.    She is an officer.
20    Q.    And did you ever speak to her
21 about anything having to do with Officer
22 Figueroa?
23    A.    No.
24    Q.    Do you know who Margaret
25 Caropolo is?

Page 113

KOMPEL VERDI

1
2     A.    Yes.
3     Q.    Is she also an officer?
4     A.    She is.
5     Q.    Did you ever speak to her about
6  anything having to do with Figueroa?
7     A.    She spoke with me.
8     Q.    And when did she speak to you?
9     A.    After Mr. Parisi interviewed
10 her.
11    Q.    And what did she say to you?
12    A.    She just was surprised at the
13 questions Mr. Parisi was asking, because she
14 had spent a lot of time with me at the mall
15 branch.
16    Q.    Is that the only time you spoke
17 to her?
18    A.    She probably mentioned it maybe
19 one or two times after that, within the week
20 or so after that and then we never spoke
21 about it again.
22    Q.    Does that refresh your
23 recollection as to whether or not you spoke
24 to anyone else, because I asked you that
25 question before, anyone else, about Mr.

29 (Pages 110 - 113)

Page 114

KOMPEL VERDI

1
2 Figueroa's allegations?
3     A.   No.
4     Q.   Did you speak to anyone else
5 about Mr. Figueroa's allegations, other than
6 the people you have identified?
7     A.   We didn't speak about
8 allegations.  We just spoke about the fact
9 that she was interviewed and she was sorry
10 for what I was going through.  She didn't go
11 through the details of what was spoken
12 about.
13     Q.   But she was referring to Mr.
14 Figueroa's allegations that you sexually
15 harassed him, correct?
16     A.   I don't know if it was that or
17 if it was the holiday schedule.  I couldn't
18 tell you.
19     Q.   Did anyone speak to you, other
20 than the people that you have mentioned,
21 about Officer Figueroa's allegations that
22 you sexually harassed him?
23     A.   No.
24     Q.   Now, second page of this letter,
25 Exhibit 6, I believe the last paragraph on

Page 115

KOMPEL VERDI

1
2 the second page, starting with, "the
3 relationship --"
4     A.   Yes.
5     Q.   -- he says here, "the
6 Relationship with the postal police officer
7 --"
8         MR. LYNCH:  Where are you
9         reading from?
10        MR. WOLIN:  Last paragraph on
11        page 2, page 1269.
12    Q.   It says, "The relationship with
13 postal police officer lasted approximately a
14 few months.  It is at this time that SCBPO
15 Sachdeva became involved with [Redacted]
16 Mr. G[Redacted] is a security officer with the
17 firm that the post office hires to perform
18 the routine security functions that the
19 postal police are excused from due to other
20 priorities.
21        "Supervisor Sachdeva begins to
22 spend a large part of her day at
23 Mr. G[Redacted]'s security post engaged in
24 longterm conversations."  Do you agree with
25 what Mr. Figueroa says?

Page 116

KOMPEL VERDI

1
2     A.   No.
3     Q.   Did you ever spend any time with
4 Mr. G[Redacted] engaged in longterm
5 conversations?
6     A.   Not with Mr. G[Redacted] not with
7 the postal police at the same location.
8     Q.   If I asked you this before, I
9 apologize.  Did you ever date Mr. G[Redacted]?
10        MR. LYNCH:  Objection.
11    A.   No.
12    Q.   Did you ever date a postal
13 police officer?
14    A.   No.
15    Q.   Now, the privous paragraph, the
16 middle paragraph on page 2, Officer Figueroa
17 says at the end of that paragraph, "At the
18 this point in time I thought that her
19 behavior would not repeat itself in that it
20 was rumored and later confirmed by SCBPO
21 Sachdeva that she was involved with the
22 postal police officer assigned to the mail
23 branch."  Did you ever confirm to anybody
24 that you were, "Involved with postal police
25 officer"?

Page 117

KOMPEL VERDI

1
2     A.   No.  Had I been asked out on a
3 date, yes.  Had I dated him?  No.
4     Q.   Did you ever date the postal
5 police officer?
6     A.   He just asked me on a date.
7     Q.   What was the name of the postal
8 police officer that asked you on a date?
9     A.   Nick.  I don't even know his
10 last name anymore.
11    Q.   What was the first name?
12    A.   Nick.
13    Q.   I believe I asked you if they
14 ever dated a CBPO.  Did you ever ask a CBPO
15 out on a date who did not go out with you?
16    A.   No.
17        MR. LYNCH:  Objection.  You
18        can answer.
19    A.   No.
20    Q.   Did any CBPO every ask you out
21 on a date?
22    A.   I can't recall.
23    Q.   Now, the bottom of the first
24 page of this document onto the second page,
25 Mr. Figueroa talks about an incident that

30 (Pages 114 - 117)